G
A01
12-18
JACKSON

1

STATE OF MICHIGAN

2

IN THE 36TH DISTRICT COURT FOR THE CITY OF DETROIT

3

CRIMINAL DIVISION

4

5   PEOPLE OF THE STATE OF MICHIGAN,

6          -vs-                        36th District Court No.
                                        01-69486
7   JAMES A. JONES, AKA, DARIO A.      C.C. 01-13853
    BALDWIN,
8
                    Defendant.
9   _____/

10                   PRELIMINARY EXAMINATION

11

12              PROCEEDINGS HAD AND TESTIMONY TAKEN   in the

13   above-entitled cause, before the HONORABLE TRUDY DUNCOMBE

14   ARCHER, Judge, 36th District Court, at Courtroom 3038 Madison

15   Building, Detroit, Wayne County, Michigan, on Tuesday,

16   December 5, 2001.

17

18   APPEARANCES:
     For the People:          WILLIAM A. ROLLSTIN (P-40771)
19                            Wayne County Prosecutor's Office
                              1441 St. Antoine, 12th Floor
20                            Detroit, Michigan 48226-2302
                              (313) 224-5777 Fax:(313) 224-0969
21
     For the Defendant:       LEESA R. FREDERICK (P-53372)
22                            719 Griswold St., Suite 1404
                              Southfield, Michigan 48034-8279
23                            (313) 964-1300 Fax:(313) 933-2839

24          REPORTED BY:      Felicia Coleman-Jordan, RPR-CSR 3466
                              Certified Shorthand Reporter
25                            (313) 965-8726



1

```
 1    Witness                                        Page
      ----------------------------------------------------
 2
      EDWARD MARTIN:
 3
              Direct Examination by Mr. Rollstin      7
 4            Cross-Examination by Ms. Frederick      17

 5

 6

 7

 8                      -        -        -

 9              E   X   H   I   B   I   T   S

10    Indentification                   Marked   Received
      ----------------------------------------------------
11    People's Xbt 1   Medical Examiner's Report   20       21

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        Detroit, Michigan

2        Tuesday, December 4, 2001

3        P R O C E E D I N G S

4            -           -           -

5        THE CLERK:  Case number 01-69486, the People versus

6    James Alfred Jones, also known as Dario Baldwin.  The charges

7    are Count One, Murder in the First Degree, Premeditated; Count

8    Two, Assault with intent to Murder; Count Three, Felon in

9    Possession of a Firearm; Count Four, Felony Firearm.  The file

10   is also noted Habitual Offender, Third Notice.

11       The Defendant has also case number 99-66517, the

12   People versus Dario A. Baldwin, also known as James Alfred

13   Jones.  The charge is Possession of Heroin Under 25 Grams; Count

14   Two, Possession of Cocaine Under 25 Grams.

15       MR. ROLLSTIN:  Good afternoon, Judge.  William

16   Rollstin on behalf of the People.

17       MS. FREDERICK:  Good afternoon, your Honor.  Leesa

18   Frederick on behalf of Mr. Baldwin Jones.

19       MR. ROLLSTIN:  Judge, before we begin -- if I could

20   just have one minute.

21       MS. FREDERICK:  If I may address the Court on the

22   issue of the second case, the drug case, I would respectfully

23   ask that that matter be adjourned at least until tomorrow.  We

24   have several witnesses on the homicide and we won't be able to

25   get to the drug case and I'm not willing to waive it at this

1  time so could it be adjourned until tomorrow.

2  THE COURT: Why don't we wait -- are all the

3  witnesses here on both cases?

4  MR. ROLLSTIN: Yeah. I think the homicide just

5  give -- we haven't had a chance to speak about the number of

6  witnesses on the --

7  THE COURT: How many do you plan to call?

8  MR. ROLLSTIN: Two or three, Judge.

9  THE COURT: So maybe we'll be able to do them both.

10  It's 2:00 now.

11  MS. FREDERICK: Okay.

12  THE COURT: We're doing the murder first.

13  MR. ROLLSTIN: That's fine. I've sent the officer

14  in charge down to the library to have the Medical Examiner's

15  report faxed to her. Apparently it's not in her file. She's

16  going to call the Medical Examiner's Office and that usually

17  takes 15 minutes to have that done.

18  MS. FREDERICK: I believe I have it.

19  MR. ROLLSTIN: Oh, great.

20  MS. FREDERICK: I don't know how many pages of it.

21  It starts here and I believe that's where it ends.

22  MR. ROLLSTIN: Ms. Frederick is kind enough to

23  indicate she did have some of the initial reports from the

24  Medical Examiner's Office but I think for a proper exhibit we

25  should have the --

```
 1                    THE COURT:  Well then let's just do the drug case.
 2                    MR. ROLLSTIN:  Well, actually what I was going to
 3      recommend is I can started taking the testimony from the
 4      civilian witness --
 5                    THE COURT:  Well, are you sure because I don't
 6      piecemeal these cases.
 7                    MR. ROLLSTIN:  I understand, your Honor.  I think
 8      there's a 95 percent probability --
 9                    THE COURT:  Let's do the drug case first.
10                    MR. ROLLSTIN:  Sure, okay.  I haven't had a chance
11      to investigate the officers here on the drug case.
12                    THE COURT:  Exams did start at 1:30.
13                    MR. ROLLSTIN:  That's correct, Judge.
14                    THE COURT:  Well please do that.
15                    MR. ROLLSTIN:  I'll do that right now.
16                    (At 1:40 p.m., short recess taken.)
17                    (At 1:55 p.m., proceedings reconvened.)
18                    MR. ROLLSTIN:  Judge, again, I thank you for your
19      indulgence.  Officer Omke(Ph) is the officer that I'm searching
20      for.  He's not in the hallway and he doesn't appear to be signed
21      in on the day sheet.  Here's my recommendation and the Court can
22      do as it pleases obviously is to take testimony on the homicide
23      case and see where we are and go from there.
24                    THE COURT:  Well are we ready to do the homicide
25      now?
```

1          MR. ROLLSTIN:   I think we are.

2          MS. FREDERICK:   Your Honor, If I may regarding the

3    drug case, we were here on the 29th for the same matter.   It was

4    adjourned for the same reason, that the officers were not in

5    court and had not reported and I'd ask simply that that matter

6    be dismissed as for the officers failure to appear for the

7    second time.

8          THE COURT:   I will hold it until the completion of

9    this case, the end.

10          MR. ROLLSTIN:   Thank you very much.   Very well.

11          THE COURT:   Counsel, how many witnesses are still

12   in the courtroom?

13          MR. ROLLSTIN:   There's two and I'll make a motion

14   to sequester now.

15          MS. FREDERICK:   Absolutely.

16          MR. ROLLSTIN:   I'm sorry, correction.   There's one

17   right now and we'll have him step in the hallway, Judge.

18          THE CLERK:   Raise your right hand, please.   Do you

19   swear or affirm that the testimony you are about to give is the

20   truth?

21          MR. MARTIN:   Yes.

22          THE CLERK:   State your name for the record.   Have a

23   seat in the box, please.

24          MR. MARTIN:   Edward Martin.

25          THE COURT:   Before we begin, have all the witnesses

1    been sequestered, those that are going to testify either today

2    or at trial?  No one is here in the courtroom who's going to

3    testify?

4             MR. ROLLSTIN:  Judge, Ms. Frederick has indicated

5    an interest in what Mr. Martin has in his hand.  It's his

6    witness statement and I'll ask that he only refer to that if he

7    needs to refresh his memory.

8             THE COURT:  That's fine.

9                  E D W A R D   M A R T I N

10   At 2:05 p.m., witness was called by the People, sworn by the

11   Clerk, examined and testified as follows:

12                    DIRECT EXAMINATION

13   BY MR. ROLLSTIN:

14   Q.  Sir, can you tell us your name, please?

15   A.  Edward Martin.

16   Q.  Mr. Martin, how old are you today?

17   A.  Eighteen.

18   Q.  I'd like to take you back in time to the 15th of November of

19   this year and ask if you had occasion to be at the corner of

20   Heyden and Clarita Streets in the afternoon hours on that date?

21   A.  Yes.

22   Q.  Do you know a person by the name of Demetrius Perdue?

23   A.  Yes.

24   Q.  I need you to keep your voice up loud enough so that we can

25   all hear you.

```
 1                      Were you with Mr. Perdue that day?

 2   A.    Yes.

 3   Q.    Tell me, if you will, if you know a person by the name of

 4   Ahmad Akins?

 5   A.    Yes.

 6   Q.    And you also know a person by the name of Phillip Mason?

 7   A.    Yes.

 8   Q.    Were they on the -- were they near that intersection with

 9   you that day?

10   A.    Yes.

11   Q.    While you were there on that intersection, did you see

12   anybody that you know by the nickname of Fresh?

13   A.    Yeah, I seen him ride up the block.

14   Q.    You saw him ride around the block?

15   A.    He rode up the block.

16   Q.    What type of vehicle was he in when he rode up the block?

17   A.    Green Aurora.

18   Q.    All right.  Was he a driver or the passenger in that

19   vehicle?

20   A.    Driver.

21   Q.    How many people were in the vehicle with him?

22   A.    Two more.

23   Q.    I'm sorry?

24   A.    Two other people.

25   Q.    Were they men or were they women?
```

1    A.   Two men.

2    Q.   Approximately how old were they?

3    A.   About around his age.   I guess however -- probably about

4    anywhere from about 22 to probably 28.   They couldn't be no

5    older than that.

6    Q.   Can you tell the judge what race they were?

7    A.   They was black males.

8    Q.   The person that you know by the nickname of Fresh, do you

9    see him in the courtroom this afternoon?

10   A.   Uh-huh.

11   Q.   Can you point him out for us, please?

12   A.   (Indicating).

13   Q.   You're pointing to a gentleman seated to my right here?

14   A.   Yes.

15   Q.   In the white tee shirt?

16   A.   Yeah.

17          MR. ROLLSTIN:   Judge, I'll ask for the record to

18   indicate that the witness has identified Mr. James Alfred Jones,

19   also known as Dario Baldwin.

20          THE COURT:   The record will reflect.

21          MR. ROLLSTIN:   Thank you, Judge.

22   Q.   (By Mr. Rollstin, Continuing):   Before this date, the 15th

23   of November, had you ever seen Mr. Fresh before in your life?

24   A.   Yeah.

25   Q.   Whereabouts?

1    A.   Just around in the neighborhood.

2    Q.   When was the first time that you ever saw him?

3    A.   First time I ever saw him?

4    Q.   Yes?  How long before this date of November?

5    A.   I met him through Demetrius them, you know.  It was probably

6    about a year or two.  I just -- I don't know him know him like

7    that.  I know of him.

8    Q.   So the first time you had ever seen him with your own eyes

9    was approximately one to two years before this?

10   A.   Uh-huh.

11   Q.   I'm sorry?

12   A.   Yes.

13   Q.   And how many times do you think you saw him around the

14   neighborhood during this one to two years?

15   A.   I seen him a lot of times.

16   Q.   Do you know him when you see him in terms of do you

17   recognize him?

18   A.   Yeah.

19   Q.   You recognize him today?

20   A.   Yeah.

21   Q.   When he came by where you were on the block there at Heyden

22   and Clarita, tell us what type of vehicle he was driving?

23   A.   A green Aurora, a green 4-door Aurora.

24   Q.   Had you ever seen him in that vehicle before?

25   A.   Like the day before that.

1   Q.   The people that were in the car with him, do you know either

2   their nicknames or their real names?

3   A.   No, sir.

4   Q.   Had you ever seen them before in your life?

5   A.   No, sir.

6   Q.   The Aurora was on Heyden the first time you saw it?

7   A.   Yeah.

8   Q.   And would it reached -- is there a stop sign for the Heyden

9   traffic as it reaches Clarita?

10  A.   Yes, sir.

11  Q.   When the Aurora reached that intersection, which direction

12  did it go?

13  A.   It made a right.

14  Q.   Onto Clarita?

15  A.   Yes, sir.

16  Q.   Now did you speak with Mr. Jones or Fresh, as you know him

17  by, at all when he rode by on this first occasion?

18  A.   No.

19  Q.   Describe what happened as he drove by on this first

20  occasion?

21  A.   Like the guys that was in the car, they was just grimming at

22  us real hard.

23  Q.   They were what?

24  A.   Just looking at us real hard.

25  Q.   Were their windows up or down, if you remember?

1    A.   Like the front two windows was down but the back window was

2    up.

3    Q.   Did anybody say anything to anybody when they rolled by on

4    this first occasion?

5    A.   No.

6    Q.   Was Demetrius Purdue there on the corner with you on his

7    first occasion?

8    A.   Yes, sir.

9    Q.   Was Ahmad Akins with you there on the corner on this first

10   occasion?

11   A.   Yes, sir.

12   Q.   Was Phillip Mason there with you on the corner on this first

13   occasion?

14   A.   Yes, sir.

15   Q.   You said the vehicle made a right onto Clarita.  Did you

16   lose sight of it after it was on Clarita?

17   A.   I'm like -- we seen it turn the corner but we ain't pay it

18   no attention because we ain't think nothing of it.

19   Q.   All right.  Now at the time that the car rolls by on this

20   occasion, do you know where Ahmad Akins is?

21   A.   He was walking in the house.

22   Q.   Who lives on that corner house there?

23   A.   Ahmad.

24   Q.   How long is he inside the house for?

25   A.   Probably about two or three minutes.

1    Q.   Where are you when the car rolls by on the first occasion?

2    A.   I was standing down like by the sidewalk, like on the grass

3    right there by the sidewalk by the stop sign.

4    Q.   Okay.   Does Mr. Akins come back to where you are before you

5    ever see the Aurora again?

6    A.   No, he was --

7    Q.   Did Mr. Akins come out of the house?

8    A.   He was coming out the house after the car was coming back up

9    the block.

10   Q.   Let me ask this question.   You said you saw it on the first

11   occasion drive away down Clarita, correct?

12   A.   Yes.

13   Q.   I believe you said that when it drove by on the first

14   occasion, Mr. Akins was going into his home; is that right?

15   A.   Yes, sir.

16   Q.   Do you see the car again that same day?

17   A.   Yeah.

18   Q.   How much time goes by before you see the car in the second

19   occasion?

20   A.   About two or three minutes.

21   Q.   Where is Mr. Akins at when the car returns?

22   A.   Standing on the porch.

23   Q.   He's come out of the house?

24   A.   Yeah, he was coming out of the house.

25   Q.   Is Mr. Akins -- does he stay on the porch or does he

1    continue to walk in your direction?

2    A.   Yeah.   He was like coming off the porch.

3    Q.   Where is the green Aurora the first time -- I'm sorry -- on

4    the second occasion, where is it coming from?   What street?

5    A.   Coming up Heyden from Seven Mile.

6    Q.   Is that the same direction it was traveling in the first

7    time you saw it?

8    A.   Yeah.   It was coming from there.

9    Q.   Going towards Clarita?

10   A.   Yeah.

11   Q.   And, again, I'm sorry if I already asked this but how much

12   time goes by from the first time you -- from the time you see it

13   driving away from you on Clarita until you see it the second

14   time coming back on Heyden?

15   A.   About two or three minutes.

16   Q.   Where are you standing when you see it coming down Heyden

17   the second time?

18   A.   Like I was backing up from the stop sign because it was

19   coming up the block kind of fast.

20   Q.   Is Mr. Demetrius Purdue out there with you?

21   A.   Yes, sir.

22   Q.   Is Mr. Phillip Mason out there with you?

23   A.   Yes, sir.

24   Q.   As the green Aurora gets close to her the intersection of

25   Heyden and Clarita, what do you see happen?

1    A.   The guy in the back seat, the window was coming down and he

2    was turning the gun around.

3    Q.   What kind of gun did you see him have?

4    A.   It was is a rifle, an AK.

5    Q.   Did you see anybody with any other type of weapon besides

6    than one?

7    A.   No.

8    Q.   As you're seeing that window come down, is the car still

9    moving?

10   A.   It was coming to a stop at the corner.

11   Q.   All right.  As it's coming to the stop, where does the gun

12   go to?

13   A.   It's coming out the passenger side window.

14   Q.   All right.  Is it pointed at anybody?

15   A.   Yeah.

16   Q.   And who is it pointed at?

17   A.   Everybody.

18   Q.   Is it pointed at the direction of Demetrius Purdue?

19   A.   Yes, sir.

20   Q.   In the direction of Mr. Akins?

21   A.   Yes, sir.

22   Q.   In the direction of yourself?

23   A.   Yes, sir.

24   Q.   In the direction of Phillip Mason?

25   A.   Yes, sir.

1    Q.   Is the gun fired while it's pointed in the direction of

2    those four people I just named?

3    A.   Yes, sir.

4    Q.   How long does the car stay stopped at the corner there?

5    A.   Just about a second or two.

6    Q.   What does the car do at that point?

7    A.   Make another right onto Clarita.

8    Q.   As he's making that right onto Clarita, is the gun

9    continuing to fire?

10   A.   Yes, it is.

11   Q.   What are you doing now that the gunfire has begun?  What do

12   you do to try to protect yourself?

13   A.   I tried to run but I tripped in the grass.  I was just

14   rolling on the grass to avoid from jumping up being an easy

15   target.

16   Q.   Did you see anything happening that made you think you were

17   being shot at?

18   A.   Yeah.

19   Q.   What was that?

20   A.   As I was rolling, the grass -- the dirt was flying up from

21   the bullets hitting the ground where I was just laying at.

22   Q.   Mr. Akins, do you know whether he's shot at all?  Is he

23   wounded at all in this?

24   A.   Yes.

25   Q.   What part of his body is he shot at?

1   A.   He got grazed in the head.

2   Q.   Mr. Purdue, do you know if he was shot during this event?

3   A.   Yes.

4   Q.   Have you ever seen him alive since?

5   A.   No, he -- probably a hot second before he -- you know.

6   Q.   I guess my question is he didn't survive that gunshot wound;

7   is that correct?

8   A.   No, sir.

9   Q.   Approximately how many times did you hear the weapon fired

10  from the green Aurora that was being driven by the gentleman who

11  you've identified in court today?

12  A.   About 30 times.

13           MR. ROLLSTIN:   Judge, I don't have anymore

14  questions of Mr. Martin.   I would indicate though that based on

15  his testimony I believe I'll be making a motion to add two

16  additional counts of assault with intent to commit murder as it

17  relates to Mr. Martin and also Mr. Phillip Mason subject to

18  cross-examination obviously.

19           THE COURT:   Cross.

20           MS. FREDERICK:   Thank you, your Honor.

21                    CROSS-EXAMINATION

22  BY MS. FREDERICK:

23  Q.   Mr. Martin, after the incident you made a statement to the

24  police regarding what happened, didn't you?

25  A.   What happened?

1    Q.   Yes?

2    A.   About the shooting?

3    Q.   Right, I'm sorry?

4    A.   Yeah.

5    Q.   And you just stated in court that there was a gun that was

6    shown out of the passenger window.   Would that be front

7    passenger or rear passenger?

8    A.   The rear.

9    Q.   And you've seen my client from around the neighborhood?

10   A.   Yeah.

11   Q.   Did you ever have any close association with this

12   individual?

13   A.   I met him through Demetrius them and like we done been close

14   up talking and we probably smoked a blunt or something but I

15   don't know him where we done been hanging or went somewhere

16   together.   I don't know him like that.

17   Q.   During the time the car goes by the second time, were you --

18   you were concerned because you said the car was coming to a stop

19   at the corner, correct?

20   A.   Yeah.

21   Q.   What did you do when you noticed the car was stopped at the

22   corner?

23   A.   I looked up at them and they looked at us and they turned

24   the corner the first time.

25   Q.   No, this is the second time?

1    A.  Oh, the second time?

2    Q.  Uh-huh?

3    A.  Oh, I will looked up and seen the gun and everybody got to

4    responding like they got and gun and got to running and that's

5    when they got to shooting and I fell in the grass.

6    Q.  Let me back up.  What were you doing when the car went down

7    the street the first time?

8    A.  We was just standing on the corner waiting for Ahmad to

9    come outside.

10   Q.  And how many people did you note were in the car when it

11   went by the first time?

12   A.  I only know one person but it was three people in the car.

13   Q.  Can you describe for me the person that you saw driving the

14   car?

15   A.  (Indicating).

16   Q.  I want a description?

17   A.  About between 20 to 24 with french braids and brown

18   complexion.

19   Q.  Can you describe for me the individual that you said was

20   shooting from the back of the car?

21   A.  Tall light skin guy with french braids.

22   Q.  When you made your statement to the police, did you write

23   the statement out yourself or was it like an interview where

24   someone else was writing?

25   A.  It was like an interview where somebody else was writing for

1    me.

2    Q.    Did you sign the statement at the end of such time?

3    A.    No.   They ain't ask me to sign nothing.

4    Q.    Do you recall stating that the car you now describe as green

5    Aurora was something different?

6    A.    No.

7    Q.    Now just refresh my memory.   Where was Mr. Phillip Mason at

8    the time -- I mean as far as proximity to where you were?

9    A.    Probably about two or three feet away from me.

10   Q.    And what did he do?

11   A.    He took off running.

12               MS. FREDERICK:   Nothing further.

13               THE COURT:   Any redirect?

14               MR. ROLLSTIN:   No.   Thank you, Judge.

15               THE COURT:   Thank you.   You may step down.

16               (At 2:23 p.m., witness excused.)

17               MR. ROLLSTIN:   Judge, may we approach.

18               (Discussion at the bench - off the record.)

19               (People's Proposed Exhibit 1 marked for

20               identification.)

21               MR. ROLLSTIN:   Judge, for the third time today I

22   thank you for your patience.   We've got copy of the Medical

23   Examiner's Postmortem Report.   I've had that marked as Proposed

24   Exhibit Number 1.

25               I believe Ms. Frederick and I are going to

1   stipulate to the identification of the deceased in this matter,

2   that being one Demetrius Raphael Perdue.  With that stipulation,

3   I'd move for admission of Proposed Exhibit 1.

4              THE COURT:  Any objection?

5              MS. FREDERICK:  No objection, your Honor, but just

6   for purpose of exam only.

7              MR. ROLLSTIN:  May I publish this to the Court.

8              THE COURT:  Yes.

9              (People's Exhibit No. 1 admitted.)

10              MR. ROLLSTIN:  Now, Judge, I'll make my motion to

11   bind over Mr. Jones on the counts in the complaint and warrant

12   along with two additional counts and that will be as to the

13   assault with intent to commit murder counts as it relates to

14   Mr. Martin and Mr. Mason.  There's already a count for Mr. Akins

15   and I would move for two additional counts for the latter two

16   gentlemen.

17              MS. FREDERICK:  Your Honor, first of all I

18   appreciate the Court's indulgence.  With regard to the bind over

19   as charged, it has been testified here today that if Mr. Jones

20   had anything to do with this, he was not the shooter and if he

21   were involved, they have not established the requisite elements

22   for first degree premeditated murder.

23              The fact that the witness stated that he had seen

24   this individual in the neighborhood does not establish the fact

25   that there was a motivation to kill a particular individual or

1    harm a particular individual and, furthermore, your Honor, the

2    brutality of the crime is insufficient to establish premeditated

3    murder.  They need to establish premeditation and deliberation,

4    meaning they need to show this Court that this individual did in

5    fact think prior to and did in fact make a decision to harm the

6    individuals on that day.  They haven't shown that.

7         Furthermore, we have a felony firearm count and the

8    witness testified today that this individual, if he were the

9    individual in the car that he thought was driving did not in

10   fact have a gun in his hand so the felony firearm count has not

11   been made out as well, your Honor.

12        With regard to the assault with intent to murder,

13   Mr. Akins has not appeared here to testify that this individual

14   assaulted him with the intent to commit murder.  In light of the

15   fact that the People wish to amend the complaint to add the

16   other two counts, I think Mr. Akins is the added count and

17   Mr. Martin, that has yet to be established either, your Honor,

18   and based on the fact that there is some serious failure in the

19   People's proof of first degree premeditated murder, felony

20   firearm and assault with intent to commit murder with two added

21   counts of assault with intent to commit murder, we'd ask the

22   matter to be dismissed.  Thank you.

23        THE COURT:  Counsel.

24        MR. ROLLSTIN:  Just two quick points.  With regard

25   to premeditation, I cite to the Court the testimony regarding

1    the car circling the block and it came by.  There was an

2    interest in the occupants in the vehicle of those standing on

3    the corner and that they looked at them and also the car left

4    for two or three minutes, returned and immediately upon its

5    return is when the onset of the assault begin and that was a

6    total 30 rounds from a rifle from the back seat of the car.

7                With regards to the actual event itself, there was

8    testimony from Mr. Martin that the car came to a stop so that

9    the individual could begin or initiate the weapon being fired

10   and then the car making an right-hand turn onto Clarita from

11   Heyden, the weapon continued to fire and during this entire time

12   the point that I would conclude with is that the driver of the

13   car has placed the operator of the weapon into a firing position

14   allowing him to complete his mission, if you will, putting the

15   fire onto the victims of the crime.

16               The premeditation comes from the absence of the car

17   for two or three minutes.  They come by.  They see the people.

18   They come back and then immediately this all begins together

19   with the type of weapon used.  It's not as thought -- because

20   it's a rifle as described by the witness, it's not a handgun

21   that's immediately produced and it's unknown to the driver and

22   catch the driver by surprise.  I mean this is a weapon of some

23   size and obviously can't be secreted like a handgun could.

24               Also I'll turn now to the other -- well for the

25   assault with intent to commit murder argument, not every victim

23

1    has to testify for a bind over on that. The testimony of this

2    witness was that all three individuals were being fired upon and

3    I suggest to the Court that's sufficient probable cause to bind

4    over.

5           With regards to the weapons count, I'm going to

6    cite two cases and I'm quoting now from Gillespie's desk book

7    and regarding aiding and abetting, "To be guilty of felony

8    firearm the Defendant must aid or abet in the actual possession

9    of the firearm or in retaining possession, not simply aid or in

10   the underlying felony." I think that's a point we all agree on

11   and they cite People versus Johnson at 411 Michigan 50.

12          More importantly, I'm citing People versus Terry at

13   124 Michigan Appeals 656, and I'm quoting from Gillespie, actual

14   physical possession is not required to convict that the

15   Defendant had control or access to the weapon, and for probable

16   cause purposes, Judge, I would suggest to the Court that the

17   Defendant in this case although he didn't have actual

18   possession, he had a type of constructive possession in that the

19   vehicle that he's the controller of or the driver of is being

20   put into a position with an individual firing upon the victims

21   in this case and because he's the operator of that vehicle and

22   the person is putting the vehicle in a position to put a gunfire

23   onto the victims. He does have a constructive type of

24   possession of that weapon and therefore there's probable cause

25   to bind him over.

1      Does the Court have any questions?

2          THE COURT:  No, I don't.  Based upon the testimony

3      of the witnesses and the arguments of both Counsel, I am going

4      to bind Mr. Jones over as charged with the two additional counts

5      of assault with intent to murder as to Mr. Martin and Mr. Mason.

6          Arraignment date, please?

7          THE COURT OFFICER:  December 18th.

8          THE COURT:  Bond is continued.

9          MS. FREDERICK:  Thank you, Judge.

10         (At 2:45 p.m., proceedings concluded.)

11      -              -              --

12         (At 2:59 p.m., proceedings reconvened.)

13         THE CLERK:  Court is back in session.  Recalling

14      case number 01-69486, the People versus James Alfred Jones, also

15      known as Dario Baldwin.  The charges are Count One, Murder in

16      the First Degree; Count Two, Assault With Intent to Murder;

17      Count Three, Felon in Possession of Firearm; Count Four, Felony

18      Firearm; Count Five, Assault With Intent to Murder; Count Six,

19      Assault With Intent to Murder.

20         MS. FREDERICK:  Good afternoon again, your Honor.

21      Leesa Frederick on behalf of Mr. Jones.

22         MR. ROLLSTIN:  Judge, William Rollstin on behalf of

23      the People.  The reason I asked the case to be called is I

24      neglected to place into evidence a certified copy of conviction

25      regarding Mr. Jones's past CCW conviction and with that,

1    Ms. Frederick and I have agreed to stipulate to that prior
2    conviction and that would be a certified document and in the
3    last four years he's been convicted of carrying concealed weapon
4    and he's on probation now with Judge Jackson for that.
5              MS. FREDERICK:  So stipulated for exam purposes.
6              MR. ROLLSTIN:  And now I will again make my motion
7    to bind over specifically on that count because I think until
8    now there was insufficient evidence on prior conviction on that
9    count to bind over.
10             THE COURT:  The Court will bind the Defendant over
11   on felony firearm count, possession of a firearm by a felon.
12             MR. ROLLSTIN:  Correct, your Honor.
13             THE COURT:  In addition to all of the other counts.
14             MR. ROLLSTIN:  Okay.
15             THE COURT:  Including the two amended charges.
16             MR. ROLLSTIN:  Thank you, Judge.
17             MS. FREDERICK:  Thank you, Judge.
18             –              –              –
19             (At 2:50 p.m., proceedings concluded.)
20
21
22
23
24
25

R E P O R T E R ' S    C E R T I F I C A T E

STATE OF MICHIGAN )

                  ) - ss

COUNTY OF WAYNE   )


        I, FELICIA R. COLEMAN, RPR, CSR-3466, Official

Court Reporter in and for the 36th District Court, Wayne

County, State of Michigan, do hereby certify that the

foregoing pages  1 through 27, inclusive, was reduced to

typewritten form by means of Computer-Assisted Transcription

and comprise a true and accurate transcript of the

proceedings taken in the above-entitled matter, on Tuesday,

December 4, 2001.


                        FELICIA R. COLEMAN-JORDAN
                            RPR, CSR 3466
                        Official Court Reporter


Dated:  This 10th day of _____December, 2001.