1  
2  
3  
4  

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN,

5  
6  

                                    Hon. Thomas E. Jackson
                  –vs–                Case No. 01-013853

7  
8  
9  

JAMES ALFRED JONES,

                  Defendant.

10  
11  

_____/

12  

WADE HEARING

13  

PROCEEDINGS HAD AND TESTIMONY

14  

taken in the above-entitled cause before the HONORABLE THOMAS E.

15  

JACKSON, Judge, Criminal Division, Third Judicial Circuit Court,

16  

Courtroom G-1, Frank Murphy Hall of Justice, 1441 St. Antoine,

17  

Detroit, Michigan, on Friday, March 8, 2002.

18  

    APPEARANCES:

19  

                  MR. WILLIAM A. ROLLSTIN, (P40771),
                      Assistant Prosecutor,
20  
                      Appearing on behalf of the People.

21  

                  MS. LEESA R. FREDERICK, (P53372),
                      Appearing on behalf of the
22  
                      Defendant.

23  

                  –   –   –

24  

                  CLARA SHAH, CSR-2602
                  OFFICIAL COURT REPORTER

25

I  N  D  E  X

WITNESS                                                          PAGE

POLICE OFFICER JOANN MILLER

    Direct Examination by Ms. Frederick              7

    Cross-examination by Mr. Rollstin               15

    Redirect Examination by Ms. Frederick           24


POLICE OFFICER DALE COLLINS

    Direct Examination by Ms. Frederick             32

    No cross-examination by Mr. Rollstin


DENNIS SHREWSBERRY

    Direct Examination by Ms. Frederick             42

    Cross-examination by Mr. Rollstin               50

    Redirect Examination by Ms. Frederick           53

E  X  H  I  B  I  T  S

| IDENTIFICATION | MARKED | RECEIVED |
|---|---|---|
| People's Exhibit No. 1 | 15 | |
| People's Exhibit No. 2 | 16 | |
| People's Exhibit No. 3 | 56 | |

1    Friday, March 8, 2002

2    Detroit, Michigan

3    At about 10:43 a.m.

4        --    --    --

5        THE CLERK:  Case No. 01-13853,

6    People versus James Jones.  The matter is here today for

7    the motion hearing.

8        MS. FREDERICK:  Good morning,

9    Your Honor.  Leesa Frederick, appearing on behalf of

10   Mr. James Jones.  We are prepared to proceed.

11       MR. ROLLSTIN:  William Rollstin.

12       Ms. Jones -- I am sorry,

13   Ms. Frederick has filed a motion for an evidentiary

14   hearing.  I learned about this this morning.  She did

15   file it timely with my office.  I did not receive a copy

16   of it.

17           With that in mind, there are

18   witnesses that are going to be required for this motion,

19   civilians who viewed the lineup.  By way of disgression,

20   it is a Wade motion.  And --

21       THE COURT:  Before you go there,

22   let me understand.  I wasn't clear as to exactly what it

23   is that you are challenging .  You are challenging the

24   entire lineup here or are you -- or was it something

25   about somebody being shown a photograph and that that

1    may have contributed to them making a lineup.  I am not

2    sure what your motion --

3                        MS. FREDERICK:  That is

4    unfortunate, Judge.  In light of the fact that there

5    was a photo shown and the lineup --

6                        THE COURT:  No.  That is what

7    you are alleging.  Help me put the issue in focus as to

8    what it is that you are challenging.

9                        MS. FREDERICK:  I am challenging

10   the lineup, Judge.

11                        THE COURT:  The entire lineup?

12                        MS. FREDERICK:  The entire lineup.

13                        THE COURT:  Based on the makeup

14   or the lineup itself or on the fact that someone may have

15   been shown a photograph beforehand and that that would

16   possibly lead to them making a decision in the lineup

17   itself?

18                        MS. FREDERICK:  Both.

19                        THE COURT:  Okay.  All right.

20   I wasn't sure.  Go ahead.

21                        MS. FREDERICK:  We need the

22   civilian witnesses, and they are not here today.  We would

23   ask for a date either 7 or 21 days down the road.  The

24   reason I suggest those two numbers, because I won't be

25   in town in 14 days to conduct a hearing.

                            -4-

1          THE COURT:  I won't be able to

2     do it next week.

3                Go ahead, Ms. Frederick.

4                MS. FREDERICK:  The problem is

5     simple.  I have the three witnesses that I need to proceed.

6     I have hand served the civilian witnesses that he is

7     speaking of and they have chosen not to appear for whatever

8     reason.

9                I have proof of service on

10    all of the witnesses that I required.  And as I stated,

11    the show attorney is here and the two officers are here,

12    and I am prepared to proceed.

13                Mr. Rollstin was made aware

14    that the motion was coming by telephone.  I spoke to him

15    myself and requested certain information be forwarded

16    to me more than 10 days prior to today.  That he is not

17    prepared --

18                THE COURT:  I will be able to

19    go with the people that you have.

20                Who do you have right now?  Are

21    you able to deal with the persons that she has here today?

22                MR. ROLLSTIN:  There is three

23    witnesses that are here today:  Mr. Shrewsberry, Dale

24    Collins, and JoAnn Miller.  And the last two are police

25    officers,  and Mr. Shrewsberry, I am sure, are able to

-5-

1    come back.

2                        THE COURT:  We will deal with

3    those people who are here today.

4                        MS. FREDERICK:  Thank you

5    very much.

6                        THE COURT:  And we will deal

7    with the others later.

8                        Go ahead.  Please, call them.

9                        MS. FREDERICK:  Your Honor, in

10   light of the fact that of the two officers, I am assuming

11   that one is the officer in charge and the other is support,

12   I would ask that all witnesses be sequestered save for

13   the officer in charge, who will be my first witness.

14                        THE COURT:  All right.  Please,

15   let's move on.

16              J O A N N     M I L L E R      ,

17   Sworn by the Clerk, at 10:47 a.m., was examined and testified

18   upon her oath as follows:

19                        THE CLERK:  You can be seated.

20                        THE COURT:  Excuse me, who is

21   at the table?

22                        MS. FREDERICK:  I am sorry,

23   this is my colleague.  He is assisting me with the

24   permission of my client.

25                        Is that right, sir?

                              -6-

1       THE DEFENDANT:  Yes.

2       MS. FREDERICK:  His name is

3   Albert Hall Rice.

4       THE COURT:  Is he an attorney?

5       MS. FREDERICK:  Yes, he is.

6       THE COURT:  Okay.  I want to

7   see proof of that, please.

8       MS. FREDERICK:  Absolutely.

9       THE COURT:  Go ahead.

10      DIRECT EXAMINATION

11  BY MS. FREDERICK:

12  Q    Morning, Officer Miller.

13  A    Good morning.

14  Q    Let me begin by getting some background information.

15       How many years have you been

16  a police officer?

17  A    15.

18  Q    How many years have you been in Homicide?

19  A    Three.

20      THE COURT:  What is your name,

21  again?

22  A    JoAnn Miller.

23      MS. FREDERICK:  Should we back

24  up, Your Honor?

25      THE COURT:  Go ahead, please.

-7-

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

BY MS. FREDERICK:

Q    At what point did you become involved in the investigation involving Mr. James Jones?

A    I believe that would have been the day after the incident occurred.

Q    So, if the incident occurred on the 15th, you are saying about the 16th?

A    Correct.

Q    Okay.  All right.

And in what capacity did you become involved in this case, were you lead or support?

A    I am officer in charge.

Q    Okay.  Thank you.

On what day was the lineup held on this matter?

A    I would have to look at the records.  I don't know offhand.  I have got the file with me though.

Q    Please, feel free.

A    That would have been on November the 18th.

Q    Thank you.

And does your record indicate a time?

A    Yes.

Q    And that would be?

A    Approximately, 5:55 p.m.

-8-

1  Q   And if you can recall, where, exactly, was this lineup held?

2  A   The Second Precinct.

3  Q   Was there any other procedure that took place at the

4      Second Precinct on the 18th?

5  A   As far as?

6  Q   As far as this defendant?

7  A   Any other procedure other than the lineup?

8  Q   Yes?

9  A   I don't believe so.

10 Q   Okay.

11                         Had you been by the Second

12     Precinct on this matter earlier in the day?

13 A   Yes.

14 Q   Okay.

15                         And why were you at the Second

16     Precinct earlier in the day on this matter?

17 A   I believe it was to conduct the lineup.

18 Q   No, I asked had you been there prior to the lineup on

19     that day of November 18th?

20 A   Yes.

21 Q   Okay.  And you are saying that you attempted to conduct

22     the lineup two times?

23 A   Actually, I think it ended up being, about, three times

24     total.

25 Q   Okay.

                         -9-

1                          Do you recall where this

2       individual was arraigned?

3    A   At the Second Precinct.

4    Q   Okay.

5    A   Yes.

6    Q   And what time do you recall the arraignment taking place?

7    A   I believe it was that morning.  I don't know what time.

8    Q   Okay.

9                          And did you leave the Second

10      Precinct following the arraignment?

11   A   Yes.

12   Q   Okay.  When did you return to the Second Precinct the

13      first time following the arraignment?

14   A   May have been an hour, I am not sure.

15   Q   And for what purpose did you return after the arraignment?

16   A   If I am not mistaken, it was to conduct the lineup.

17   Q   Okay.

18                         Did you have occasion to leave

19      the Second Precinct to go pick up three young boys who

20      were involved or who had stated that they could identify

21      someone in this case?

22   A   Yes.

23   Q   Okay.

24                         What time did you leave to pick

25      up those witnesses?

                              -10-

1   A   I believe that was the second time.  Maybe, about, 2:30,

2       three o'clock, I am not sure.

3   Q   Okay.

4                           Do you recall the names of the

5       three witnesses that you went to pick up?

6   A   Well, I have -- I believe so.

7   Q   You, obviously, can refer to that to refresh your recollection?

8   A   Yes.  Yes.

9   Q   Okay.

10                          May I, please, have the names?

11  A   One was Edward Martin.  The other was Philip Mason.  And

12      I don't have the third one.

13  Q   Okay.

14  A   I just don't have that.  But I am sure --

15  Q   You don't have the name, but you are aware of the fact

16      that there was a third person?

17  A   Yes.

18  Q   Okay.

19                          Did any of your witnesses

20      make any comments in the witness room during the lineup?

21  A   Yes.

22  Q   Would you, please, tell me the name of that witness?

23  A   Which ones made comments?

24  Q   Yes?

25  A   All three of them made some type of comment.

                          -11-

1   Q   I understand.  I mean, I am sorry.  That is my fault.

2                           Not the identification comment

3       or the lack of identification comment, but any extraneous

4       comment?

5   A   Yes.

6   Q   Okay.  And who might that have been?

7   A   I believe that was Philip Mason.

8   Q   Okay.  And what, exactly, do you recall him saying?

9   A   I recall him saying that that is the guy that was in

10      the photo that you showed us the other day.

11  Q   And he stated -- it was Philip Mason that you stated?

12  A   I believe it was Philip Mason.  It may have been the

13      third one, but it was not Edward Martin.

14  Q   That is fine.  Okay.

15                          Now, during -- as part of the

16      answer you just gave me --

17  A   Yes.

18  Q   You are stating that he made mention of this event or

19      occurrence of the photo happening the other day?

20  A   Yes.

21  Q   And what other day might that have been if this lineup

22      took place on the 18th?

23  A   Okay.  I believe it was probably the 17th or it may have

24      been the 16th.

25  Q   And for what reason did you show these individuals a

                            -12-

1        photograph of Mr. Jones?

2    A   Well, originally, when I received the case, Mr. Jones

3        was not identified. I had a street name of Fresh. I also

4        had the information that supposedly Fresh had gotten

5        robbed the day before the shooting occurred.

6    Q   Okay.

7                     MR. ROLLSTIN: No, I would

8        ask the witness to be allowed to finish her answer.

9                     THE COURT: What is your

10       concern about her not answering that?

11                   MS. FREDERICK: My concern

12      is specifically what reason did she have to show the

13      picture.

14                   THE COURT: Isn't that what

15      she is telling us?

16                   MS. FREDERICK: She is pretty

17      much elaborating further than I would like here.

18                   THE COURT: I have no problems

19      with it. Okay. I will hear it.

20                   MS. FREDERICK: Thank you.

21                   THE COURT: Proceed. Go ahead.

22    A   I also had information that supposedly Fresh had gotten

23      robbed at a location the day before the shooting. I

24      contacted the 8th Precinct to find out if there was in

25      fact a police report made on a robbery at that location,

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1      and they did have one.

2    BY MS. FREDERICK:

3    Q   Okay.  So, basically, you are saying that in this case,

4       you felt it was okay to show three potential witnesses

5       a photograph?

6    A   I showed two potential witnesses the photograph.

7    Q   Okay.

8                   Now --

9    A   And yes, because he wasn't identified.  I didn't know

10      who Fresh was.

11    Q   Are you aware that on the date you showed the picture,

12      he was in custody?

13    A   No.

14    Q   Okay.

15               After you showed this picture,

16      was he picked out of the lineup?

17    A   Yes.

18    Q   Okay.

19               And during the time that you

20      first left to go and pick up your witnesses and the time

21      you got back, can you just estimate how many hours, minutes

22      that it took you to go and get your witnesses?

23    A   Maybe, 45 minutes, because I believe on my second time

24      back with them, I was informed that Mr. Jones had been

25      already conveyed somewhere so I took them back home.

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

Q    Okay.

How long did it take you to
drop him back off at home?

A    15, 20 minutes.

MS. FREDERICK:   Nothing further,
Your Honor.

THE COURT:   Mr. Rollstin,
anything you want to ask?

CROSS-EXAMINATION

BY MR. ROLLSTIN:

Q    What two witnesses did you show the photographs to or the
photograph to?

A    Edward Martin was one, and I am not sure if Philip Mason
was the second one but the third or the third young man
that was actually at the lineup.

Q    And do you have a picture of the photograph that you
showed those two people that day?

A    I believe I should have one in the file.

Q    Would you pull that out, please.

MR. ROLLSTIN:   Could you mark
this for me, please?

(People's Exhibit No. 1 marked
by the reporter.)

BY MR. ROLLSTIN:

Q    Ms. Miller, I am showing you proposed exhibit No. 1 here.

-15-

1                                        What is that?

2    A    This is a photograph or mug shot taken of Mr. Jones.

3    Q    Okay.   There is four pictures of him on that sheet of

4         paper, correct?

5    A    Yes.

6    Q    Did you show the witnesses one picture or that document

7         you have there?

8    A    It seems to me there was only two side by side, one face

9         and one side, but I can't recall.

10   Q    Okay.

11                                   Do you have the document you

12        showed the witness?

13   A    The photograph?

14   Q    Yes?

15   A    I believe it should be somewhere in the file.

16   Q    Okay.  Can you pull that out for us, please.  That is

17        what we need.

18   A    (Indicating.)

19   Q    Okay, great.

20                                   (People's Exhibit No. 2 marked

21                                    by the reporter.)

22   BY MR. ROLLSTIN:

23   Q    Ms. Miller, I am handing you what has been marked for

24        proposed exhibit No. 2 now.

25                                   What is that document?

                                   -16-

1   A   This is two photos.  One of a full face shot of Mr. Jones,

2       and one of a side shot.

3   Q   Okay.

4               Is that what you showed the two

5       witnesses on the 16th or 17th of November?

6   A   Yes.

7   Q   All right.

8               Did it have the writing on the

9       document, what you showed them?

10  A   Yes.

11  Q   Okay.

12              Now, when -- how did you --

13      after showing them that photograph, did either of them

14      identify that person to you?

15  A   Yes.

16  Q   As recognizing him?

17  A   Yes.

18  Q   Okay.

19              Did you -- do you remember which

20      ones recognized that picture?

21  A   I believe it was Mr. Martin that was positive.  Well, he

22      was the one that stated to me that is him.  That is Fresh.

23  Q   Okay.

24              The other person you don't

25      remember who you showed the picture to, the second

-17-

1      individual?

2   A   If I see his face.  I don't recall his name, but I know

3       he was younger than Mr. Martin.

4   Q   Okay.

5                                     Three witnesses saw the lineup,

6       right?

7   A   Yes.

8   Q   Edward Martin, correct?

9   A   Yes.

10  Q   Joseph McCirmon?

11  A   That is the third one, yes.

12  Q   And Philip Mason?

13  A   Right.

14  Q   Okay.

15                                   When you showed Edward Martin

16      the photograph --

17                          THE COURT:  What is the

18      last name?

19                          MR. ROLLSTIN:  Spelled

20      M-c-C-i-r-m-o-n.

21  BY MR. ROLLSTIN:

22  Q   The third witness was Philip Mason?

23  A   Yes.

24  Q   Those three people saw the lineup with the defendant as

25      a member of it on the 18th of November, right?

                          -18-

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

1   A   Yes.

2   Q   You showed a photograph to Edward Martin on either the

3       16th or 17th of November of the defendant, a photograph

4       of the defendant?

5   A   Yes.

6   Q   Okay.

7                   There was -- either Mr. McCirmon

8       or Mr. Mason saw that same photograph at that point in time?

9   A   Yes.

10  Q   Okay.

11                  What did Edward Martin tell

12      you about that photograph?  Where did he recognize the

13      person from?

14  A   From the scene as the driver of the car.

15  Q   Okay.

16                  Do you remember what the other

17      person told you as having recognized the person?

18  A   If I am correct, I think he just said something like that

19      is him.  That's him.

20  Q   Okay.  But you don't remember which of the other two

21      individuals said that?

22  A   I believe it was the 16-year-old.  I am not positive.

23  Q   Okay.

24                  How did you arrange to get the

25      defendant, Mr. Jones, into a lineup for the witnesses to

-19-

1      view on the 18th?

2    A   I am not sure.

3    Q   The 18th of November, there was a corporeal lineup,

4      correct?

5    A   Yes.

6    Q   That means the defendant's body is in the lineup?

7    A   Correct.

8    Q   Okay.

9                      How did you arrange to get

10   Mr. Jones personally into that lineup?

11   A   I contacted the precinct.  I contact an attorney.  And

12      I contacted the supervisor of that precinct to let them

13      know that we want to conduct a lineup.

14   Q   Okay.

15                      Now, what I am trying to get

16   you to explain for Judge Jackson is how did you locate

17   Mr. Jones?

18   A   He was already at the Second Precinct.

19   Q   Okay.  When did you learn he was at the Second Precinct?

20   A   I believe he had been arrested the day before.

21   Q   The day before what?

22   A   The day before the lineup.

23   Q   Okay.

24                      Was the date of his arrest

25   before or after you showed the photos to Mr. Martin and

1   the other person who you are uncertain of?

2 A He was arrested after the photo was shown.

3 Q Okay.

4            Was he arrested on this case

5 or another case?

6 A He was arrested on this case.

7 Q Okay.

8            Were any other photos shown

9 to Mr. Martin and the other individual who you are uncertain

10 of?

11 A No, not that I know of.

12 Q Okay.

13            With regard to the lineup itself,

14 when it was conducted, how many people were in it?

15 A I believe, five.

16 Q Okay.

17            Does that refresh your memory

18 as to the number of people in it?

19 A Yes.

20 Q Okay.

21            Was an attorney present?

22 A Yes.

23 Q Okay.

24            And was a photograph taken of

25 the array as it was presented to the witnesses?

1    A    I don't believe so.

2    Q    Why not?

3    A    I am not sure.  I can't explain that.

4    Q    Okay.

5    A    It is usually taken by the door man, but I was told later

6         that he hadn't taken one.

7    Q    Okay.

8              Did you in some way record

9         the physical descriptions of the individuals in the lineup?

10   A    Yes.

11   Q    Okay.

12             Will you tell Judge Thomas,

13        please, the height --

14             THE COURT:  Jackson.

15             MR. ROLLSTIN:  I am sorry, Judge.

16        I apologize for that.

17   BY MR. ROLLSTIN:

18   Q    Judge Jackson, the biological data that you recorded

19        on your lineup sheet?

20   A    Yes.

21             Number 1 was a black male,

22        25, 5'9" and weighed, approximately 200 pounds.  Number 2

23        was, I think, that is a 21.  I am not sure what that is.

24        He was in his twenties, early twenties, 5'11", weighed

25        175 pounds.  Mr. Jones was number 3, at 23, 5'9", 150

                           -22-

1    pounds.  Number 4 was 36 at 5'11" and 180 pounds.  And

2    number 5 was -- I can't make that out, 5'9", 170, but I

3    can't make out the age.

4    Q    Okay.

5    A    I got a bad copy.

6    Q    Edward Martin viewed the lineup, correct?

7    A    Yes.

8    Q    Edward Martin saw the photograph of Mr. Jones on the

9         16th or 17th of November, correct?

10   A    Yes.

11   Q    Did Mr. Martin pick out Mr. Jones from the lineup?

12   A    Yes.

13   Q    I am sorry.  One minute, if I may.  Okay.

14                           Did Mr. McCirmon view the

15        lineup?

16   A    Yes.

17   Q    Did he pick out anybody?

18   A    I don't believe originally he did.

19   Q    Well, do you have the lineup sheet there in front of

20        you?

21   A    Oh, yes.  Oh, yes.  Mr. --

22   Q    McCirmon?

23   A    Yes.  No, he -- no.  I believe he stated "they said he

24        was driving."

25   Q    Did he identify anybody in the lineup?

                          -23-

A    He identified Mr. Jones.

Q    Okay.

                    The fourth -- or the third person,

     Mr. Mason, did he view the lineup?

A    Yes.

Q    And did he identify anybody?

A    No.

Q    Okay.

                    MR. ROLLSTIN:  Nothing else of

     this witness.

                    THE COURT:  Anything else of

     this witness?

                    MS. FREDERICK:  Yes, Your Honor.

     I have a couple more questions, please.

                    REDIRECT EXAMINATION

BY MS. FREDERICK:

Q    The communication that you received from the 8th Precinct

     occurred at what time and what date?

A    The information from the 8th Precinct?

Q    Yes, you stated on direct exam that you had been in

     communication with the 8th Precinct?

A    Yes.

Q    Regarding Mr. Jones.  What date and time did that communication

     take place?

A    I believe that was -- what day did I get the case, the 16th.

                              -24-

1   Q   I don't know what date you got the case.

2   A   Okay.  I would have to look at the file.

3   Q   Please.

4   A   It is on the front of it.

5                        THE COURT:  Ms. Miller, if

6   you end up testifying in this case, I hope you take the

7   time to review the file and know what you are doing with

8   it.  You are a poor officer in charge.

9   A   I apologize.  I have several cases.

10                       THE COURT:  We all have several

11  cases.

12                       Let's go with this.

13  BY MS. FREDERICK:

14  Q   I am sorry, the question was, when did you get the case

15      so that you could answer my question as to when you

16      communicated with the 8th?

17  A   I believe I received the case on the 16th.

18  Q   You still are not sure?  I thought you got the file

19      for the purpose of knowing when you got the case?

20  A   I know when it happened.  We are usually assigned the

21      case the following day.

22  Q   Okay.  And in this case, did the usual occur?

23  A   I believe so.

24  Q   You are not sure though?

25  A   No.

                        -25-

Q    Okay.  So, we are looking at, maybe, the 16th is when

     you were assigned the case?

A    I am pretty sure it was the 16th.

Q    Okay.

                    Now, the next question or

     should I say the previous question was what date did

     you receive or did you make contact with the 8th Precinct

     regarding Mr. James Jones?

A    The 17th.

Q    And was that early morning communication, afternoon

     communication?

A    I believe it was morning.

Q    Okay.

                    MS. FREDERICK:  And I would ask the

     court take judicial notice that November 17th was a

     Saturday.

                    THE COURT:  For what reason?

                    MS. FREDERICK:  For the purpose

     of establishing that Mr. Jones was taken into custody at

     the 8th Precinct under the direction of Homicide.

BY MS. FREDERICK:

Q    Correct?

A    Yes.

Q    On a Saturday?

A    Yes.

                          -26-

1                          THE COURT:  Go ahead, please.

2                    MS. FREDERICK:  And that, Your

3    Honor, was simply because Officer Miller might not have

4    recalled the dayof the week.

5   BY MS. FREDERICK:

6   Q   And from the moment that Mr. Jones was taken into custody

7      at the 8th Precinct, you were apprised of that?

8   A   I was notified, yes.

9   Q   Okay.

10                    Were you also notified that

11    counsel was present?

12  A   Yes.

13  Q   Okay.

14                The photograph you have that

15    you showed to the witnesses is the photograph taken

16    from when?

17  A   This was taken on the 4th of September, the year, 2000.

18             MS. FREDERICK:  Your Honor,

19    might I approach to verify that information?

20            THE COURT:  What do you mean,

21    verify?  She just told you what it is.

22           MS. FREDERICK:  I didn't see

23    that on the document, Your Honor.

24          THE COURT:  Go ahead, please.

25  BY MS. FREDERICK:

Q     And how did you receive it?

A     I got the photo from Central Photo downstairs.

Q     Downstairs?

A     At 1300 Beaubien.

Q     Thank you.

A     Okay.

Q     Now, the photo that you pulled up and showed to the
      witnesses, that was basically to assist them in making
      an identification?

A     No.  It was to assist me in making an identification.

Q     But you noted that they were giving you a name?

A     Fresh.

Q     But, apparently, not giving you a description.  So, you
      used the photograph again to help you?

A     Correct.

Q     Aren't the witnesses supposed to give you that information?

A     Yes.

Q     Okay.

                              And so, your giving them the
      information does what?

A     I did not give them the information.

Q     If the witness is giving you a description?

A     Yes.

Q     And then you turn and supply them with a photograph, are
      you not giving them information?

                              -28-

1                                    THE COURT:  I believe that

2      is argumentative, Ms. Frederick.  Get the evidence out

3      here and then let me decide what it is that may or may

4      not have been correct.  Okay.  You are asking her to

5      draw conclusions and speculate as to what the effect

6      might have been on those persons.

7                                    So, move on.

8                                    MS. FREDERICK:  Understood,

9      Your Honor.

10     BY MS. FREDERICK:

11     Q    Now, let's go forward to the Second Precinct on the 18th?

12     A    Okay.

13     Q    Was Mr. Jones arraigned at the Second Precinct?

14     A    Yes.

15     Q    Were you present at the arraignment?

16     A    No.

17     Q    Was Officer Collins at the arraignment?

18     A    He was at the Second Precinct.  I don't know if he went

19          back to the actual room --

20     Q    Well, I don't mean -- let me clarify that.

21                                    I don't mean were you in the room

22     at the time of arraignment before the video camera.  I mean

23     were you present at the Second Precinct when this individual

24     was being arraigned?

25     A    I believe so, yes.

                                    -29-

Q   Okay.

    And I was also present, correct?

A   Yes.

Q   Okay.  And the arraignment took place in the a.m.,
    correct?

A   I believe so.

Q   And the arraignment took place in the a.m. on a Sunday,
    per a writ, correct?

A   Correct.

Q   Okay.

    And after the arraignment,
    we all left, correct?

A   Correct.

Q   Homicide conveyed Mr. Jones back to Homicide, correct?

A   No.

Q   Where was Mr. Jones after the arraignment?

A   I believe after his arraignment, they conveyed him to
    the Wayne County Jail.  Homicide would not have conveyed
    him, the precinct would have.

Q   Okay, I understand.  Thank you for correcting me there.

    So, in any event, when you
    decided to put together the lineup, you had to go through
    some formality to get him from the county jail, correct?

A   Yes.

Q   Okay, and you stated that you tried to put together the

                              -30-

1          lineup twice, correct?

2     A    Yes.

3     Q    Okay.

4                                So, during the time that you

5          are going to organize a lineup, have you made contact

6          with your witnesses?

7     A    Yes.

8     Q    Okay.

9                                And what was the reason that

10         the lineup didn't go off the first time?

11    A    I believe he had been conveyed to the Wayne County Jail.

12    Q    Okay.

13                               And at the time of that conveyance,

14         you were prepared to proceed with your witnesses?

15    A    I believe so.

16    Q    Okay.

17                               Now, you had made contact --

18         you did know where they were and you were able to go and

19         get them?

20    A    Yes.

21    Q    Okay.

22                               MS. FREDERICK:   Nothing further,

23         Judge.   Nothing else.

24                               THE COURT:   Mr. Rollstin, anything?

25                               MR. ROLLSTIN:   No thank you, Judge.

                                      -31-

1          THE COURT:   Thank you.   You

2   may stand down, Officer.

3   A   Thank you.

4          THE COURT:   Go ahead.   Who else

5   you want to call?

6          MS. FREDERICK:   Your Honor,

7   I would like to call Attorney Dennis Shrewsberry, please.

8          THE COURT:   Okay, go ahead.

9          MS. FREDERICK:   Judge,

10   Mr. Shrewsberry went upstairs to Judge Cahalan.   I will

11   call Officer Collins in the interim.

12          THE COURT:   Very well,

13   Proceed, then.

14          D A L E    C O L L I N S    ,

15   Sworn by the Clerk, at 11:16 a.m., was examined and testified

16   upon his oath as follows:

17          DIRECT EXAMINATION

18   BY MS. FREDERICK:

19   Q   Good morning.

20   A   Good morning.

21   Q   Investigator Collins, how long have you been a Detroit

22   police officer?

23   A   30 years.

24   Q   And how long have you been with the Homicide Division?

25   A   20.

-32-

Q    Okay.

I am just going to cut to the chase.  Now, with respect to the case at hand, how were you notified of Mr. Jones and the potential that he might be a suspect in a homicide?

A    Well, we were assigned the case, a murder, and during the investigation, there was some information that came out that led to Mr. Jones being arrested.

Q    Okay.

Did you receive any notification that he was in custody?

A    Yes, at some point in time, yes.

Q    Okay.  Do you recall the date of that notification?

A    No.

Q    Do you recall the manner of that notification?

A    Just that he was in custody.

Q    Did you receive that information by fax, phone, do you recall?

A    I don't remember.

Q    Okay.

When did Mr. Jones come into your physical custody over at Homicide?

A    We conducted lineups and that was my contact with Mr. Jones. I conveyed him from one point to another to be placed in a lineup.

-33-

Q     Okay.

                        I am getting the feeling that

you are not that familiar with the case and the question

was at what time did you come into contact with Mr. Jones

at the Homicide Unit at 1300 Beaubien?

A     Some time in November.  Maybe, around the 17th or the 18th,

but I can't tell you the time.

Q     Okay.  That is fine.  The day will get me there.

                        So, did you at any time have

occasion to question Mr. Jones while he was being detained

at the Homicide Unit?

A     No.

Q     You did not question him?

A     No.

Q     Do you recall my being present at the unit on November

17th?

A     Yes.

Q     Okay.

                        And do you recall our discussion

regarding the information that you required and needed

or wanted from Mr. Jones?

A     Not verbatim.  No.  I know we had a discussion about

Mr. Jones.

Q     Okay.  And do you recall telling me that you had spoken

with Mr. Jones?

                        -34-

```
 1    A   No, I don't, but I may have spoken with him.  But I am

 2        speaking of interviewing him regarding this case, I don't

 3        remember doing that, but I may have spoken with him.

 4    Q   Okay.

 5                            And when you spoke with him,

 6        you were just talking about what?

 7    A   Well, we were conducting an investigation.  So, that

 8        would be our only conversation, only topic.

 9    Q   Right.  So, the question before or should I say, the

10        answer before was that you didn't really talk to him about

11        the specific case.

12                            And so now, I am trying to

13        find out what exactly did you talk to him about if it

14        wasn't this specific case.  And now you are saying, well,

15        that would be the only thing that we would discuss with

16        him.  So, I am confused.

17                            THE COURT:  Do we have a

18        motion here regarding some statements that were allegedly

19        taken?

20                            MS. FREDERICK:  I am sorry,

21        Judge?

22                            THE COURT:  Is there a motion

23        here to suppress some statements or confessions?

24                            MS. FREDERICK:  No, Judge.  I

25        am trying to make out some issues as to organization,
```

-35-

1    credibility, things that would ---

2                    THE COURT:  Ms. Frederick,

3    we are not here for a trial.  You have filed a motion,

4    apparently, testing the identification process here.  I

5    am going to hold you to that.  If it is not relevant to

6    that, let's move on.  We are not here to try this case.

7                    MS. FREDERICK:  I understand,

8    Your Honor.

9                    THE COURT:  Go ahead, please.

10                   MS. FREDERICK:  Thank you.

11   BY MS. FREDERICK:

12   Q    In any event, do you recall when Mr. Jones was formally

13        arrested?

14   A    About the 17th.  If there is a copy of a PCR, I can

15        refresh my memory.

16   Q    I accept his answer as being correct.

17                   Was he arrested pursuant to

18        a warrant?

19   A    I am not sure.

20   Q    Okay.

21                   Did you have occasion to

22        convey Mr. Jones to the Second Precinct?

23   A    Yes.

24   Q    And when was that, sir?

25   A    On or about the 17th or the 18th of November, 2001.

                            -36-

1    Q    Okay.

2         Did you have occasion to be

3    present in the precinct at the time he was arraigned on

4    the warrant for this case?

5    A    No.  Not arraigned.  I conducted the lineup at the precinct.

6    He wasn't arraigned at the time.

7    Q    Okay.

8         Do you recall there being a

9    writ of habeas corpus on this case?

10   A    Yes.

11   Q    Do you recall the instructions on the writ regarding

12   arraignment for Mr. Jones?

13   A    No.

14   Q    Okay.

15        And so, you are saying that

16   you were not present during the time the arraignment on

17   the warrant took place?

18   A    No.

19   Q    Okay.

20        Do you know that I was present

21   at that time?

22   A    You may have been.  I don't -- I would have to look at

23   some paperwork with some dates and some times on it.

24   Q    Absolutely.

25        Well, at the time of the warrant,

-37-

1    were you notified that he was being arraigned?

2  A   If there was a warrant, he would have had to have been

3      arraigned in a timely manner and that did take place at some

4      point in time.

5  Q   You don't recall us having conversation at the Second Precinct

6      organizing information so as to ensure that he would be

7      arraigned on the warrant pursuant to the writ?

8  A   Well, you were at the Second Precinct.  You were there.  Yes.

9  Q   And you were there at the time, also, correct?

10  A   That's correct.

11  Q   So, you were mistaken when you said you weren't there?

12  A   I never said I wasn't there.  You talked about arraignment,

13      and arraignment did not take place at the precinct.  That was

14      the lineup.

15  Q   The lineup took place in the afternoon of November 18th,

16      correct?

17  A   Yes, I believe so.

18  Q   Okay.

19                              And what was your function at

20      this lineup?

21  A   Conducted the lineup.

22  Q   Okay, and can you explain to me what conducting a lineup

23      means?

24  A   Bring the witnesses in.  Let the witness look at the persons

25      standing in the lineup.  Instructing them that if they see

                              -38-

1      a person that they know, tell me what they did.  Point

2      that person out and tell me what they saw that person do.

3   Q   Can you explain to me what you mean by bringing the witness

4      in?

5   A   The witness will come into a room.  And in that case at

6      the Second Precinct, there is a one-way mirror, and the

7      subjects of the lineup will be on the other side of the

8      mirror.

9              The witness would view those

10     subjects.  And if they saw that person or a person that

11     they knew, they would go by the number and give me a

12     number and say, that person did so and so and so on.

13  Q   Okay, thank you.

14             By the way, was there ever a

15     warrant issued on this case?

16  A   Yes.

17  Q   Okay.

18             Do you have that with you now?

19  A   No.  It was probably in the file.

20  Q   Okay.

21             Did you at any time ever

22     interview any of the witnesses that were participants,

23     not participants, but were -- that viewed the lineup?

24  A   I may have.

25  Q   Okay.  Now, how many attempts did you make to conduct the

-39-

1             lineup?

2    A    I don't understand what you mean?

3    Q    How many times on the date of November 18th did you attempt

4             to conduct a lineup?

5    A    If I remember, I believe, there was a problem with times

6             and setting things up.  So, it may have been more than

7             once, but that is if I am correct.  I may be incorrect.

8    Q    So, did you have to -- did you have any issue with

9             transport with respect to Mr.Jones on the 18th?

10    A    Not issues, just that we had to transport him from one point

11             to another point in order to conduct the lineup.

12    Q    And when you retrieved Mr. Jones, where was he?

13    A    The Third Precinct.  I believe it was the Third Precinct,

14             Vernor Station.

15    Q    And you were the individual that went to get him, correct?

16    A    Yes.

17    Q    You and another officer?

18    A    Yes.

19    Q    Who was that other officer?

20    A    I am not sure.  One of my partners.  May have been

21             Officer Miller.  One of my partners.  We have several,

22             I have several partners that work in my office.

23    Q    Okay.  Did you have any communications with the witnesses

24             on the day of the lineup prior to the lineup?

25    A    I don't understand what you mean.

Q   On the day of November 18th, did you speak to Edward Martin,
    Philip Mason or Joseph -- I am sorry about the pronunication,
    McCirmon?

A   If they were witnesses to view the lineup, yes, I did have
    conversations with them.

Q   And what was your conversations based on?

A   I asked them had they ever viewed a lineup. If the answer
    was yes, I would tell them to go in the room. The subjects
    were listed by number behind the one-way glass. And if
    they saw the person that they knew, to point that person
    out with the number and then tell me what that person did.

Q   I understand. Okay.

                    How many officers were there
    to provide assistance in conducting this lineup?

A   Well, I know Officer Miller was there. May have been
    somebody else also. I don't remember. I am not sure.

Q   Was Officer Derrick Thomas in the room with the participants
    of the lineup?

A   He may have been.

Q   Okay.

                    Was the lineup successful?

A   There was an identification made, yes.

Q   There was.

                    MS. FREDERICK:  I have nothing
    further, Judge.

                            -41-

1          MR. ROLLSTIN:  No questions.

2          THE COURT:  Nothing, Mr. Collins.

3     You may stand down.

4          (Witness excused at 11:28 a.m.)

5          MS. FREDERICK:  Your Honor, I

6     am assuming Mr. Shrewsberry --

7          THE COURT:  There he is right

8     now.

9          You are on cue, Mr. Shrewsberry.

10    You walked in the very moment that you were being asked for.

11         MS. FREDERICK:  Your Honor,

12    defense calls Dennis Shrewsberry.

13         D E N N I S    S H R E W S B E R R Y    ,

14    Sworn by the Clerk at 11:28 a.m., was examined and testified

15    upon his oath as follows:

16         THE CLERK:  You can be seated.

17              DIRECT EXAMINATION

18    BY MS. FREDERICK:

19    Q    Good morning, Mr. Shrewsberry.

20    A    Good morning.

21    Q    Just for the record, even though we all know, what is your

22         profession, sir?

23    A    I am an attorney.

24    Q    And how long have you been an attorney?

25    A    17 years.

                         -42-

1   Q   And what are your areas of practice, sir?

2   A   Mostly criminal, court-appointed criminal defense.

3   Q   Okay.

4            Do you do lineups and show-ups

5   as a result of your court-appointed work?

6   A   Yes.

7   Q   Did you have occasion to do a lineup on November 17th, 2001?

8   A   Was it the 17th or the 18th?

9   Q   I am sorry, you are right.  It was the 18th?

10   A   Yes, I did.

11   Q   Okay.

12            And what, exactly, is your

13   function as a show-up or lineup attorney?

14   A   My function is to observe the lineup, make any objections

15   to the police who are conducting the lineup if I think

16   the lineup is unfair or something like that and make

17   notes of any statements or identifications that are made

18   by witnesses.

19   Q   Okay.

20            And do you consider the lineup

21   to be an important part of the criminal process?

22   A   Yes.

23   Q   Okay.

24            And if, you know, why is it an

25   attorney is called to participate in a lineup?

-43-

A    Well, just because -- to have an outside observer there

to help ensure the fairness of the lineup.

THE COURT:    We can assume that

after about 20 years on the bench and 10 years of practicing

law, I understand what a lineup is about.    We can take

judicial notice of that.

Proceed.

MS. FREDERICK:    Thank you.

BY MS. FREDERICK:

Q    What time were you summons to the Second Precinct, sir?

A    Could I consult my notes on that.

Q    If it were to refresh your recollection, yes.

A    Did you say the Second Precinct?

Q    Yes, sir?

A    I think I was there at about 2:48 p.m.

Q    Okay.    Do your notes reflect that?

A    Yes.

Q    Okay.    And why were you called to the Second Precinct?

A    The notification and Control Section of the Detroit Police

Department advised me to go over.    They make the

assignments and they told me to go to that precinct and

contact the officer in charge and observe a lineup.

Q    Okay.

And what, if anything, happened

upon your arrival?

-44-

1   A   Nothing.  I was there for several hours before the lineup

2        was actually conducted.

3   Q   Did you encounter Investigator Dale Collins?

4   A   Yes.

5   Q   And did you discuss the lineup?

6   A   Yes.

7   Q   And what was the end result of that discussion?

8   A   Investigator Collins told me that they -- I have to refresh

9        my memory.

10                  When I first talked to

11      Investigator Collins, it was about 3:40.  So, it was about

12      an hour after I got there.  I was told that there was some

13      kind of a mix-up and that the defendant had been returned

14      downtown instead of being at this precinct for the lineup.

15   Q   Okay.

16                  Did they, did -- I am sorry, did

17      Investigator Collins tell you at that time where downtown?

18   A   No.

19   Q   Okay.  Did you happen upon or speak to Police Officer

20      JoAnn Miller?

21   A   I don't have a note that I actually spoke with Officer

22      Miller.  I know that her name is in my notes.

23                  By 4:45, the desk officer

24      said that they were still looking for Collins and Miller,

25      and that they had just left out a couple of minutes ago.

1    Q    So, you were called to the Second at 2:25?

2    A    Right.

3    Q    You were told at 3:40 that they were going to retrieve the

4         defendant.  And then, again, at 4:45, you were told that --

5         what, again, I am sorry?

6    A    I was told by the desk officer that they had, that those

7         two officers had just left.  Then I have another note at

8         5:08 p.m. that Collins and Thomas came out to the lobby

9         and said that they were waiting for some witnesses, and that

10        was it.  They were waiting for some witnesses.

11   Q    Okay.

12                        And you were told that Officer

13        Miller was going to get those witnesses?

14   A    I believe so.

15   Q    Okay.

16                        As the lineup was finally put

17        together, did you note any objectionable concerns with

18        respect to the physical presence of the individual

19        participants?

20   A    I made a note on my lineup sheet that I believed the

21        police officers have a copy of that I objected to the

22        appearance of person No. 3 because his hair was substantially

23        different than the hair of the other participants.  And it

24        turned out that No. 3 was, I believe, was the defendant.

25   Q    Okay.

                              -46-

1   A   So, I noted that objection. But they don't have to do

2       anything about it. I just --

3   Q   That is fine. I just wanted to make it clear whether or

4       not you had any objection?

5   A   Yes.

6   Q   Okay.

7                      Now, the order on your sheet,

8       is that the order by which the witnesses were introduced?

9   A   I believe so because I put down the times of when they had

10      three witnesses.

11   Q   Correct. Okay.

12                   And now I would like to ask you

13      to give us detail on what each individual witness noted

14      after viewing the lineup. I will start with Mr. Philip

15      Mason who you have noted as witness No. 1.

16   A   No. 1, witness No. 1 did not make an identification.

17      He couldn't identify any of them.

18   Q   And how long did it take him to not make an identification?

19   A   I have in my notes about 10 seconds.

20   Q   Okay.

21   A   That is just an approximate because it was fairly quick.

22   Q   Sure. And you note also that he walked in the room at

23      5:55, correct?

24   A   Yes.

25   Q   What time did the second witness come in?

A    I have six o'clock.

Q    Okay, and what was the name of the second witness?

A    Martin.

Q    Okay.  And what, if anything, did Mr. Martin state
     regarding the lineup?

A    Mr. Martin said No. 3 was driving and he didn't do any of
     the shooting.

Q    Okay.

                    And then the third witness
     comes in at 6:02 p.m.  And he does what?

A    Can I -- I have to refresh my memory from these notes.

Q    Please, do.

A    And, also, try to read my writing.

                    Okay, as I recall from looking
     at this, the third witness came in and, apparently, said
     No. 3.  And somebody asked him what did he do.  And he
     said, nothing.  The guy that just left out of here said
     he was driving.

                    And then he also said that is the
     guy that she showed us the pictures of.  So, I made a note
     of that.  But I am not sure who he was referring to when
     he said "she".  But I think there was one female officer
     in the group.

Q    Okay.

                    And so, we have three individuals

                              -48-

1      and we can say that we have one, possibly, two identifications,

2      correct?

3    A   Yes.

4    Q   Okay.

5                      And after that last witness,

6      McCirmon, was there any other communication on the lineup?

7    A   Not that I made any notes of.  I don't think there was

8      anything else significant.  Just -- yes.  I already made

9      the note of the appearance of No. 3.

10   Q   Okay.

11                     Now, when Mr. Joseph McCirmon

12     stated that, first, that the second witness informed him

13     that it was No. 3, he was driving, he said, he was driving,

14     did you make an objection?

15                     THE COURT:  What kind of --

16   A   No.

17                     THE COURT:  What kind of objection

18     did you make?

19   BY MS. FREDERICK:

20   Q   I am sorry.  Did you make inquiry, did you make any

21     comments whatsoever regarding those statements?

22   A   Not that I recall.  I think I just wrote it down.

23   Q   Okay.

24                     Did Police Officer Miller

25     make any comment after these comments?

-49-

1   A   I don't have any notes of it.

2   Q   Okay.  But as you recall, you can't recall absent the notes?

3   A   No.

4                       I don't remember any further

5       discussion except that it was -- that they said -- I mean,

6       that witness said that he had seen a picture of this

7       person before coming to the lineup.

8   Q   Okay.

9                       And did he note that he was the

10      only one that saw the picture?

11  A   Well, he said that is the guy they showed us the picture

12      of.  Now, I don't know who he meant by us.

13                      MS. FREDERICK:  Okay, nothing

14      further, Judge.

15                      THE COURT:  Anything, Mr. Rollstin?

16                      MR. ROLLSTIN:  Just briefly,

17      Judge.

18                      CROSS-EXAMINATION

19  BY MR. ROLLSTIN:

20  Q   Mr. Shrewsberry, did you feel the array was unduly

21      suggestive of Mr. Jones?

22  A   My note, my objection was that his hair was substantially

23      different and therefore he stood out.  So, whether I

24      specifically said that it was suggestive that it was him,

25      I didn't make a note of that and I don't think that was my

                            -50-

1    objection.

2                It was that he was substantially

3    different.

4  Q    Okay.

5                I am asking you if your opinion

6    was that, was the array unduly suggestive as to direct

7    the attention of the witnesses to Mr. Jones?

8  A    Well, I think that it was because of that difference

9    in appearance.

10  Q    The hair feature, correct?

11  A    Yes.

12  Q    Anything else about his appearance that you felt made

13    him distinguishable from the other four participants in

14    the array?

15  A    Can I check my notes here?

16  Q    Go right ahead.

17  A    On the attorney lineup sheet, there is a place for attorney

18    remarks. And looking at the notes that I made at the time,

19    looking at all the people in the lineup, he was the only

20    one who was substantially different in all respects. He

21    was clean shaven. He had a different hair style. And he

22    had on a white T-shirt where the other ones had on jackets.

23            So, it was different enough

24    that I thought it should be noted.

25  Q    Okay.

1            Any additional comments section

2      of your report it states:  Quote:  I object to the

3      appearance of No. 3. (Hair is substantially different.)

4                         Right?

5   A   Yes.

6   Q   No mention of being clean shaven in that portion of

7      your report, right?

8   A   No, not specifically.

9   Q   No mention of the white T-shirt in that portion of the

10     report, correct?

11  A   No.

12  Q   Okay.  Describe the person's hair that was person No. 1.

13                      What did that hair look like?

14  A   My notes indicate that he had short hair.

15  Q   Okay.  Was Mr. Jones' hair as it basically appears today?

16  A   I can't remember that.

17  Q   So, you can't remember what Mr. Jones looked like then,

18     right?

19  A   No.  No.  I only made the notes of what I saw at that time.

20  Q   Is it fair to say you have no independent recollection of

21     what any of these five people looked like then?

22  A   That's correct.

23  Q   So, you are going to be able to give us just what is on

24     your report here, correct?

25  A   Yes.

                        -52-

1    Q    Okay.

2              Now, if the lineup was unduly

3         suggestive of him, then why didn't the one witness pick

4         him out?

5    A    Can't say.

6              MR. ROLLSTIN:  No further

7         questions.

8              THE COURT:  Anything else of

9         Mr. Shrewsbery, Ms. Frederick?

10             MS. FREDERICK:  Just a couple

11        of questions.

12                  REDIRECT EXAMINATION

13   BY MS. FREDERICK:

14   Q    There isn't a great deal of space where it says, attorney

15        comments, is there?

16   A    No.

17   Q    In fact, your notes are all over the page, aren't they?

18   A    Yes.

19   Q    Okay, and the fact that a witness does not identify a

20        participant in the lineup does not change the fact that

21        you felt it was suggestive?

22   A    I don't think it does.

23   Q    Okay.

24             And the notes you made where

25        it says, attorney remarks, do take into account the

-53-

differences in these individuals, correct?

A   Yes.  From my viewpoint, yes.

Q   Okay.

                    And while we are on that sheet,
can you tell me the commonalities just in light of the
heights that we have?

A   According to the heights that were given by the people
who were in the lineup, three of them were five foot nine
including the defendant, and two of them were five foot
eleven.

Q   Okay.  And Mr. Jones was No. 3?

A   Yes.

Q   And that would be the center of five people, correct?

A   Yes.

Q   And he was the only one wearing a white T-shirt?

A   Yes.

Q   He was the only one not wearing a jacket, correct?

A   Yes.

Q   And when you were making mental note of these differences,
you were also having witnesses coming in and you were making
notes of what they were saying, correct?

A   Well, the order is not exactly correct.

Q   Okay.  Please, explain.

A   The notes that I made under attorney remarks, those are
made during the first few minutes when the lineup comes

-54-

1    into the room and the officer is asking each person their

2    vital statistics.

3                    While the officer is doing

4    that, I am filling in substantially the same things that

5    the officer is asking and then I am also making note of

6    the appearance.  So, I have to do it pretty fast because

7    by the time I get done with one, he or she is already on

8    the next one.  So, I try to do that as quickly as possible

9    to write the obvious differences that I see.

10   Q    And there were obvious differences?

11   A    Well, I thought there were.  I mean because based on what

12   they were wearing and what they looked like and then the

13   other notes below that line No. 7 where I start the other

14   notes, those are things that I observe during the lineup

15   itself.

16   Q    During, okay.

17                    So, at the time Mr. McCirmon

18   made a comment about the photograph, what, if anything,

19   was your reaction to that?

20   A    I was kind of surprised because I mean that sort of

21   suggested to me that he saw something prior to coming

22   into the lineup.

23   Q    Okay.

24                    And what would the word "us"

25   seem to indicate to you?

-55-

1    A    More than one person.

2    Q    Okay.  And how were these witnesses brought in, if you

3         remember?

4    A    That, I don't know if they were all brought in together

5         or -- it seems like I recall that the police went to pick

6         them up or something.  But I don't know exactly.

7                        MS. FREDERICK:  Your Honor, I

8         have nothing further.  Thank you. .

9                        THE COURT:  Do you have

10        anything else?

11                       MR. ROLLSTIN:  No.

12                       Could we get his report marked,

13        Judge?  Could we get the report marked by Mr. Shrewsberry

14        entered as an exhibit.

15                       THE COURT:  No problem with that.

16                       MR. ROLLSTIN:  Mark that as 3.

17                       (People's Exhibit No. 3 marked

18                       by the reporter.)

19                       THE COURT:  Any other witnesses

20        for today on this?

21                       MS. FREDERICK:  None, Your Honor.

22                       THE COURT:  We have to settle

23        on a date here.  What were you asking earlier about another

24        date?

25                       MR. ROLLSTIN:  Either a week

                                   -56-

1   from today or two weeks from today, Judge.

2                    THE COURT:   Okay, a week from

3   today is not going to work. Two weeks from today is the

4   22nd.

5                    MR. ROLLSTIN:   Yes, sir.

6                    MS. FREDERICK:   Judge, give

7   me two seconds.

8                    (Pause.)

9                    MS. FREDERICK:   I am good for

10  the 22nd.

11                   THE COURT:   Very well.   Two

12  weeks from today we will continue with this.   Okay.

13                   MR. ROLLSTIN:   Thank you, Judge.

14                   MS. FREDERICK:   Thank you.

15                   THE COURT:   Thank you all.

16                   MS. FREDERICK:   Quick question.

17  Should I file the return copies of the subpoenas?

18                   THE COURT:   They don't have to

19  be filed with me.   They can go in the file, but it doesn't

20  matter.

21                   (Matter concluded at 11:46 a.m.)

22             -   -   -

23

24

25

                          -57-

R E P O R T E R ' S    C E R T I F I C A T E

STATE OF MICHIGAN    )
                     )  ss.
COUNTY OF WAYNE      )

                            I, CLARA SHAH, CSR-2602, an

Official Court Reporter in and for the Third Judicial Circuit

Court for the County of Wayne, State of Michigan, do hereby

certify that I have reported stenographically proceedings had

and testimony taken in the above-entitled cause, and I do

further certify that the foregoing transcript constitutes a

full, true and complete transcript of said stenographic notes.

                                             _CLARA SHAH, CSR-2602_
                                           CLARA SHAH, CSR-2602
                                           OFFICIAL COURT REPORTER