STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN,

—vs—

Case No. 01—013853

Hon. Thomas E. Jackson

JAMES ALFRED JONES,

                Defendant.

_____/

JURY TRIAL — VOLUME 1

            PROCEEDINGS HAD in the above—entitled cause before the
HONORABLE THOMAS E. JACKSON, Judge, Criminal Division, Third Judicial
Circuit Court, Courtroom G—1, Frank Murphy Hall of Justice, 1441 St.
Antoine, Detroit, Michigan, on Monday, May 20, 2002.

    APPEARANCES:

            MR. WILLIAM A. ROLLSTIN, (P40771),
                Assistant Wayne County Prosecutor,
                On behalf of the People of the State of Michigan.

            MS. LEESA R. FREDERICK, (P53372),
                On behalf of Defendant James Alfred Jones.

            —   —   —

            CLARA SHAH, CSR—2602
            OFFICIAL COURT REPORTER



THE CORBY GROUP  1-800-255-5040

LAS: STOCK FORM FMSRN

I    N    D    E    X

WITNESS                                                    PAGE

JURY  SELECTION

JURY  INSTRUCTIONS                                          118

OPENING  STATEMENTS

      By Mr. Rollstin                                124

      By Ms. Frederick                               133

E    X    H    I    B    I    T    S

IDENTIFICATION                          MARKED        RECEIVED


N    O    N    E

1          Monday, May 20, 2002

2          Detroit, Michigan

3          At about 10:07 a.m.

4              _   _   _

5              THE CLERK:  Case No. 01-13853, People versus James Jones.

6      The matter is here today for jury trial.

7              MR. ROLLSTIN:  Judge, good morning.  William Rollstin,

8      on behalf of the People.

9              MS. FREDERICK:  Morning, Your Honor.  Leesa Frederick,

10     on behalf of the defendant, Your Honor.

11             May we approach?

12             THE COURT:  Anything you have to say, say it on the

13     record, Ms. Frederick.

14             MS. FREDERICK:  Sure.  On Friday afternoon after we had

15     brought Mr. Jones over for the purpose of trying to take a plea on

16     the matter that fell through, the family and Mr. Jones advised me

17     that they had the intent to retain Mr. Terrell Thomas to proceed

18     with this matter.  And, in fact, I should prepare his documents

19     to transfer over to Mr. Thomas.

20             I spoke to Mr. Thomas a couple of times Friday, Friday

21     evening.  He is supposed to be here this morning.  Clearly, I

22     understand that if he is not here, I need to proceed on Mr. Jones'

23     behalf.  However, Judge, I think that in light of some of the

24     circumstances of Friday, my advocacy has been diminished substantially

25     by some of the conversations that took place on the voice mail

                                    -3-

messages and so forth and ---

THE COURT: You have prepared this case for trial, right?

MS. FREDERICK: Yes, I have.

THE COURT: And you are prepared to go to trial?

MS. FREDERICK: Mr. Jones is waving me off. I understand, Judge.

THE COURT: It is ten o'clock in the morning on a Monday morning for this trial. This trial has been set for at least two or three months I believe. I think I set this trial date back in March at the very least. THat is it was set for trial.

MS. FREDERICK: Yes, sir.

THE COURT: And we have a jury here waiting. It is ten o'clock in the morning. This court has not been contacted by any other lawyer or attorney for any kind of appearance or any kind of request about entering this case.

MS. FREDERICK: I understand, Judge.

THE COURT: We are going to proceed to trial with this case. So, bring in the jury, please.

MR. ROLLSTIN: One matter for the record, Judge. The offer to Mr. Jones was murder second degree, felony firearm, minimum sentence 25 years, 40 years plus two years for the gun.

THE COURT: I am sure that Ms. Frederick communicated that to him. He was aware of that. They brought him in on Friday for that purpose.

-4-

1 MS. FREDERICK: Yes.

2 THE DEPUTY: Rise for the jurors.

3 (Jurors enter the courtroom at 10:09 a.m.)

4 THE DEPUTY: You may be seated.

5 THE COURT: Let me say good morning again to all of you.

6 I spoke with you just briefly there a little while ago. Understanding

7 certainly that you would be discontented with having to wait there in

8 the hallway, but occasionally, situations are unavoidable. Quite often

9 on Monday morning, we have a difficult time even getting the jury

10 commission to get persons, you know, here at an early time and often,

11 it is about this time when they get a group down to us. But we were

12 able to get a group a little earlier today. So things didn't work

13 out as I thought they were.

14 We have been trying to get this started for some time now.

15 So, I apologize for that.

16 My name is Thomas Edward Jackson, one of about 60-plus

17 judges of the entire Wayne County Circuit Court system; and the Wayne

18 County Court system is divided into three divisions. Basically, there

19 is a civil division, a criminal division, and a family division.

20 Civil division is where cases are heard involving matters

21 where someone may be suing someone for damage to their person or

22 their property, something like that. And if you were a juror in a

23 civil case, you would be deciding whether or not someone is liable

24 or should be compensated for doing damage to someone's personal

25 property.

-5-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1        The family division kind of speaks for itself, divorces

2   and other family-related matters.

3        And there in this building is where we have the -- what is

4   called the criminal division basically.  And we deal with any and all

5   felony criminal matters that occur inside of Wayne County, okay.  All

6   felony criminal matters that occur inside of Wayne County.

7        I understand there may be a couple of people missing.  We

8   are trying to see what is happening with those persons.

9        (Pause.)

10       THE COURT:  Don't see them, Dan.

11       We are going to try to proceed and deal with that later.

12  We will check the list in a minute.  I am aware, of course, that

13  earlier today that when you checked into the jury commission office

14  upstairs then that since that time you have seen a video and so

15  forth and given you some idea of what to expect and some of the

16  things to anticipate with being on jury duty and things about certain

17  kinds of -- part os the law and things that deal with that.

18       But understand that the basic concern is to select from

19  the group of you persons who will eventually sit there in the jury

20  box and listen to the evidence in this case and make a decision

21  about that evidence.  That decision being basically whether or not

22  the prosecution proved the charges that have been made in this case

23  and for you to make that decision.

24       Sir, if you are a juror, step up to the front there,

25  please, in the front row, okay.

-6-

1    So, for you the jurors to make a decision as to whether

2 or not that evidence proved the charge in this case.  I am sure that

3 all of you, most of you are probably aware that our whole criminal

4 justice system is based on laws and constitution, and the fabric

5 of laws that have been brought to the various high courts in this

6 country.

7    And one of the basic parts of our constitution when it

8 was written, of course, a few hundred years ago was to write in

9 the requirement that when a person is accused of a crime, that that

10 person has the constitutional right to have a trial by a jury.

11 Meaning that if the government says someone did something or accused

12 him of a crime, that person has the right to have citizens

13 essentially review that and look at the evidence in that and make

14 a decision as to whether or not that person should be held liable

15 for that crime, for that conduct.

16    And with that in mind, and the fact, you know that everyone

17 has a right to ahve a jury trial, then of course it has to be a means

18 or a way in which to -- sir come up to the front in the first couple

19 of rows here, okay.

20    So, it has to be some means or way in which to make

21 that system work.  And, of course, that is done through the summons

22 of the jury process and having citizens report in for jury duty.

23 So, I will talk about that in a few minutes.  But think of a trial

24 as a way of trying to reconstruct an event.  Some charges have been

25 made here.  something allegedly occurred that brings this matter

-7-

1 for trial.  The accusations essentially have been made, but the

2 defendant has the right to have citizens as you are to listen

3 to that evidence, and with the law that I will give you, decide

4 if in fact that those charges, you know, are supported by the

5 evidence, and you as citizens make that call.

6    And understand that when you are brought in here to act

7 in the capacity of a jury, please, understand it is not expected

8 or not required that you all of a sudden be transformed into

9 something more than what you may do in your normal everyday life.

10 That you all of a sudden have to become kind of a super human

11 being or someone who has to know the law or anything like that.

12    As jurors, we expect you just to use your basic common

13 sense in the same way as you may be making a decision in your normal

14 everyday life based on information that is given to you.  We decide

15 at some point whether we are going to buy a car, go on a trip, you

16 know, buy a house.  And in doing that, we weigh out the various

17 factors and the decision, you know, in doing that and make a decision

18 on that.

19    And think of a trial as something similar to that.  And

20 in most situations, obviously, there is not a camera or videos of

21 that whole proceeding of what the case may be based on.  So, then we

22 rely on persons who may have seen something, heard something, and

23 in some way observed something or have something that they can add

24 to this to give you information about that for you to make your

25 final decision.

-8-

And, of course, when we depend on other human beings to do that, they are subject to the same kind of shortcomings that anyone else may be subject to in terms of what they saw, what they think they saw, and all of that. And that is what is put before you as jurors for you to make that ultimate decision about.

Now, but what we are concerned about here in this initial process is the persons who will eventually make that decision. Now, from my prospective for the most practical way in terms of shortcutting this process here and getting to the whole issue of the trial would be if I were able to call to the people upstairs there and say bring down 14 people, prospective jurors, put you in a jury box. Okay, lawyers, let's go. We have a jury. Let's start the trial.

But let's just say if that were to occur that way, somebody in the back row says, I think I know so and so or I might have worked with this person or I may have been the neighbor to someone else. And, of course, that would compromise that person's objectivity about being a fair juror. So, that depletes the numbers and you can go on with examples like that until you get down to nobody or, at least, to numbers below that which is required to try a case.

So, the best way, the wisdom of this is and this is being done probably in thousands and thousands of courtrooms over this country right now and has been done in millions of cases over the years to do as we are now, to bring down the group of you. Let you

-9-

1  all know what the possibilities are and what the case is all about and
2  then to go that way.  Otherwise, you have to go over that process
3  again and again and again to select a jury.
4          So, this is the best way to do it.  So, in that regard,
5  I will be asking some questions of you and, of course, I will
6  instruct you on relevant and pertinent matters of law at this
7  juncture and the lawyers may ask some questions.  And understand
8  that these questions are just designed to, one, kind of give you
9  an impression of what is important about being a fair and impartial
10  juror, to maybe ask you to examine your own mind to make sure that
11  there is nothing that would get in the way of your being a fair
12  juror because normally when persons come in, it is rare that the
13  persons -- and when they come for jury duty are not qualified
14  to be a juror.
15          And we want to make sure that there is nothing that would
16  get in the way of one being able to have an open mind and listen and
17  be fair.  Now, I know that sometimes jurors might say, well, how
18  do I know that I can be a fair juror if I don't hear the case
19  and then decide whatever.  It is not about all of that, your
20  knowing the case.  It is about being able to have an open mind
21  and to listen to what is going on and to make your decision on
22  that with the understanding that at the very least when you see
23  persons who might be involved with the case, you know, you don't
24  recognize or know anyone.
25          If you do at some point think you recognize someone, let

-10-

me know about that. But as I said, in most cases, persons as yourself are qualified to be fair and impartial jurors. We go through this initial process as is required by law to make sure there is nothing that would get in the way of your being able to be fair and impartial. So, again, I will ask some questions. The lawyers will ask some questions. Please, respond to those questions consistent with the oath that you would take shortly.

That is that you will give true answers to the questions put before you about being a fair and impartial juror, being able to render a fair and impartial service as a juror. Understand, also, that there are two ways in which a person may be excused from being a juror in this case. There is what is called a challenge for cause. That is where I make a legal determination that someone should not sit in this case and may be best served to go somewhere else in another trial or courtroom.

And that, for example, may be something that I was just talking about a minute ago where someone may have known someone, may have worked with someone. I had a situation a few weeks ago where the person on trial father was in the courtroom and somebody recognized the father as someone that they worked with everyday, and that kind of thing.

So, certainly, we don't want to put anyone in a position you know of being a juror where that possibility may be there and you have to decide the faith of someone, a relative that you know in some kind of way. So, those are the kind of things that we look

-11-

1   for to make sure you can be fair and impartial.

2   The other way in which the person may be excsued is what

3   is called a peremptory challenge. That is where the lawyers by law

4   and procedure are allowed to dismiss or excuse a limited number of

5   jurors without having to state a reason for that. This is allowed

6   by law so should you be excused in that way, don't take it

7   personally or hold it against anyone. It is all part of the process

8   of selecting a jury in a criminal trial.

9   Now, any time a criminal case or any kind of case is

10   brought into the court system in the State of Michigan, be it here

11   in Wayne County or Marquette or any of the other 80-plus counties

12   of this state, if it is a civil case wehre someone is suing someone

13   for -- to get monies to pay for damage done to their property or

14   there was an injury in a car accident, something along that line,

15   where we generally call civil cases, the case name usually has

16   the name of the people who might be involved with that case because

17   if Joe Jones is suing Mary Smith because Mary Smith ran into his

18   car or hurt him or something like that and trying to get compensated

19   for that, then the case name just simply becomes Jones v Smith.

20   That is the way of naming cases that way.

21   Now, criminal cases are different in this way. If a

22   criminal charge is brought, if criminal charges are brought,

23   whether it be here in Wayne County, whether it be in Marquette

24   or Kalamazoo or Saginaw, wherever in this state, if it is a

25   criminal case, the first name part of that case always is the

-12-

1    People of the State of Michigan versus whoever is accused of a

2    crime.

3        The reason for that is primarily because whenever it is

4    alleged that a law has been violated, a law that has been enacted

5    in the name of the People of this state through our elected

6    officials that we send to Lansing.  That law is the same whether

7    it be here in Wayne County or any other city or county in this

8    state.  So, the People of the State of Michigan has the interest

9    in maintaining peace and dignity and respect for the laws.

10        So, criminal cases are just named in the name of the

11   People of the State.  We are all people of the State of Michigan.

12   So, please, don't think that it means anything more than that.

13   It is just the way of naming criminal cases.

14        This case is entitled People of the State of Michigan

15   versus James Alfred Jones.  Here in this case, we have an

16   assistant Wayne County prosecutor who is responsible for prosecuting

17   this case, Mr. William Rollstin.

18        Mr. Rollstin, if you will let the jury see you, please.

19        MR. ROLLSTIN:  Good morning, Your Honor.  Good morning,

20   ladies and gentlemen.  My name is William Rollstin.  I am assistant

21   Wayne County prosecutor.

22        THE COURT:  There may be a person who is the officer

23   in charge.  That is the police officer or investigator who has the

24   responsibility of coordinating the case and witnesses and so forth

25   and assisting the prosecutor in doing that.  I have a name here of

-13-

1   JoAnn Miller.

2           MR. ROLLSTIN:  That's correct, sir.

3           THE COURT:  By the way, if you think you know anybody

4   that I am introducing right now, please, raise your hand and let me

5   know.

6           Defense counsel in the case is Ms. Leesa Frederick.

7   Ms. Frederick, if you will let the jurors see you, please.

8           MS. FREDERICK:  Thank you, Judge.

9           Good morning.

10          THE COURT:  At the table with Ms. Frederick is her client,

11  the accused in the case, James Alfred Jones.  Mr. Jones, will you

12  stand, please.

13          Anybody recognize anybody so far?

14          (NO RESPONSE.)

15          THE COURT:  All right.  Please, proceed.  I have here

16  a list of prospective witnesses.  I say prospective because as a

17  general rule these names are listed but it doesn't necessarily mean

18  that all of them will testify particularly when you may have two or

19  three police officers doing the same basic thing, it may not be

20  required of all of them.

21          There is a Dr. Chung, who is with the Wayne County Medical

22  Examiners Office.  There is a Deondre Jones.  Okay.  Edward Martin --

23  is Edward Martin in the courtroom?  How about Joseph McCrimon,

24  Phillip Mason and Ahmad Akins.  Okay.

25          The remaining names I am going to give here are police

-14-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

officers from the 8th Precinct or from the Evidence Tech Unit.  There
is a police officer named Bradley Clark, a Vaden Cook, Clarence Troller,
Beryl Curry, a Kenneth Chawford, Jonathan Yakimovich, and a Rickey
Townsell.  Police Officer Fitzhugh from the Evidence Tech.

As I say, most of the police officers may or may not be
called.  Anyway, I have what is called an Information here, also.  A
Information is jsut that.  It informs as to what the charge or
charges are in the case.  Understand that the Information is in no
way evidence of the charges themselves.  So, don't -- I don't want
anyone thinking that, well, there is an Information and charge,
and because it is a charge, that there is evidence there.

This is what the prosecution would have to prove to you
and what you as jurors have to look at in terms of the evidence as
to whether or not the charges are proven to you.

It charges that the offense or the offenses occurred on
the date of November 15, 2001 in the 18918 900 block of Heyden in
the City of Detroit.  That is kind of like on the northwest, about,
maybe, three or four blocks, a couple of blocks into east of
Evergreen.  This is probably, maybe, in the Seven Mile area, in
that general area.  That is the street name.

And it charges the defendant with one, premeditated murder
saying that the defendant did deliberately with the intent to kill
and with premeditation, kill and murder one Demetris Perdue and
did make an assault upon a Phillip Mason with intent to murder;
did make an assault upon Edward Martin with the intent to murder,

-15-

and did make an assault upon Ahmad Akins with the intent to murder.

And what you are going to hear here by way of an assault here, an assault occurs allegedly when a person attempts to do harm to someone and the nature of the harm, how it may be done may determine what the intent might be and what kind of assault it may be.

Certainly, if someone you know touches someone in an offensive way or the way they don't want to be touched or pushing, something like that, that could be like a simple assault and battery. If someone were to take a baseball bat and start beating someone about the head or trying to hit them with that, it may be different from somebody taking a -- hitting someone on the knees. So, it all depends on how it may be done.

Is there a first name Lundy, L-u-n-d-y. Last name, Dickson, D-i-c-k-s-o-n. You are supposed to be in another courtroom. Okay. So, check with the deputy there.

So, anyway, that is the assault. There is also a charge called possession of a firearm by a convicted felon. That means that the defendant had been convicted of a felony and had not become eligible to have a firearm. And the other charge is called felony firearm charging that the defendant did have possession of a firearm at the time that a murder or assault with intent to murder was done.

So, those are the charges in the case. And what you will ultimately have to decide here as to whetehr or not the evidence proves the charges here.

-16-

At this time, we are going to start seating some of you in the jury box to proceed with the selection process I was just talking about.  In that regard, the clerk will administer the oath to all of you, all the prospective jurors.  That means that you will give true answers to the questions put to you touching upon the qualifications to be a fair and impartial juror.  And names will be called to seat you in the jury box.

You get to the jury box to come right through that kind of double door that is right there dividing where you are in this part of the courtroom.  And then walking behind the table where Mr. Rollstin is, right there. There is a door right there that goes into the jury box.  There is another door right here near this chalkboard that goes into the jury box.

So, take the seats in the sequence in which your name is called. First name called, take Seat No. 1.  Seat No. 1 is the farthest one from you in that first row right there.  Seat No. 1, my far left here, the farthest one from you.  We have got one through five there in the first row.

Number 6 name called will take the farthest seat there in the second row.  6, 7, 8, 9 in the second row.  No. 10 name called will take the seat up there in the top row in the far corner, but once they start, just follow the sequence in the seating there.

So, proceed with that, please.

THE CLERK:  Please, stand and raise your right hand?

-17-

1          (Jury panel sworn by the Clerk at 10:30 a.m.)

2          THE CLERK:  You can be seated.

3          Theresa Pappas, Seat 1.

4          Kelly Markham, Seat 2.

5          Veronica Johnson, Seat 3.

6          Darrel Papke, Seat 4.

7          William --

8          THE COURT:  I am sorry, I missed the first name you

9  called is -- oh, I see it now.  P-a-p-p-a-s.

10          THE CLERK:  Yes.

11          THE COURT:  Go ahead.

12          THE CLERK:  William Wingate, Seat 5.

13          Leonard Dickinson, Seat 6.

14          Daniel Contreras, Seat 7.

15          Linda Benson, Seat 8.

16          Kevin Raden, Seat 9.

17          Kenneth Alexander, Seat 10.

18          Jo Anne Pettit, Seat 11.

19          Monyaka Burnett, Seat 12.

20          Tatijana, last named spelled, S-e-r-a-f-i-m-o-v-s-k-a,

21  Seat 13.

22          Colleen Daniel, Seat 14.

23          THE COURT:  Let me ask that those persons sitting here

24  on this side, to move over a little bit. And those of you over here

25  to my right, to move over to that area so we can get all the jurors

-18-

together, please.

Thank you.

For those of you who remain there in the spectator area who were not called presently, keep in mind that through the process here, persons who are in the jury box, someone may be excused by one of the means I mentioned earlier, either a challenge for cause, where I excuse someone for kind of a legal basis or reason and the peremptory challenge that the lawyers are able to exercise, you know, by law and procedure.

And when someone is excused, another name is called to fill that vacancy and we continue on in that way until the jurors are finally agreed on.  So, understand that anyone of you who are presently out there now in the spectator area could be called to replace someone.

Understand, also, that you are equally apart of this process as much as the persons there in the jury box are.  Although the focus of attention may primarily be on the persons in the jury box, you are equally a part of this.  The one distinction is that when something is asked or said that requires a verbal response, persons in the jury box will be able to do that, respond to that as that is being asked for or during the course of this process, you know, here.

The reason for that is this, the court reporter is making a record of the procedure as is required by law.  And it is easy for her to identify by seat number and by the name of the seating

-19-

chart here who might be there because if somebody is responding,

we can look and say, juror in Seat No. 5 or 6, whatever that may

be. That is easier for her without having to stop and move on

through the process.

If I were to have a response from any and everybody

trying to get their response, I have to find out who you are,

where you are, and this would take forever. I am asking those

of you out there to do this. If something is asked or said that

you think might in some way affect your being a fair and impartial

juror that you need to bring to our attention here, make a mental

note of that. Keep it in mind. If you are called to replace someone,

I will start off by asking a general question of whether or not

anything that has been asked or said might apply to you that would

affect your being a fair and impartial juror.

And we will go from there to anything else that needs to

be done without having to go through and ask each and every question

over again every time someone new comes to that jury box. So, please,

understand that you out there are apart of this process. Do not

tune us out. And, please, do not just wander out of the courtroom.

Do not leave the courtroom.

If there is some urgency of some kind, get my attention.

Don't just get up and walk out of the courtroom if there should be

some urgency of some kind. Let me know. We have to stop and deal

with that. I am going to try to expedite this process as quickly

as possible with this.

-20-

1    Now, you may have noticed that while names were being

2    called here a minute ago and we were going through the seating

3    of the jurors in the jury box, I have a list here, the lawyers

4    have this.  What this is is just prior to them calling your name

5    to line you upstairs to bring you down here, based on the nature

6    of the case and so forth, they put in a number in the computer

7    and the computer just randomly picks names and makes a hard copy

8    of the number of you who are up there and that is printed out

9    and they call the names out and bring you down here.

10    What this contains is nothing but this.  It is a badge

11   number.  That is a number that is assigned by the computer so

12   when there is further reference in terms of monies being paid,

13   anything to be done, they can go by the name there rather than

14   trying to go just by name.

15    Name, marital status and occupation.  Occupation is

16   general term, either supervisor, housewife, cabinet maker, whatever

17   that is, that is all that we get here in the courtroom.  Information

18   in terms of names, addresses, phone numbers or anything like that

19   stays within the confines and the security of the jury commission

20   offices, and it does not get to anybody in the courtroom.  So,

21   understand that.

22    So, I want to begin by having you introduce yourself to

23   us in the following way.  I want to start with juror in Seat No. 1,

24   Ms. Pappas. And we are going to proceed one after the other until

25   we get to the last Seat No. 14, Ms. Daniel.  Go from 1 through 14.

-21-

As soon as one person finishes, one after the other.

First, stand, good loud clear voice that we can all hear, tell us, first, you name. Second, your occupation. Just a general description of what you do on an everyday basis. If you are a dealer at a casino, whatever that may be, speak up and tell us that. If there is a spouse, husband or wife, tell us what that person's occupation is without having to give a name.

Here we go, your name, your occupation, spouse's occupation. If you are retired or spouse is retired, tell me what they did before they retired.

JUROR PAPPAS: Theresa Pappas. And I am a project manager for a company that makes interior store decor. And basically, when a project is in, I follow it from the beginning to end and work with vendors and the customer and get it accomplished. My husband is in sales.

THE COURT: Thank you very much. Proceed on, please.

JUROR MARKHAM: My name is Kelly Markham. I work in an office. I do data entry, clerical stuff, process insurance claims. And my husband is a mechanic.

THE COURT: Okay, thank you. You don't have to give me a whole explanation. If you are doing -- just give me a brief description of whatever the title is, okay.

Ms. Johnson?

JUROR JOHNSON: Veronica Johnson. I am responsible for pricing and signing the home department in a retail store,

-22-

1    and I am single.

2         THE COURT:  Okay.

3         JUROR PAPKE:  My name is Darrel Papke.  I am a Ford

4    Quality layout inspector, responsible for the fit of the vehicle.

5    My wife's job is working at a hospital doing billing.

6         THE COURT:  Okay, thank you.  Go ahead, please.

7         JUROR WINGATE:  My name is William Wingate.  I am

8    retired from General Motors.  I work for General Motors maintenance

9    engineer.  And my wife is retired, also.

10        THE COURT:  Okay, thank you.

11        Mr. Dickinson?

12        JUROR DICKINSON:  My name is Leonard Dickinson.  I work

13   for Ford Motor Company and I am an assembler.  And my wife works for

14   the City of Detroit, custodian at the General Motors Building.

15        THE COURT:  All right, thank you.

16        JUROR CONTRERAS:  My name is Daniel Contreras.  I am a

17   crane operator, steel factory.  And my wife is a day care center

18   worker.

19        THE COURT:  Okay.  Ms. Benson?

20        JUROR BENSON:  My name is Linda Sims Benson.  I am

21   on disability now.  Former construction worker.

22        THE COURT:  Okay.

23        JUROR RADEN:  My name is Kevin Raden.  I am retired.

24   I have no wife.

25        THE COURT:  Before you retired, sir, what did you do now?

                              -23-

1    JUROR RADEN:  Pardon?

2    THE COURT:  Before you retired, what were you doing?

3    JUROR RADEN:  What was I doing?

4    THE COURT:  Before you retired?

5    JUROR RADEN:  I work in a steel warehouse.

6    THE COURT:  Very well.  Mr. Alexander?

7    JUROR ALEXANDER:  Kenneth Alexander.  I am a supply

8    base manager, Ford Motor Company.  My wife is medically retired.

9    THE COURT:  Okay.  Ms. Pettit?

10   JUROR PETTIT:  My name is JoAnne Pettit.  I work with

11   mentally and physically handicapped seniors.  And my husband is

12   retired.

13   THE COURT:  Before he retired, what did he do?

14   JUROR PETTIT:  He was a truck driver.

15   THE COURT:  Very well.  Thank you, Ms. Pettit.

16   Go ahead, please.

17   JUROR BURNETT:  My name is Monyaka Burnett.  I am a

18   full-time student, and I don't have a spouse.

19   THE COURT:  What was your area of study and where?

20   JUROR BURNETT:  Ravendale.

21   THE COURT:  I am sorry, what area of study?

22   JUROR BURNETT:  High school completion and medical

23   association.

24   THE COURT:  Very well.  Thank you.

25   JUROR SERAFIMOVSKA:  My name is Tatijana Serafimovska.

-24-

1    I am sorry.  Ia m not speaking very well English.

2              THE COURT:  Okay.

3              JUROR SERAFIMOVSKA:  I can't understand everything.

4              THE COURT:  You can't understand what is going on here

5    right now?

6              JUROR SERAFIMOVSKA:  No.

7              THE COURT:  Go back up to the main floor and tell them

8    what your concern is.  I told them time and time again you know

9    upstairs that they shouldn't send persons -- check out that

10   beforehand because they only send us so many people here and

11   once the numbers are depleted like that.

12             Go up there and explain that to them upstairs, ma'am.

13   Go back upstairs.  Go back to the main floor.

14             THE CLERK:  Margaret McDonough, Seat 13.

15             THE COURT:  Introduce yourself to us, please, when you

16   get to your seat there.  Go ahead.

17             JUROR MCDONOUGH:  Margaret McDonough.  I am retired.

18   I was a medical technologist.  And I am single.

19             THE COURT:  Okay.  And Ms. Daniel?

20             JUROR DANIEL:  My name is Colleen Daniel.  I am a student

21   at Michigan State for the summer.  I am an intern at Arco Construction

22   and I am single.

23             THE COURT:  How long have you been at Michigan State?

24             JUROR DANIEL:  I just completed my second year.

25             THE COURT:  Oh, okay, all right.  I have a daughter

-25-

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

about to start at U of M.  You may become rivals at some point.

Let me say a few things before we move on to this.  First of all, I recognize that probably some of you were kind of peeved with having to wait outside there.  So, you can understand that things happen because persons -- we were not able to get always started.  One thing I do have is a reputation for getting cases started and moving and trying to make the best of the time and so forth, but I can't control any and everything that happens.

So, I would hope that you know, you understand that we are dealing with responsible adults here who can understand and appreciate that those kinds of things could happen and we are going to try to get this done as quickly as possible.  In the same vein, I recognize that jury duty certainly is an inconvenience to say the least in terms of what it does to your normal everyday routine, work, home, whatever that may be.

I have been called on jury duty about three or four times since I have been on the bench and I have to look at that and reschedule trials sometimes or whatever.  Although I have been called and I hit the jury box about three different times when I have been called, somehow or the other before it all ends, I get excused by one of the lawyers in the case even though I think I could probably serve fairly as a juror.  But I guess if some of the lawyers may have been here before me and they come up for trial,  they may think otherwise.

So, anyway, I can understand and recognize and identify

-26-

1   with that.  And I say that because I hope you all understand

2   that I just cannot excuse someone from being on jury duty because

3   it is an inconvenience or because you want to be somewhere else

4   because each and every one of you can give me the best reason in

5   the world from your prospective as to why you would want to be

6   home or work or don't want to be here, whatever, that might be.

7        So, it -- a very hard line has to be drawn in that regard.

8   So, if you have something more catastrophic, somebody has death

9   in the family or somebody put out some monies for a trip over

10  the next, like, two or three days or so and they are concerned

11  about that.

12        I think I am looking at hopefully getting all the evidence

13  in this case in by tomorrow.  I don't know because, like I say,

14  you can anticipate things.  We are already probably an hour beyond

15  where I want to be already.  So, things happen like that.  So, keep

16  that in mind.  It shouldn't take too long to get the evidence in,

17  but that doesn't necessarily mean that the trial will be over

18  tomorrow.

19        Because once you get the evidence in, then you have the

20  deliberation process and sometimes, I have jurors deliberate for

21  15 minutes in some cases and then other situations, some may go

22  over a period of days.  So, I can't always tell you that the trial

23  begins here and it ends at so and so time on a certain date.  It is

24  very difficult to work it that way.

25        So, understand where we are coming from with that.  So,

-27-

in that regard, in terms of the oath that you have taken to give

true answers to the questions touching upon the qualifications to

be a fair and impartial juror, please, don't just try to find some

kind of convenient reason for not being here.

No one necessarily likes jury duty but as citizens, we

have responsibilities and it is expected that we all share and

understand what those responsibilities are in terms of us having

a free and ordered society as we do. So, please, if there is a

legitimate concern, state it, but it seems all too often in my

20 years, too often people look for any kind of reason to avoid

jury duty.

So, anyway, I want you to keep that in mind as we go

through this process. One, let me start off with this. Let me

see the hands of persons who are sitting there, we are going to

start with the first row there. If you have been on jury duty

before, not just being called down, mind you, but have actually

sat through a trial, either civil or criminal.

Anybody in the first row?

(NO RESPONSE.)

THE COURT: Okay. No hands -- I am sorry, Mr. Wingate,

you have. Mr. Wingate, just briefly, tell me what kind of a case

were you on. If it was a criminal case, what was the charges in

that case?

JUROR WINGATE: It was a criminal case, larceny from a

store.

-28-

1    THE COURT:  Okay.  Do not tell me, Mr. Wingate,

2  whether or not that jury said guilty or not guilty.  Assuming

3  that you sat through the entire trial, but was a decision, a

4  verdict reached one way or the other?

5    JUROR WINGATE:  Yes.

6    THE COURT:  Okay.  How about the second row?

7    (NO RESPONSE.)

8    THE COURT:  Okay, nobody in the second row.

9    Third row.  Okay, let's go over to Ms. McDonough.  What

10  kind of case was it?

11    JUROR MCDONOUGH:  It was a civil case.

12    THE COURT:  Civil case. What you will learn along the

13  way, there are some critical differences between civil and criminal

14  cases.  Anybody else who happens to hit the jury box who has prior

15  jury experience, understand what my concern is if you have been

16  on a civil case, that there is a dramatic difference in the law

17  that is to be applied in a criminal case, and I will give you all

18  the law that you need to do that.

19    If you had prior jury service in a criminal case, do not

20  rely on what you may recall from that case although certainly there

21  are similarities there would be the same, but just rely on the

22  law that I will give you here and don't come into the jury room

23  if you are a juror and say in the other case I was in, the judge

24  said or the law was.  That just confuses the issue.  Rely on what

25  I will give you in this particular case.

-29-

1        Now, let me move on to some other things here that we want

2    to explore.  And understand, again, that the bottom line concern

3    as I said is about being fair and impartial.  Jurors are looked at

4    as kind of like in a way what we call judges of the facts.  I

5    guess a better term would be to be like the determiners of the

6    facts, but either way, it comes down to the same thing.

7        And basically what that means is that something happened

8    based on these charges, okay. And there will be persons getting

9    on the witness stand and they will give you some information that

10   goes into this and in some kind of way.  But you, the jury, have

11   to decide who and what you believe and what you think happened and

12   kind of put that all together as the way you might do with a jigsaw

13   puzzle.

14       Put all of those pieces together and kind of get a

15   general picture of what is there.  And it doesn't necessarily

16   mean that you have to have all of the pieces you know there to

17   get a general idea, because anybody who puts together a jigsaw

18   puzzle knows that when you are looking at those pieces, what you

19   often see is blue sky that looks like all the same but you can

20   get enough to a picture of what you think occurred.

21       That is what we meant by finding the facts.  You are the

22   determiners based on what is presented to you by way of the

23   testimony from the witness stand.  And understand, too, that some

24   people think that evidence means you have to have something in

25   your hand.  That is what evidence is, but evidence is also

-30-

1    testimony with someone getting on the witness stand and saying what

2    they saw, heard, or something like that.

3         And quite often in a lot of cases, that is all that is

4    in a criminal case, in a case, just someone getting on the witness

5    stand saying what they saw, heard, but that is testimony.  So -- and

6    that is evidence.  So, it also means that when you are listening

7    to somebody, what they say, you have to decide who and what you

8    believe based on that and that is what we call determining

9    credibility or believability.

10        And there is no way that I can tell you, you know, that

11   if you take A plus B and you know, equal C or any other kind of

12   mathematical formula or equation that would guarantee that you are

13   getting the actual facts and that someone's credibility is to

14   measure in that way.  Because human nature being what it is, there

15   might be any number of reasons that you look at.

16        You look at what that person's position might have been.

17   If that person says they saw something, were they in a position to

18   actually see what they are describing.  Does that person have any

19   bias or any other reason to kind of twist that testimony for any

20   kind of a reason.  Does that person have a good memory of what

21   happened.  All of those are the various kinds of factors that you

22   look at when you weigh credibility.

23        Now, what you do not do is decide that you are going to

24   believe or not believe someone merely because of what that person

25   does or how that person may be dressed.  Just as an example, to

-31-

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

illustrate my point, say someone steps up to the witness stand and that person has a uniform and you recognize that is a Detroit police officer or police officer. Someone might right off say my cousin is a police officer or my cousin, Mary, is a police officer and I know that that is a straight-up person out there risking his or her life and I know that person would not get on the witness stand and say something that would be wrong.

There is no reason why I shouldn't believe that person. But understand, again, and someone else might be at the other extreme and say, I know I did not roll through that stop sign. That cop stopped me and gave me a ticket. You know, they all lie, blah, blah, blah, whatever. So, you got those extremes like that. So, what we don't want you to do is to look at it that way, but look at the person who is taking that witness tand and decide if you are going to believe them because anyone is subject to making a mistake.

Example I always use is this. If someone is of the mind, well, a police officer who is trained in the law, enforces the law and so forth, can't make a mistake. Let's take this for example. Police officer on the witness stand. Person has been a police officer for, like, 20 years or something like that. And this person described say, well, it was broad daylight. I was about a half a block away, you know, and I saw this, this, that, and the other, and this is what I saw.

One of the lawyers may ask, well, ma'am, I see today

-32-

you are wearing glasses that seem to be highly prescriptive kind of glasses. You know the old thing, the coke bottle kind of look. Were you wearing them that day. Well, no, I left them at home. I forget them so I wasn't wearing them that day. Well, how far can you see without your glasses. Maybe, about, three feet.

So, there may be any number of factors or reasons why that person could make the mistake or something that you might want to know about that may be a reason there without assuming or presuming that that person is always going to be right or accurate.

So, again, listen to what taht person has to say, how they say it, and make a decision based on that and not to believe or discredit someone merely because of what that person does or how that person dresses or anything like that. That is what we mean by determining credibility.

And when you come right down to it, that is probably the most important function that jurors have, trying to put together what happened and who and what, you know, you believe about that and there is nothing as I said that requires you to be a super human being in doing that.

Just use your own basic common sense in looking at those factors as to what that person is saying to you, how they are saying it, how it fits in with the other evidence in the case, whether or not one person says something that is consistent with that. And if not, what might the difference be because one

-33-

1    person might have been standing up, you know, behind the tree.

2    Someone else might have been, like, laying down in the yard,

3    whatever it might be.  So, all of those are the very factors that

4    you look at when you are making those decisions.

5         But it is nothing, believe me, it is nothing really

6    difficult about doing it when you accept the way that it is to

7    be done.  Keep in mind, also, that there is another factor

8    involved with a criminal case I am going to make sure that we

9    are on the same page.

10        For those of you who have been on a civil case before,

11   you might have recalled, but as a general rule, civil cases may

12   sometimes require maybe eight or nine people as jurors.  And for

13   there to be a verdict or decision in that case, it doesn't require

14   that all of those jurors agree one way or the other.

15        For example, if there is, like, nine jurors and seven

16   of those jurors might say, well, this is how we find here and this

17   is what we think should happen,t hen it can be a verdict.  It

18   doesn't require all of them to agree in the same way.

19        Criminal cases however for there to be a verdict,

20   whether it be guilty or not guilty, whatever verdict there may

21   be, it requires that all of the jurors agree one way or the other

22   on whatever that decision may be.  All of the jurors have to agree

23   on that.  So, it is important for me to know going into this that

24   the person who will eventually decide this case, who will go to

25   that jury room and sit there and talk about this case and try to

-34-

1    reach a decision will be of the mind that they will make every

2    effort to do that and not have someone kind of back out or drop

3    out, you know, and say, okay, the rest of you can do what you want

4    to do, I am going to sit here, twiddle my thumbs, read my book,

5    play with my pac man, not pac man, whatever, and you can do what

6    you want to do.

7         So, if that were to occur, then we would have just wasted

8    our time here because somebody is not at least making an effort

9    to do it.  I am not saying that everybody has to agree mind you

10   or it requires that you agree, but if you have a verdict you have

11   to agree, but you have, at least, everybody participating with the

12   object in mind to try to reach a decision.

13        So, my question is this, is there anyone who thinks or

14   feels that they have some kind of philosophical view or religious

15   kind of thing that says that, well, if I were to decide that someone

16   violated the law and did something to somebody else they shouldn't

17   have done in violation of the law, that I cannot and will not do that

18   because it will go against this philosophical view or some kind of

19   religious stricture that you think is at play.

20        Anybody in the first row with that concern?

21        (NO RESPONSE.)

22        THE COURT:  Second or third row?

23        (NO RESPONSE.)

24        THE COURT:  See no hands on that.  Moving on.  So --

25        MR. ROLLSTIN:  Judge, Mr. Contreras had his hand up.

                              -35-

1    THE COURT:  Pardon me.  Yes?

2    JUROR CONTRERAS:  You said something about religious

3 purpose?

4    THE COURT:  Go ahead and tell me what you are saying.

5    JUROR CONTRERAS:  Well, it is hard for me to judge

6 a man, you know, because I believe in the Lord.

7    THE COURT:  Sir, that doesn't -- hold on a minute.  Let

8 me just stop you right there.  I would think that all of us believe

9 in the Lord, okay.  Let's just say that is the case.  Okay.  And

10 we have religion and we go to church of our choice, you know, and

11 whatever, but we also live in the secular world where we have to

12 deal with things in terms of laws, traffic laws, other laws,

13 you know, that are there.

14    We have to -- don't you agree with that, okay.  So, as

15 a juror, you are not asked to judge a man in the way that you would

16 in the Christian religious kind of way because everyone would have

17 a different standard about how they might do that.  Because different

18 religions have different ways of looking at that.  So, you are asked

19 here as a juror to put aside anything about religion.  You are simply

20 deciding if somebody broke a law, broke a rule based on the evidence

21 that is here.

22    And that is not judging the person.  That is judging

23 the evidence.  You are deciding whether or not somebody did something

24 that violates the law.  Behavior, whatever it is, it doesn't matter

25 who that person is.  You are deciding about whether or not those

-36-

1    facts and that evidence show that somebody violates the law.  You

2    see that difference, sir.  Okay, very well, okay.

3            Now, some principles of law that are involved with every

4    criminal case.  One of those that you often here is what is called

5    the presumption of innocence.  It is woven into the whole fabric

6    of our criminal justice system.  The presumption of innocence.

7            I also say the presumption of not guilty the same way

8    that I say the presumption of innocence in being the same way,

9    and I will tell you why for this reason.  If I were to say to

10   you right now in the history of this country, in the millions

11   and millions of cases, you know, that have been through the

12   court system for jurors to decide, that never has a jury returned

13   a verdict of innocent.

14           Obviously, I am playing with words and the reason is

15   this.  As jurors, you are only asked to decide if the evidence

16   is enough to prove someone guilty and if not, you say not guilty.

17   At no time is the juror asked to decide if someone is innocent.

18   It is either guilty or not guilty.  So, the law says the presumption

19   of innocent, and I say the presumption of not guilty in the same

20   way because the purpose of that and the reason for that principle

21   is for you to understand that it defines what your state of mind

22   is and should be at this very moment.

23           The fact that the defendant has been charged with a

24   crime, that he is on trial,t hat we are all here means nothing

25   in terms of your thoughts about him, whether he is guilty or not

-37-

guilty.  He is presumed to be not guilty in spite of all of the

circumstances that we have here.

The presumption of innocence, the presumption of not

guilty is to be foremost in your mind.  The prosecution is saying

that the defendant did something.  The defendant is saying that he

didn't.  You have to decide and we start off to understand that he

is presumed to be innocent and not guilty of the crime he is charged

with.

Now, I emphasize that in this way, and understand this is

the illustration and understand the point that I am trying to make.

If at this very moment I were to say to you, members of the jury,

bring me a verdict in this case.  Now, of course, the first response

might be, well, Judge, how can I do this.  I haven't heard any

evidence in the case.  I don't know what my verdict would be.

I am going to narrow that down to a choice.  You have to

say either guilty or not guilty at this juncture.  So, with that

in mind, the only thing you can say is not guilty because you have

not heard any evidence in the case and because of that presumption

of not guilty.

So, if you were asked that right now at this point,

understand that it simply would be not guilty.  It would not be

I don't know or I can't say or anything like that.  Simply, not

guilty because of that presumption and because you have not heard

any evidence in this case.

Another principle of law for you to be aware of is this,

-38-

1    in a criminal case, the prosecution always has what is called the

2    burden of proof.  By that I mean the prosecution has the responsibility

3    to bring forth the evidence and prove the charges in this case and

4    that responsibility to do that is on the prosecution throughout

5    the entire course of the trial.

6    At no time does that shift over to the defense side

7    where the defense has to prove anything.  Let me illustrate that

8    with this example.  And this is an extreme example and I think it

9    illustrates the point quite well.  Let's say that the prosecutor

10   calls a witness, calls a witness, any number of witnesses, and

11   that defense counsel does not even ask one question on cross-

12   examination or say anything during that process.

13   All the evidence is put before you.  The lawyers make

14   their arguments to you as to what they think you should look at

15   and decide this case on.  You go to the jury room and decide the

16   case.  Now, the first thing someone might say, well, the defense

17   didn't do anything.  He must be guilty, whatever.  But you have to

18   look at the evidence that is put before you, and you heard nothing

19   from the defense, and if you look at the evidence and say, I heard

20   10 witnesses from the prosecution but I am not convinced that they

21   have shown the defendant guilty beyond a reasonable doubt.

22   So, the prosecution hasn't met that burden of proof.

23   So, you find not guilty because the defense doesn't have to do

24   anything.  It is always on the prosecution to prove their case.  I

25   am not suggesting that it would happen that way but that is again

-39-

1    to illustrate my point.

2         Now, as I said, the prosecution always has the burden

3    of proof.  It doesn't shift to the defense side in any kind of

4    way and the defense has to do anything.  And the defendant here,

5    Mr. Jones, does not have to get on the witness stand to testify.

6    That is his right by law.  Now, I know it is a very common circum-

7    stance that I get that jurors like to say, well, I would like to

8    hear his side.  I would like to hear what he has to say about this.

9    I don't think I can make a decision without my hearing what he has

10   to say.

11        But, again, it is exactly what I just said about the

12   prosecution having the burden of proof and the defense doesn't have

13   to do anything.  But more importantly, that is allowed by law.

14   If the law allows that a person accused of a crime has the right

15   to remain silent and not take the witness stand, no one can force

16   him to do that if he doesn't want to.

17        And the most important thing about that from your

18   prospective, you cannot in any way hold it against him if he

19   does not take the witness stand to testify.  That means that

20   you cannot go to the jury room and say, he must be guilty.  He

21   didn't get on the witness stand and tell me anything.  He must

22   be trying to hide something.  You cannot engage in any kind of

23   discourse like that in the jury room if he does not testify.

24        The basic law is he has the right not to testify and

25   if he doesn't, you cannot hold that against him.  You have to

                              -40-

1   decide the case on the evidence that is there.

2         So, is there anyone who thinks that even though you

3   might want to hear him, the other side, that you could not follow

4   the law that says that if he doesn't, you can't hold it against

5   him.  Anybody have any problem with that?

6         (NO RESPONSE.)

7         THE COURT:  Good.

8         The other principle I want to talk about and we will

9   go to the lawyers.  You have to make that ultimate decision in

10  the case. That ultimate decision is this, it will be worded

11  something like this.  After hearing all of the evidence in this

12  case and the law given by the judge, am I convinced that the

13  prosecution has proven the charges against the defendant, and

14  am I convinced beyond a reasonable doubt, beyond a reasonable

15  doubt.  That is the proper standard.

16        Proof beyond a reasonable doubt, a doubt for which you

17  can find a reason in the evidence or lack of evidence in the case

18  as to the elements, which I will tell you about in a minute.  And

19  I mention this because -- and I am not trying to in any way insult

20  anyone's intelligence, but quite often I talk to jurors after

21  cases have been over and trying to figure out what might have been

22  the problem and what might have been done differently.

23        And all too often people get hung up on something they

24  may have seen on some TV show and think that real court cases are

25  supposed to follow the same kind of way that it may happen there.

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

1    But see, as jurors, you don't get to the jury room and

2    then try to act like detectives or anything like that.  You simply

3    take the evidence for what it is and weigh that out to make that

4    decision.  So, proof beyond a reasonable doubt is not the same

5    thing you might hear on television, proof beyond all doubt or proof

6    beyond a shadow of the doubt and all of those kind of things you

7    hear in TV shows.

8    Proof beyond a reasonable doubt as to the elements of

9    the charge. And the elements usually -- there are usually a couple

10   of things, you know, theories, I guess you might say almost in

11   every criminal case and understand this is my own breakdown of

12   this.

13   Most of the time, it is a situation where someone may

14   have done something and they may say, well, I had a reason for

15   doing it and what it was and what I did wasn't as bad as I say.

16   The other one may be that somebody said it just wasn't me.  So,

17   then you get identification.  The prosecution has to prove one,

18   that the crime was committed, and has to prove that the person

19   accused of that crime committed that crime and those require

20   proof beyond a reasonable doubt.

21   So, again, when I say, elements, I mean this.  The law

22   recognizes that for every crime there are stpes or parts that make

23   it up and each of those steps or parts that are called elements

24   have to be proved beyond a reasonable doubt.

25   For example, if someone breaks into somebody's garage

-42-

1    and it is called breaking and entering with intent to commit

2    larceny.  One element would be the breaking.  Another element

3    would be the entering. The third element would be with the intent

4    to steal something.

5           Breaking means someone can open a door, open a window.

6    And then entering means that you can put any part of your body

7    inside of that to do something.  If it is done with the intent

8    to steal something, you know those three elements are there.

9           Let's assume, you know, that somebody breaks or opens

10   the door or window, enters the place but they did it because

11   they thought they saw a fire inside.  They weren't going in

12   there to steal something.  So, it is not a crime because there

13   is no third element there to show that somebody was doing something.

14          But anyway, the point I want to make is that the

15   prosecution must prove each element beyond a reasonable doubt.

16   Proof beyond a reasonable doubt is the proper standard that is

17   to be used.

18          That is my spiel for the time being.  I am going to

19   to to the lawyers now.  The prosecution always has the burden of

20   proof. And with that in mind, the prosecution gets to go first.

21   Proceed, please.

22          MR. ROLLSTIN:  Thank you, Judge.  Good morning,

23   everyone.

24          THE JURY:  Good morning.

25          MR. ROLLSTIN:  Ms. Pappas, how long did you get your

                                -43-

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

1    subpoena to come down here?

2              JUROR PAPPAS:  Just a couple of weeks.

3              MR. ROLLSTIN:  Okay.  And Mr. Papke, about the same

4    for you, a couple of weeks.

5              Ms. Pappas, when you got that subpoena, were you real

6    happy about the prospective of coming down to the Frank Murphy?

7              JUROR PAPPAS:  I was nervous.

8              MR. ROLLSTIN:  For a day or two?

9              JUROR PAPPAS:  I happened to be busy at work, but it

10   was a bit of a problem.  But other than that.

11             MR. ROLLSTIN:  Ms. Markham, did you have other things

12   that you might be attending to?

13             JUROR MARKHAM:  I work afternoons, not really.

14             MR. ROLLSTIN:  It was an honest effort.

15             Mr. Papke, how about you, other things that you

16   might rather be doing today than down here with us in jury

17   service?

18             JUROR PAPKE:  Not really.

19             MR. ROLLSTIN:  Well --

20             JUROR PAPKE:  I am kind of nervous.

21             MR. ROLLSTIN:  That is kind of natural.

22             Mr. Wingate, you served as a juror before, correct?

23             JUROR WINGATE:  Yes.

24             MR. ROLLSTIN: How about you, other things that you

25   might be tending to do today in your personal life if you were

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1    not here?

2        JUROR WINGATE:  I don't want to be down here, but it

3    doesn't bother me being here.

4        MR. ROLLSTIN:  That is the point I am trying to get at

5    is this idea, and to Ms. Pappas and Ms. Markham and Mr. Papke as

6    well, and Ms. Benson, I have seen nodding your head, too, as we

7    warm up to the idea a little bit, the reality of it is that there

8    is probably something else all of us would rather be doing here

9    than here in this room at this point in time, okay.

10       Ms. Johnson, would you agree with that?

11       JUROR JOHNSON:  Yes.

12       MR. ROLLSTIN:  Okay, and the reason that I began at

13   that point is to express to all 14 of you here and also to those

14   of you who will be brought up slowly during the course of this

15   process of selecting a jury, is to, you know, recognize the reality

16   of that we appreciate that you make a sacrifice to be down here.

17       Okay.  So, that is a starting point.  And we thank you

18   for that.  Now, let me also say this.  For those of you that are

19   eventually chosen as jurors in this case, I will make you one

20   promise that is whatever your verdict is and it is too early to

21   talk about that, but whatever your verdict is, at the end of this

22   case, I can promise you,  you will be happy that you served as a

23   juror.  Okay.

24       Now, let me, first of all, begin with this idea that you

25   come down here as jurors and the judge talked about the notion that

-45-

1      you don't leave your common sense at the door.

2              Now, Ms. Benson, have you ever been the victim of

3      a crime?

4              JUROR BENSON:  Yes.  Too close to home, my son was

5      murdered.

6              MR. ROLLSTIN:  How long ago was that?

7              JUROR BENSON:  Four years.

8              MR. ROLLSTIN:  That, obviously, is probably one of the

9      most devastating events in your life, would you agree?

10             JUROR BENSON:  (Nods head.)

11             MR. ROLLSTIN:  For the record, Ms. Benson is nodding

12     her head, yes.

13             Now, Ms. Ross is the mother of Demetris Perdue, who

14     is the deceased in this matter and she shares a similar situation

15     to you and one which is really more common than it should be today,

16     but do you think for a moment that James Jones, the defendant,

17     had anything to do with the demise of your son, with his death?

18             JUROR BENSON:  I can't say that.

19             MR. ROLLSTIN:  Okay.  It is safe to say he probably didn't?

20             JUROR BENSON:  I don't know who killed my son.

21             MR. ROLLSTIN:  Okay.  For a moment, let's assume he

22     did not, okay.  I think that is probably a safe assumption, and

23     the reason that I am bringing this out is you have had a very bad

24     event in your life, and the last thing in the world that any of us

25     want you to do during your jury service is to use that bad event

                              -46-

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

1    against Mr. Jones to try to seek vengeance for the death of your

2    son.  You can see how that can be wrong.

3            JUROR BENSON:  I don't really want to be here on this

4    trial.

5            MR. ROLLSTIN:  I understand that, and you may not be,

6    okay. But using you as an example -- Mr. Alexander, can you see

7    the example I try to use of Ms. Benson here. The thing that I

8    am trying to point out is that we may have all had bad events in

9    our lives, but what we are asking you to do is to realize that the

10   people involved in this case, both from the victims perspective

11   and also from Mr. Jones' perspective, it would be wrong to use those

12   bad events against either one of them.

13            Would you agree, Ms. Markham?

14            JUROR MARKHAM:  Yes, okay.

15            MR. ROLLSTIN:  Anybody had on the panel here had a bad

16   experience with police officers at any time in their life, traffic

17   ticket?

18            Mr. Dickinson, Mr. Contreras, Ms. Benson.  I see, Ms. Benson

19   you are getting right on board with this one, okay.  I got no problem

20   with that.

21            Mr. Dickinson, you indicated you have, too, right?

22            JUROR DICKINSON:  I was beat up by one one time.

23            MR. ROLLSTIN:  Okay.  Mr. Contreras, how about you?

24            JUROR CONTRERAS:  Same thing.

25            MR. ROLLSTIN:  Okay, Ms. Benson, were you pleased with how

-47-

1    your son's homicide was investigated?

2              JUROR BENSON:  Nothing.

3              MR. ROLLSTIN:  Okay.  I didn't just fall off -- I might

4    have been born at night, but not last night, okay.  I understand

5    what you are saying, the three of you for a moment, okay.

6              If I told you that Ms. Ross is the mother of Demetris

7    Perdue, who is the deceased in this matter, and, obviously, James

8    Jones is on trial, and a very important day of your life, would you

9    agree, Mr. Contreras?

10             JUROR CONTRERAS:  (No response.)

11             MR. ROLLSTIN:  You have to say, yes or no.

12             JUROR CONTRERAS:  Yes.

13             THE COURT:  Okay. Can you see, Mr. Dickinson, how it

14   would be wrong to use that bad event in your life in this trial?

15             JUROR DICKINSON:  I have been in his position.

16             MR. ROLLSTIN:  You have been charged with a crime?

17             JUROR DICKINSON:  Yes.

18             MR. ROLLSTIN:  Were you convicted of it?

19             JUROR DICKINSON:  Yes.

20             MR. ROLLSTIN:  How long ago was that?

21             JUROR DICKINSON:  '73.

22             MR. ROLLSTIN:  Okay.  Mr. Contreras, how about you, do

23   you see how it would be wrong to use the bad event in your life

24   improperly in this trial?

25             JUROR CONTRERAS:  Yes.

-48-

LASER STOCK FORM FM/SRN

THE CORBY GROUP 1-800-255-5040

1          MR. ROLLSTIN:  Okay.  Ms. Benson, would you agree?

2          JUROR BENSON:  Sure, I don't want to be here on a murder

3     trial.

4          MR. ROLLSTIN:  Okay, we got that part down.  We know you

5     don't want to be here,  and I appreciate that.  I think if we

6     went through and actually asked everybody in the entire room,

7     I am not saying that I want to be here but I am -- but I will be.

8          Now, with that in mind, do you see the point that I am

9     trying to make?

10          JUROR BENSON:  I understand you.

11          MR. ROLLSTIN:  Okay.  Is it Ms. McDonough?

12          JUROR MCDONOUGH:  Yes, it is Mrs.  I am a widow.

13          MR. ROLLSTIN:  Am I pronouncing your last name right?

14          JUROR MCDONOUGH:  McDonough.

15          MR. ROLLSTIN:  Ms. McDonough, okay.  Do you appreciate

16     the point that I am trying to make?

17          JUROR MCDONOUGH:  Absolutely.

18          MR. ROLLSTIN:  Okay.  Ms. Daniel, you understand?

19          JUROR DANIEL:  Yes.

20          MR. ROLLSTIN:  Okay.  Ms. Burnett, you see the point I

21     am trying to make here?

22          JUROR BURNETT:  Yes.

23          MR. ROLLSTIN:  Okay, all right.  And I thank the three

24     of you for your candor, oaky.  Now, all right, the point that

25     I think that I will try to make here, Ms. Johnson, is the notion

-49-

1    that we all have life experiences in our past and we come to the

2    courtroom with. There is no way we are going to leave those at the

3    door, you agree?

4              JUROR JOHNSON:  Yes.

5              MR. ROLLSTIN:  Okay. The inquiry that I try to make

6    right now or the question that I try to put to you and the 13 other

7    members of the panel right now is the idea that the promise that I

8    am searching for from you is that you will give both sides a fair

9    shake and you won't use some bad event in your past to, you know,

10   right the wrong, if you will.

11             Can you do that for us?

12             JUROR JOHNSON:  Sure.

13             MR. ROLLSTIN:  Okay,  Ms. Pappas, can you do that for us?

14             JUROR PAPPAS:  Yes.

15             MR. ROLLSTIN:  Ms. Markham?

16             JUROR MARKHAM:  Yes.

17             MR. ROLLSTIN:  Mr. Papke?

18             JUROR PAPKE:  Yes.

19             MR. ROLLSTIN:  Mr. Wingate?

20             JUROR WINGATE:  Yes.

21             MR. ROLLSTIN:  Mr. Raden?

22             JUROR RADEN:  Yes.

23             MR. ROLLSTIN:  Ms. Burnett?

24             JUROR BURNETT:  Yes.

25             MR. ROLLSTIN:  Ms. Pettit, would you agree?

                              -50-

JUROR PETTIT:  I don't know.

MR. ROLLSTIN:  Okay.

JUROR PETTIT:  I feel for her, you know.

THE COURT:  Hold on a minute, please.  Don't look for some convenient reason not to be here, first of all.  Your feeling for her has nothing to do with whether or not you can be a fair and impartial juror.  Now, why would you make that as a reason for not being able to be fair?  Why would that affect your being a fair juror?

JUROR PETTIT:  (No response.)

THE COURT:  Who else would know but you.  You understand that what may have happened to her in her case has nothing to do with your decision in this case.  You are not going to go to the jury room and say, well, Ms. So-and-so's son was killed, so therefore, I am going to find this person guilty or not guilty?

JUROR PETTIT:  No, I didn't say that.

THE COURT:  Well, you are suggesting that it would affect your decision making in some kind of way.

Proceed, please.

MR. ROLLSTIN:  Thank you, Judge.

Let's talk a little bit about the burden of proof in this matter.  Ms. Pappas, where is the burden of proof at?

JUROR PAPPAS:  The evidence and everything that is brought up about it.

MR. ROLLSTIN:  Who has the burden of proof in this case?

JUROR PAPPAS:  The burden of proof?

-51-

1       MR. ROLLSTIN:  Let me help you out here.  Who has got

2  the burden of proof?  I do, don't I?

3       JUROR PAPPAS:  Yes.

4       MR. ROLLSTIN:  Mr. Alexander, is the burden of proof

5  proof beyond all doubt?

6       JUROR ALEXANDER:  Has to be.

7       MR. ROLLSTIN:  Okay.  Ms. Daniel, is the burden of

8  proof, proof beyond a shadow of doubt?

9       JUROR DANIEL:  (Shakes head.)

10       MR. ROLLSTIN:  Mr. Wingate, is the burden of proof

11  proof beyond any doubt?

12       JUROR WINGATE:  Beyond any doubt?

13       MR. ROLLSTIN:  Help us out?

14       JUROR PAPPAS:  Reasonable doubt.

15       MR. ROLLSTIN:  Proof beyond a reasonable doubt.

16       THE COURT:  I have to say this.  We are dealing

17  here with supposed to be responsible adults.  I sat here for

18  an hour almost going over certain things and you ask a simple

19  question of things that I said and everybody is getting it wrong.

20       Proof beyond a reasonable doubt.  Proof beyond a

21  reasonable doubt.  A doubt based on reason and common sense.

22  The burden of proof.  I gave the example that if the prosecutor

23  were to put on the witnesses and the defense didn't do anything,

24  that the burden of proof is on the prosecution.

25       Come on people.  You are responsible adults.  Act like it.

LASER STOCK FORM FMSRN

THE CORBY GROUP   1-800-255-5040

1          MR. ROLLSTIN: Thank you, Judge.

2          Now, the reason I bring that out is this notion that we

3    have all heard on TV, maybe in papers, Ms. Markham, proof beyond

4    a shadow of doubt, any doubt, all doubt, shadow of doubt -- I think

5    I said that.

6          Proof beyond a reasonable doubt.  Nothing more.  Nothing

7    less.  Can you hold it to that?

8          JUROR MARKHAM:  Yes.

9          MR. ROLLSTIN:  Ms. Daniel?

10          JUROR DANIEL:  Yes.

11          MR. ROLLSTIN:  Mr. Wingate?

12          JUROR WINGATE:  Yes.

13          MR. ROLLSTIN:  Mr. Papke?

14          JUROR PAPKE:  Yes.

15          MR. ROLLSTIN:  Okay.  You wouldn't let me whittle that

16    down any, would you?

17          JUROR PAPKE:  No.

18          MR. ROLLSTIN:  You wouldn't let anybody inflate that

19    burden, would you?

20          JUROR PAPKE:  No.

21          MR. ROLLSTIN:  Proof beyond a reasonable doubt.  Nothing

22    more.  Nothing less.

23          Bring us what we order, right, Mr. Raden?

24          JUROR RADEN:  Yes.

25          MR. ROLLSTIN:  There you go.  Fair enough.

-53-

All right, Ms. McDonough, what is the burden of proof pertaining to, what do you think I have to do?

JUROR MCDONOUGH:  (No response.)

MR. ROLLSTIN:  Do I have to prove every fact and circumstance that is testified to on the witness stand?

JUROR MCDONOUGH:  Proof beyond the reasonable doubt that the party is guilty of the crime that they are charged with.

MR. ROLLSTIN:  Very good. Guilty of the crimes charged, correct?

JUROR MCDONOUGH:  Right.

MR. ROLLSTIN:  You all heard Judge Jackson read the six crimes that are named in the Information, correct. All right, first degree murder, three counts of assault with intent to murder, felon in possession, felony firearm.

UNIDENTIFIED JUROR:  I wasn't in here when he did all of that.

MR. ROLLSTIN:  That is all right. We will catch you up in a minute. There were six crimes in total that were read in the Information. And the judge will also instruct everybody that that is not evidence, okay. All right.

So, we have to prove those six crimes, correct, Ms. Johnson?

JUROR JOHNSON:  Yes.

MR. ROLLSTIN:  And we have to prove that Mr. Jones committed them, right?

-54-

1          JUROR JOHNSON:  Yes.

2          MR. ROLLSTIN:  All right.  Now, Mr. Alexander, you

3  know the definition of first degree murder?

4          JUROR ALEXANDER:  No.

5          MR. ROLLSTIN:  Okay.  Does anybody here know the

6  definition of first degree murder?

7          Ms. Pappas, I see you got your hand up here.  Let me

8  just say this.  Unless I have got the book inf ront of me, I can't

9  recite the five elements to first degree murder.  I don't have

10  them memorized in my head and I have been doing this for about

11  15 years, okay.

12          Let me just for a moment say this.  During the course

13  of the trial, you know, one of the problems is I won't waste your

14  time.  As I said before, you guys make a sacrifice to be down

15  here.  We are not going to waste your time while you are here.

16          The officer in charge, JoAnne Miller is somebody who is

17  going to be having a limited appearance here during the course of

18  this trial.  The reason that is the case is that she lost her

19  father in the past few days, okay.  So, with that in mind while

20  I am thinking of that, I want to bring that fact to your attention.

21          Now, then, each crime is defined by elements.  Okay.

22          Ms. Pettit, ever used a cookbook?

23          JUROR PETTIT:  Yes.

24          MR. ROLLSTIN:  When you get a recipe out of a cookbook,

25  what are the individual items in that recipe called?

-55-

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

1           JUROR PETTIT:   Ingredients.

2           MR. ROLLSTIN:   There are a certain number of ingredients

3  that you might use to cook something, is that correct?

4           JUROR PETTIT:   Correct.

5           MR. ROLLSTIN:   Same way, definition of the crime.

6  Ingredients that we call elements, okay.  All of the elements

7  to prove the crime charged.

8           With me on that, Ms. Pappas, Ms. Markham, Ms. Johnson?

9           (NOD HEADS.)

10          MR. ROLLSTIN:   Okay, everybody perceive that idea.

11          The judge is going to give you the elements at the

12  end of the trial.  He is going to say this is what first degree

13  murder is.  This is what assault with intent to murder is.  Felon

14  in possesion of a firearm, felony firearm is.  Do you believe the

15  facts that were testified to from the witness stand prove that

16  beyond a reasonable doubt.  Yes or no.

17          You make your decision, you understand the process,

18  Ms. Markham?

19          JUROR MARKHAM:   Yes.

20          MR. ROLLSTIN:   Everybody feel comfortable with that

21  idea and that procedure.  Ms. Burnett, you are okay with that?

22          JUROR BURNETT:   Yes.

23          MR. ROLLSTIN:   All right.  Ms. Daniel, there is three

24  counts of assault with intent to commit murder in this case.

25  One count for each individual.  Assault with intent to murder.

-56-

Obviously, the person has to try to kill somebody, right.  Okay.

What if none of those three people was injured?

JUROR BURNETT:  It still can be intent or something.

MR. ROLLSTIN:  Mr. Raden, let's say you are out in front getting a hot dog at lunch today, right. And I have a bow and arrow and I shot an arrow at you from across the street, but I myself, you are with me on this?

JUROR RADEN:  Yes.

MR. ROLLSTIN:  Okay.  You don't see me do that?

JUROR RADEN:  Right.

MR. ROLLSTIN:  Okay.  And you don't hear the arrow because it is silent.  You don't even know that I have shot an arrow at you, right?

JUROR RADEN:  Right.

MR. ROLLSTIN:  Have I committed the crime of assault with intent to commit murder?

JUROR RADEN:  I don't think so.

MR. ROLLSTIN:  I sure have.

JUROR RADEN:  I don't know --

MR. ROLLSTIN:  I absolutely have.  I tried to kill you but I missed, right?

JUROR RADEN:  I didn't know anything about it.

MR. ROLLSTIN:  You don't have to know, okay.

Let's say there are 10 priests -- well, let's not use priests.  I am Catholic, by the way, so I can say that.  But let's

-57-

1    say there is 10 --

2            MS. MARKHAM:  Cooks.

3            MR. ROLLSTIN:  10 honest cooks that watched me do that,

4    right.  Now, I have committed the crime.  I have tried to kill you

5    but I am a bad shot.  I missed, right.  I have still committed the

6    crime.  You haven't been hurt and you didn't even know I tried to

7    do it.

8            You understand the point I am trying to make here?

9            JUROR MARKHAM:  Right.

10           MR. ROLLSTIN:  No injury is required for assault with

11   intent to commit murder, you understand that?

12           JUROR RADEN:  Yes.

13           MR. ROLLSTIN:  We are not going to award people who are

14   bad shots is the idea.  Okay.  And the notion that the person

15   didn't know about it is just an example that I used to try to draw

16   it out even.  It is a much more extreme example.  You don't have to

17   know about it.  I am not suggesting that is going to be the ways

18   in this situation.

19           You don't have to know about it.  Don't have to be

20   injured.  You are still guilty of the crime.  As long as you intended

21   to kill the person and you tried to assault them, okay.

22           Mr. Raden, fair enough, all right.

23           JUROR RADEN:  Okay.

24           MR. ROLLSTIN:  Mr. Wingate, first degree murder.  In

25   this case, it is charged first degree premeditated, in other words,

-58-

the person has to think about it ahead of time.  Okay, that is

one of the things that I am going to have to prove in this case,

that not only did he commit the crime, but it was committed with

a certain state of mind.

> With me on this, okay.  You have to say, yes or no.

> JUROR WINGATE:  Yes.

> MR. ROLLSTIN:  Okay.  The law does not define how much

time is required for premeditation and deliberation in first

degree murder.  It is for you to decide whether or not there

was sufficient time for Mr. Jones to consider the pros and cons

of his conduct, okay?

> JUROR WINGATE:  Okay.

> MR. ROLLSTIN:  All right.  Now, you ever go through a

yellow traffic light?

> JUROR WINGATE:  Yes.

> MR. ROLLSTIN:  Okay.  You are driving down the street,

the light is green.  It goes to yellow.  You size up how fast

you are going, correct?

> JUROR WINGATE:  Right.

> MR. ROLLSTIN:  You size up how far you are from the

intersection, correct?

> JUROR WINGATE:  Correct.

> MR. ROLLSTIN:  You might also consider the weather

conditions?

> JUROR WINGATE:  Yes.

-59-

1      MR. ROLLSTIN:  You might think about are you in a school

2  area, correct?

3      JUROR WINGATE:  Yes.

4      MR. ROLLSTIN:  All right.  And you do all of that in

5  a second or two, would you agree?

6      JUROR WINGATE:  Yes.

7      MR. ROLLSTIN:  And then you make a decision, stay on the

8  gas, apply the brake, correct?

9      JUROR WINGATE:  Yes.

10      MR. ROLLSTIN:  Oh, all right.  You have considered

11  the pros and cons of going through that intersection in that length

12  of time?

13      JUROR WINGATE:  The pros and cons of going through that

14  light.

15      MR. ROLLSTIN:  Have you done that.  Have you thought

16  about what you want to do?

17      JUROR WINGATE:  I have thought about it.  Yes.

18      MR. ROLLSTIN:  I am not suggesting in this case that

19  you might be sitting as a juror on would be that compressed of a

20  time frame, but I am suggesting to you that we can consider the

21  pros and cons of our conduct in something less than a day or week,

22  would you agree?

23      JUROR WINGATE:  Yes.

24      MR. ROLLSTIN:  Would everybody agree with Mr. Wingate?

25      JUROR MARKHAM:  Yes.

-60-

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

1          MR. ROLLSTIN:  Okay, fair enough.

2          Ms. Johnson, for example, for a moment, I want you

3   to invision here sitting at the table with me although she is

4   not today, JoAnn Miller.  And I decide we are a little short

5   on cash this morning, okay.

6          So, during lunch today, we are going to go over to

7   Bank One on Woodward and we are going to relieve them of some

8   of their money and neither one of us have an account there.  With

9   me on that.  And the suggestion that I am making here is that we

10  are going to go over and rob the place, okay.

11         I don't carry a gun, but JoAnn does.  All right.  But

12  I got a car. And what I am going to do is while JoAnn is in the

13  bank holding the place up, I am outside and she is giving me one

14  of the police radios so I can talk to her and I got the car out

15  front.  It is all warmed up.  I am keeping an eye out for everybody.

16  Making sure that the police don't show up.

17         Right, Mr. Papke.

18         JUROR PAPKE:  (Nods head.)

19         MR. ROLLSTIN:  Okay. She runs out of the bank.  She has

20  got some cash.  We drive off.  Have I committed a bank robbery?

21         JUROR PAPKE:  You are assessory.

22         MR. ROLLSTIN:  Mr. Dickinson, I see you are nodding

23  your head.  Have I committed --

24         JUROR DICKINSON:  Yes.

25         MR. ROLLSTIN:  Assessory after the fact is a separate

-61-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1    crime and that captures the idea, well, it doesn't matter what it

2    captures.  That is a separate crime that he is not charged with,

3    Mr. Jones.  You understand that, Ms. Johnson?

4              JUROR JOHNSON:  Yes.

5              MR. ROLLSTIN:  Have you ever heard of the term, aiding

6    and abetting?

7              JUROR JOHNSON:  Yes.

8              MR. ROLLSTIN:  Okay.  I am going to tell you right now

9    I am as guilty as JoAnn Miller robbing that bank.

10             JUROR JOHNSON:  Right.

11             MR. ROLLSTIN:  Never touched a gun.  Never got ahold

12   of the cash.

13             Let's say we have pulled off.  I never got my hands

14   on the loot.  I am just as guilty as her.

15             JUROR JOHNSON:  Yes.

16             MR. ROLLSTIN:  You agree, Ms. Markham?

17             JUROR MARKHAM:  (Nods head.)

18             MR. ROLLSTIN:  Ms. Pappas, you agree?

19             JUROR PAPPAS:  Yes.

20             MR. ROLLSTIN:  Okay.  Idea that I am broaching with

21   all of you here is the notion that people who encourage or assist

22   a crime are just as guilty as those who actually commit it.

23             Can you all appreciate that and agree to that point of

24   law if the judge tells you that's the rule of law in Michigan?

25             THE JURY:  (No response.)

                             -62-

1          MR. ROLLSTIN:  A nod of the head would be fine.

2          THE JURY:  (Nod heads.)

3          MR. ROLLSTIN:  Mr. Alexander, can you do that.  Can

4    everybody see why we shouldn't be allowed to excuse ourselves

5    from criminal conduct just because we get somebody else to do

6    it for us?

7          You agree with that, Ms. Johnson, Mr. Papke, Mr. Wingate?

8          (NOD HEADS.)

9          MR. ROLLSTIN:  Fair enough, okay.

10         Ms. Daniel, I have been talking about, going over a

11   little over 15 minutes now.  Have I provided any evidence to you

12   whatsoever?

13         JUROR DANIEL:  No.

14         MR. ROLLSTIN:  Where does the evidence come from?

15         JUROR DANIEL:  The prosecution.

16         MR. ROLLSTIN:  Okay. The witnesses that testify.

17         JUROR DANIEL:  Un-hun.

18         MR. ROLLSTIN:  They are going to come in one at a

19   time, raise their hands, tell the truth.  I am going to ask

20   them some questions.  Ms. Frederick will ask some questions, you

21   understand?

22         JUROR DANIEL:  Yes.

23         MR. ROLLSTIN:  At the end of the day, it will be up to

24   you to decide whether I believe the witness or not.  Do you think

25   that every witness that has ever sat in that chair over the last

                              -63-

1   20 or some-odd, 30 years has always told every ounce of truth?

2         JUROR DANIEL:  No.

3         MR. ROLLSTIN:  Mr. Raden, do you think that every witness

4   that has testified in a case has always told the truth?

5         JUROR RADEN::  No.

6         MR. ROLLSTIN:  Mr. Wingate?

7         JUROR WINGATE:  No.

8         MR. ROLLSTIN:  You see your function here.  They are

9   going to come in, one question at a time, one witness at a time,

10  and then you are going to ask yourself do I believe the elements

11  have been proven beyond a reasonable doubt.  Right, okay.

12        Mr. Alexander, can I ask an unfair question?

13        JUROR ALEXANDER:  Yes, you can ask.

14        MR. ROLLSTIN:  Sure I could.  Okay.

15        Ms. Pappas, if the witness were up there and say this is

16  a domestic violence case, okay.  And the man is on the witness

17  stand for a few minutes.  Pretend that he is the defendant, and

18  I were to say to that man, have you stopped beating your wife

19  yet.

20        Mr. Alexander, if he answers, yes or no, is there any

21  way that he can get out of that question with any dignity?

22        JUROR PAPPAS:  No.

23        MR. ROLLSTIN:  Ms. Pappas is helping you out.  We are

24  happy to get out of it.

25        Now, Ms. Pappas, what is wrong with that case?

-64-

JUROR PAPPAS:  Well, it is --

MR. ROLLSTIN:  It assumes so --

JUROR PAPPAS:  Yes, that he has been beating his wife.

MR. ROLLSTIN:  It assumes something that may or may not be true, right.  My point to you is this, the judge is going to tell you that the questions I ask and the things that I say are not evidence, and the questions that Ms. Frederick asks and things that she says are not evidence either.

Can you all follow that instruction if you are given it?

Mr. Raden, can you follow that instruction?

JUROR RADEN:  Yes.

MR. ROLLSTIN:  Okay.  Mr. Wingate?

JUROR WINGATE:  Yes.

MR. ROLLSTIN:  Okay, fair enough.

Couple more questions here and then I will be done.

Ms. McDonough, would you agree that James Jones deserves a fair trial?

JUROR MCDONOUGH:  Yes.

MR. ROLLSTIN:  Okay.  He deserves to have every one of his constitutional rights protected during this process, correct.  That is what we call due process.  It is this idea that there is a judge and there is an orderly progression of what we do.

Ms. Pettit, would you agree with that?

JUROR PETTIT:  (Nods head.)

MR. ROLLSTIN:  Ms. Johnson, you understand that I don't

-65-

1  have the ability to bring in the deceased, Demetris Perdue, in

2  this case, that is obvious?

3      JUROR JOHNSON: Yes.

4      MR. ROLLSTIN: Okay. Would you also agree, ma'am,

5  that Demetris Perdue, and really, what I am saying is the

6  victims also deserve a fair trial?

7      JUROR JOHNSON: Yes.

8      MR. ROLLSTIN: Okay. Mr. Alexander, would you agree

9  with that?

10     JUROR ALEXANDER: Yes.

11     MR. ROLLSTIN: Ms. Markham?

12     JUROR MARKHAM: Yes.

13     MR. ROLLSTIN: Mr. Papke?

14     JUROR PAPKE: Yes.

15     MR. ROLLSTIN: Mr. Wingate?

16     JUROR WINGATE: Yes.

17     MR. ROLLSTIN: Mr. Raden?

18     JUROR RADEN: Okay.

19     MR. ROLLSTIN: Ms. McDonough, you would agree with

20 that. Okay, fair enough.

21     Now, with that in mind that each side deserves a fair

22 trial and you are all attached to that idea, Ms. Pappas, if all

23 the elements are proven beyond a reasonable doubt, if they are

24 all proven beyond a reasonable doubt, would your verdict be

25 guilty or not guilty?

-66-

1          JUROR PAPPAS:  If they are proven, yes, it would be

2     guilty.

3          MR. ROLLSTIN:  Okay.  Ms. Markham?

4          JUROR MARKHAM:  Guilty.

5          MR. ROLLSTIN:  Ms. Johnson?

6          JUROR JOHNSON:  Guilty.

7          MR. ROLLSTIN:  Mr. Papke?

8          JUROR PAPKE:  Yes.

9          MR. ROLLSTIN:  Mr. Wingate?

10          JUROR WINGATE:  Yes.  Beyond a reasonable doubt would

11     be guilty.

12          MR. ROLLSTIN:  Okay.  Mr. Raden, what would your verdict

13     be?

14          JUROR RADEN:  Pardon?

15          MR. ROLLSTIN:  What would your verdict be if all the

16     elements are proven beyond a reasonable doubt?

17          JUROR RADEN:  Guilty or not guilty?

18          MR. ROLLSTIN:  What would your verdict be, guilty or

19     not guilty?

20          JUROR RADEN:  If they were --

21          MR. ROLLSTIN:  No problem.  Assuming that all of the

22     elements have been proven beyond a reasonable doubt, would your

23     verdict be guilty or not guilty?

24          JUROR RADEN:  Guilty.

25          MR. ROLLSTIN:  Mr. Alexander?

-67-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1              JUROR ALEXANDER:  Yes.

2              MR. ROLLSTIN:  Ms. Pettit?

3              JUROR PETTIT:  Yes.

4              MR. ROLLSTIN:  Ms. McDonough?

5              JUROR MCDONOUGH:  Guilty.

6              MR. ROLLSTIN:  Ms. Daniel?

7              JUROR DANIEL:  Guilty.

8              MR. ROLLSTIN:  What are you studying at Michigan State?

9              JUROR DANIEL:  Marketing.

10             MR. ROLLSTIN:  Opposite of the same coin.  Obviously,

11    all the elements aren't proven beyond a reasonable doubt, not

12    guilty.  Everybody agree with that.  Call the case as you see

13    it, all right.

14             Ms. Benson, you are tired of me asking questions.

15             JUROR BENSON:  You are doing your job.

16             MR. ROLLSTIN:  Okay.  Thank you very much.  Thank you

17    all.

18             THE COURT:  Ms. Frederick, go ahead, please.

19             MS. FREDERICK:  Thank you, Your Honor.

20             Good morning, ladies and gentlemen.

21             THE JURY:  Good morning.

22             MS. FREDERICK:  I am going to try and work a little

23    bit backwards, and I want you to ask yourselves that before you get

24    to the point where all the elements have been proven, you have to

25    be satisfied that they have been proven, correct.  We don't make

-68-

1   a verdict without that satisfaction because he sits here totally

2   innocent unless proven guilty beyond a reasonable doubt.  And it

3   is true that each charge has a number of elements, but there are

4   also several charges.

5         So, you are not going to be satisfied that one is done

6   and so all the rest must be done.  You have to go over each and

7   every count.

8         Now, with respect to witnesses.  Have you ever been

9   mistaken for someone else, Ms. Markham?

10        JUROR MARKHAM:  Yes.

11        MS. FREDERICK:  Have you, Ms. Johnson?

12        JUROR JOHNSON:  No.

13        MS. FREDERICK:  Never.  Have you ever mistaken someone

14   else for someone else?

15        JUROR JOHNSON:  Yes.

16        MS. FREDERICK:  Have you ever been upset and said something

17   that you thought was true that you later on found out was not

18   exactly the truth?

19        JUROR JOHNSON:  Yes.

20        MS. FREDERICK:  Ms. Pappas, you have seen television

21   police shows and so forth and you have seen how the police arrive

22   and they take a statement.

23        Is that the police officer's opinion of the situation?

24        JUROR PAPPAS:  No.  It is what other people are telling

25   him.

-69-

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

1        MS. FREDERICK:  Thank you.

2        Mr. Leonard or Mr. Dickinson, having been in this

3 position before, what is your understanding of the criminal

4 justice process?

5        JUROR DICKINSON:  I don't understand what you are saying.

6        MS. FREDERICK:  What do you think about the process

7 of criminal justice?

8        JUROR DICKINSON:  I really don't know.  I don't know

9 what I think about it.

10       MS. FREDERICK:  Were you judged fairly?

11       JUROR DICKINSON:  I don't think I was.

12       MS. FREDERICK:  You said there were some polcie officers

13 involved in your case?

14       JUROR DICKINSON:  No.  I said I have been beaten up

15 by the police.

16       MS. FREDERICK:  That is a separate incident?

17       JUROR DICKINSON:  Yes.

18       MS. FREDERICK:  Okay, thank you.

19       Could you sit here and listen to the facts and listen

20 to the evidence as presented by the People and judge this case

21 fairly in light of your past experience?

22       JUROR DICKINSON:  Sure, I could.

23       MS. FREDERICK:  Has anyone here a family member who

24 has been convicted of a felony?

25       Ms. Benson, and without the details, is that individual

-70-

1    still incarcerated?

2        JUROR BENSON:  Probably getting sentenced up on the

3    second floor now.

4        MS. FREDERICK:  It is a present ongoing matter?

5        JUROR BENSON:  Yes.

6        MS. FREDERICK:  Is that an immediate family?

7        JUROR BENSON:  My son, my oldest son.

8        MS. FREDERICK:  And you also stated that you have lost

9    a son to violence?

10       JUROR BENSON:  Yes.

11       MS. FREDERICK:  And that the matter remains, I guess,

12   unsolved?

13       JUROR BENSON:  No one cares.

14       MS. FREDERICK:  Okay.  Would you want just anyone as a

15   defendnat in that case or do you want the individual that actually

16   murdered your son?

17       JUROR BENSON:  I would like the right individual.

18       MS. FREDERICK:  Would you be satisfied to have the

19   case brought up without sufficient evidence that that individual,

20   the accused is the person?

21       JUROR BENSON:  No.  It is supposed to be done right.

22       MS. FREDERICK:  So, do yu view -- I guess, the lapse

23   or the wait as something that is harmful to you or better for the

24   system of justice?

25       JUROR BENSON:  It is just more hurting to me, that is

                              -71-

1     all.

2            MS. FREDERICK:  Now, Ms. Markham, how would you test the

3     reliability of a witness's testimony?

4            JUROR MARKHARM:  By their actions.

5            MS. FREDERICK:  Is there any other way?

6            JUROR MARKHAM:  I would think by their actions, their voice.

7            MS. FREDERICK:  And what if you had several individuals

8     who were present at a location and they say the same thing, does

9     that make it true?

10           JUROR MARKHAM:  No.

11           MS. FREDERICK:  Could one witness's testimony or statement

12    affect other people.

13           JUROR MARKHAM:  Yes.

14           MS. FREDERICK:  Ms. Johnson, what exactly do you expect

15    to hear in this courtroom today or tomorrow, I am sorry?

16           JUROR JOHNSON:  Evidence to prove your client either

17    innocent or guilty.

18           MS. FREDERICK:  What is my function?

19           JUROR JOHNSON:  To defend your client.

20           MS. FREDERICK:  And what does that involve?

21           JUROR JOHNSON:  Making sure the evidence that is brought

22    to the court is correct or can prove your client innocent or guilty.

23           MS. FREDERICK:  And what if I don't say a word?

24           JUROR JOHNSON:  You still have done your job.

25           MS. FREDERICK:  Does that mean he is guilty?

                              -72-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1          JUROR JOHNSON:  No.

2          MS. FREDERICK:  I am here to assure that his constitutional

3     rights are not violated.  I am not here to say someone else did

4     it.  I am not here to say anything more than I do.

5          And what if he doesn't testify, Mr. Papke?

6          JUROR PAPKE:  He has a right to and if he doesn't,

7     he does, it is whoever calls him up to the stand.

8          MS. FREDERICK:  What if he doesn't testify, does that

9     mean he is guilty?

10         JUROR PAPKE:  No.

11         MS. FREDERICK:  Does that mean he has something to hide?

12         JUROR PAPKE:  No.

13         MS. FREDERICK:  He has a right not to testify, correct?

14         JUROR PAPKE:  Yes.

15         MS. FREDERICK:  Now, he mentioned -- Mr. Rollstin

16    mentioned a little bit the theory of aiding and abetting.  Before

17    you get to that, you have to say that he is guilty of something.

18    He assisted the guilty party.  That is where we are.

19         Is that right, Mr. Alexander?

20         JUROR ALEXANDER:  Yes.

21         MS. FREDERICK:  Someone did something and the theory

22    is Mr. Jones provides some assistance.  So, first, we have got

23    to get to the first something.  Now, the fact of Mr. Perdue's

24    death is the something.  But now we are coming out from that

25    and we are saying how do we get Mr. Jones for first degree murder

-73-

1   in this courtroom.  We are saying that he somehow did something to

2   assist the person who committed the murder.

3           How do you expect that to be shown to you, Mr. Alexander?

4           JUROR ALEXANDER:  By the evidence.

5       MS. FREDERICK:  What evidence would you need?

6           JUROR ALEXANDER:  Me, clear-cut evidence that he committed

7   that crime.

8           THE COURT:  Pardon me, that is an unfair question.

9   What kind of evidence would that be.  So, you are asking what

10  he needs is the evidence, but I think it is more difficult to ask

11  that other question about what evidence would that be.  So, move

12  on to something else, please.

13      MS. FREDERICK:  I stand corrected, Judge.

14          THE COURT:  Okay.

15      MS. FREDERICK:  The charge of first degree premeditated

16  murder suggests some time, some forethought, maybe, even a plan

17  that needs to be established beyond a reasonable doubt.  It is not

18  going to be a guess or supposition, you need evidence to that.

19          Can you sit and wait for that evidence to be shown to

20  you, Mr. Contreras?

21          JUROR CONTRERAS:  Yes.

22      MS. FREDERICK:  You were, I guess, expressing some

23  religious apprehension about judging him?

24          JUROR CONTRERAS:  Right.

25          MS. FREDERICK:  Okay.  And it was explained that you are

                              -74-

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1 not judging him?

2     JUROR CONTRERAS:  Right.

3     MS. FREDERICK:  Are you okay with that?

4     JUROR CONTRERAS:  Yes.

5     MS. FREDERICK:  Can you proceed?

6     JUROR CONTRERAS:  Yes.

7     MS. FREDERICK:  I have nothing further.

8     THE COURT:  Thank you.

9     Any for cause starting with the prosecution?

10     MR. ROLLSTIN:  Yes, Judge, Mr. Dickinson in Seat 6.

11     THE COURT:  Pursuant to the court rules, Mr. Dickinson,

12 you will be excused and go back up to the main floor.  If you go

13 back up to the main floor, they will give you further instructions

14 there.

15     THE CLERK:  Michael Mahdi, Seat 6.

16     THE COURT:  Sir, tell us about you, sir, your name and

17 so forth.

18     JUROR MAHDI:  Michael Mahdi.  I am a student at Duke

19 University.  I finished my freshman year.  I am going to be a

20 sophomore in the fall.

21     THE COURT:  At Duke, you said?

22     JUROR MAHDI:  Yes, sir.  I am studying political science.

23     THE COURT:  I mentioned to Ms. Daniel my daughter is

24 at U of M.  She applied at Duke.  She decided to go to U of M.

25 I am happier because it is cheaper.  Anyway, that is her choice.

1        Do you have any prior jury service?

2            JUROR MAHDI:  No, sir.  This is my first time.

3            THE COURT:  You heard my comments and those by the

4    lawyers and you have some sense of what this is all about,

5    Mr. Mahdi.  Is there any reason why you could not and would not

6    be able to sit there and listen to the evidence in this case

7    in accordance with the law and so forth.  Calling it as you see

8    it, can you do that?

9            JUROR MAHDI:  Yes, I can be impartial.

10           THE COURT:  Very well, thank you.

11           Go ahead, Mr. --

12           MR. ROLLSTIN:  Rollstin.

13           THE COURT:  One of those senior moments.

14           MR. ROLLSTIN:  No offense taken.

15           Mr. Mahdi, you heard my questions earlier.  Would your

16   answers be about the same as the rest of the panels?

17           JUROR MAHDI:  Yes.

18           MR. ROLLSTIN:  Okay.  My question to you is can you

19   give each side a fair trial in this case and call it the way you

20   see it?

21           JUROR MAHDI:  (Nods head.)

22           MR. ROLLSTIN:  Okay.  If the evidence proves to you

23   in your mind beyond a reasonable doubt all the elements are

24   proven, would your verdict be guilty or not guilty?

25           JUROR MAHDI:  It would be guilty.

-76-

1    MR. ROLLSTIN: Okay. The evidence does not convince

2 you what would your verdict be?

3    JUROR MAHDI: Not guilty.

4    MR. ROLLSTIN: Do you agree that they deserve a fair

5 trial?

6    JUROR MAHDI: Yes.

7    MR. ROLLSTIN: Victims and the person charged with a

8 crime deserve a fair trial?

9    JUROR MAHDI: Yes.

10    MR. ROLLSTIN: There was some question by Ms. Frederick

11 about the notion of the mistaken identity. Have you ever been --

12    JUROR MAHDI: Yes.

13    MR. ROLLSTIN: How did that mistake get resolved?

14    JUROR MAHDI: It was quickly resolved. What do you mean

15 as far as --

16    MR. ROLLSTIN: Did the person finally realize you are not

17 the person I thought you were?

18    JUROR MAHDI: Yes.

19    MR. ROLLSTIN: How long did that take to occur?

20    JUROR MAHDI: About three weeks.

21    MR. ROLLSTIN: Have you ever mistaken somebody for

22 somebody you thought them to be?

23    JUROR MAHDI: Yes.

24    MR. ROLLSTIN: Did you quickly realize you were mistaken?

25    JUROR MAHDI: Yes.

-77-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1            MR. ROLLSTIN:  Have you ever had a situation where you

2   mistakenly identified somebody and carried on that mistake for

3   months or weeks or even a year?

4            JUROR MAHDI:  No.

5            MR. ROLLSTIN:  You see the point I am trying to make here

6   is that you have had the mistaken identity happen in your life where

7   you quickly identified as a mistake, is that correct?

8            JUROR MAHDI:  Yes.

9            MR. ROLLSTIN: Thank you, Mr. Mahdi.  No further questions.

10           THE COURT:  Go ahead.

11           MS. FREDERICK:  You heard the several questions counsel

12   and I asked.  Do you have any reason why you would not be able to

13   be fair and impartial in this case?

14           JUROR MAHDI:  No, ma'am.

15           MS. FREDERICK:  Thank you.  Nothing further.

16           THE COURT:  Any for cause as to Mr. Mahdi?

17           MR. ROLLSTIN:  No, Your Honor.

18           THE COURT:  If not, we will go to peremptory to you,

19   Mr. Rollstin?

20           MR. ROLLSTIN:  Thank you.  I am going to thank and excuse

21   Mr. Contreras and Ms. Benson in Seats Nos. 7 and 8.

22           THE COURT:  Okay, Mr. Contreras and Ms. Benson in Seat

23   No. 8, I ask that both of you step down, please.  Go back up to

24   the main floor to the jury commission office and they will give you

25   further instructions there.  Thank you both.

1          THE CLERK:  George Gostias, Seat 7.  Joseph Marth, Seat 8.

2          THE COURT:  Is it Gostias?

3          JUROR GOSTIAS:  My name is George Gostias.  I am a full-time

4     student.

5          THE COURT:  Stand so we can hear.

6          JUROR GOSTIAS:  I am George Gostias.  I am a full-time

7     student at Central Michigan University, and I am single.

8          THE COURT:  Okay.  I can usually tell, you know, when the

9     colleges are off, May or June, because I get a lot of college students

10    for jury duty.

11         Okay, go ahead.  You may be seated for a minute, okay.

12         JUROR MARTH:  My name is Joseph Marth.  I am retired

13    and I used to be a general foreman in a company.

14         THE COURT:  Okay.  Is there a spouse, Mr. Marth?

15         JUROR MARTH:  Pardon me?

16         THE COURT:  Is there a spouse?

17         JUROR MARTH:  My wife was a principal's secretary in

18    a high school.

19         THE COURT:  Thank you very much, both of you.

20         Mr. Gostias, have you been on a jury case before?

21         JUROR GOSTIAS:  No, I have not.

22         THE COURT:  Have not.  And you heard my questions and

23    those by the lawyers.  And when you peel it all down, what we are

24    asking you to do is understanding what is required of you as a juror,

25    to assess yourself in that context and let us know you can be a fair

-79-

1    juror?

2            JUROR GOSTIAS:  Yes, I can.

3            THE COURT:  Same question, Mr. Marth, can you be fair

4    and impartial?

5            JUROR MARTH:  Yes.

6            THE COURT:  Okay, thank you.

7            Prosecutor?

8            MR. ROLLSTIN:  No questions for Mr. Marth or Mr. Gostias.

9            THE COURT:  Ms. Frederick, your questions?

10           MS. FREDERICK:  Again, each of you have heard the

11    several questions.  Is there any reason that you would like to

12    express at this point why you could not be an impartial juror?

13           JUROR GOSTIAS:  No.

14           JUROR MARTH:  No.

15           MS. FREDERICK:  Thank you.

16           THE COURT:  Okay.  None for cause from either side as

17    to those two persons.  We will move to the defense now for

18    peremptory.

19           MS. FREDERICK:  Thank you, Judge.

20           Defense would like to thank and excuse Ms. Johnson

21    in Seat No. 3.

22           THE COURT:  Okay.  Ms. Johnson, if you will go back

23    up to the main floor to the jury commission office up there.  Thank

24    you for your time and attention.

25           JUROR JOHNSON:  You're welcome.

                              -80-

THE COURT:  They will give you further information up there.

THE CLERK:  Lori Sassak, Seat 3.

THE COURT:  Ma'am, when you get comfortable to your seat there, tell us about you.

JUROR SASSAK:  I am a principal's secretary --

THE COURT:  Your name first?

JUROR SASSAK:  Lori Sassak.  I am the principal's secretary for the vocational school in Livonia.  And my husband is a sub teacher and basketball coach.

THE COURT:  Thank you.  Ms. Sassak, have you been on a jury before?

JUROR SASSAK:  Yes.

THE COURT:  What kind of case was it?

JUROR SASSAK:  Breaking and entering.

THE COURT:  Breaking and entering, okay.  Without telling me, Ms. Sassak, if that jury and you said guilty or not guilty, was a decision reached one way or the other?

JUROR SASSAK:  He took a plea after it started.

THE COURT:  Okay.  So, you didn't have to really get to deliberate the case, okay.

Again, you understand what is being sought here and what is being done having had that prior service before.  And all we are asking you to do is to have an open mind, listen to the evidence, and be guided by the law that I will give you and just make a fair

-81-

decision.  Can you and would you do that?

        JUROR SASSAK:  Yes.

        THE COURT:  Thank you so much for that.

        Ms. Frederick, your questions to Ms. Sassak.

        MS. FREDERICK:  How do you view the testimony of the
witness?

        JUROR SASSAK:  How do you view?

        MS. FREDERICK:  Yes.  How would you take or value or
weigh a witness's testimony?

        JUROR SASSAK:  I don't know.  I am not sure.  I guess
on the same things, actions.

        MS. FREDERICK:  Okay.  And have you ever been mistaken
for someone else?

        JUROR SASSAK:  No.

        MS. FREDERICK:  Have you ever mistaken someone for
someone else?

        JUROR SASSAK:  No.

        MS. FREDERICK:  Never, ever?

        JUROR SASSAK:  No.

        MS. FREDERICK:  Thank you.

        THE COURT:  Go ahead, please, Mr. Rollstin.

        MR. ROLLSTIN:  Ms. Sassak, you heard all of my questions
earlier?

        JUROR SASSAK:  (Nods head.)

        MR. ROLLSTIN:  You have to answer, yes or no?

1          JUROR SASSAK:  Yes.

2          MR. ROLLSTIN:  Would your answers be about the same as

3     the rest of the panel.  Give each side a fair trial, call the case

4     the way you see it.  Thank you.  Nothing else.

5          THE COURT:  Any for cause for either side.  If not,

6     go back to the prosecution for a peremptory.

7          MR. ROLLSTIN:  Judge, we are going to thank and excuse

8     juror in Seat No. 6, Mr. Mahdi.

9          THE COURT:  Sir, if you will, please --

10         MR. ROLLSTIN:  And also juror in Seat No. 14, Ms. Daniel.

11    Thank you, ma'am.

12         THE COURT:  If the two of you will, please, stand down

13    and go back up to the main floor where you were earlier and they

14    will give you further attention there.

15         THE CLERK:  Daniel Larabell, Seat 6.

16         Russell Judd, Seat 14.

17         THE COURT:  Introduce yourselves to us.

18         JUROR LARABELL:  Daniel Larabell, midnight manager.

19         THE COURT:  Mr. Judd?

20         JUROR JUDD:  Russell Judd.  I was a supervisor in the

21    steel industry.  My wife was a homemaker.

22         THE COURT: Thank you both.

23         Mr. Larabell, you heard my questions and comments and

24    those by the lawyers.  And, again, as I just kind of phrased that

25    to the last person here, the bottom line concern is asking you to

                                    -83-

assess yourself and the context of what is needed to be a fair juror

in this case and tell us can you be a fair juror. Can you do that?

JUROR LARABELL: Yes.

THE COURT: Same question, Mr. -- I am sorry. Mr. Larabell,

have you had prior jury service?

JUROR LARABELL: No.

THE COURT: You have not. Have you been -- Mr. Judd --

JUROR JUDD: No.

THE COURT: Same question I just asked Mr. Larabell

about being fair and impartial. Anything getting in the way of

your being able to do that?

JUROR JUDD: No.

THE COURT: I am sorry. Is there anything that would

get in the way of your being able to be fair?

JUROR JUDD: No.

THE COURT: Okay, you can be fair?

JUROR JUDD: Yes.

THE COURT: Now we are together. If anybody have any

problem with hearing me at any time or any of the lawyers, please,

just raise your hand and say something so we can make sure that

everybody can hear, okay.

All right, proceed, Mr. Rollstin.

MR. ROLLSTIN: Mr. Larabell and Mr. Judd, you heard

my questions to the jury this morning. Would your answers be about

the same as the rest of the panel?

-84-

1     JUROR LARABELL:  Yes.

2     JUROR JUDD:  Yes.

3     MR. ROLLSTIN:  Mr. Judd, fair enough.  Thank you.

4     Nothing else.

5     THE COURT:  Ms. Frederick?

6     MS. FREDERICK:  The question was answered by the People's

7     questions.  Thank you.

8     THE COURT:  Okay, thank you.

9     See if there is none for cause from either side.  If

10    not, back to Ms. Frederick for a peremptory.

11    MS. FREDERICK:  Thank you,  Judge.

12    At this time, the defense would like to thank and

13    excuse Ms. Sassak seated in Seat No. 3.

14    THE COURT:  Okay.  Ms. Sassak, you please stand down

15    and go back up to the main floor to the jury commission office

16    where you were earlier.  They will give you further instructions

17    there.  Again, thank you.

18    THE CLERK:  Marian Smith, Seat 3.

19    THE COURT:  Go ahead.

20    JUROR SMITH:  My name is Marian Smith.  I am

21    assistant administrative assistant for City of Detroit Health

22    Department.

23    THE COURT:  I am sorry, for the City?

24    JUROR SMITH:  Detroit Health Department.

25    THE COURT:  Spouse?

-85-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1       JUROR SMITH:  No, I am single.

2       THE COURT:  Okay, thank you.  You may be seated.

3       Ms. Smith, has there been prior jury service, have you

4  been on jury service before?

5       JUROR SMITH:  Yes.

6       THE COURT:  What kind of case?

7       JUROR SMITH:  Possession of drugs.

8       THE COURT:  How long ago was that, roughly?

9       JUROR SMITH:  Excuse me, I am sorry?

10      THE COURT:  How long ago was that, roughly, just a guess?

11      JUROR SMITH:  '92, '93.

12      THE COURT:  Okay.  And do you recall if you and that jury

13  said -- I am sorry, let me rephrase this so I can get it just right.

14      Did you and that jury make a decision one way or the

15  other?

16      JUROR SMITH:  Yes.

17      THE COURT:  Okay, very well.

18      In this case, you heard me, you heard the lawyers, we have

19  been talking about this for the last two hours or so.  And surely,

20  you understand what we are asking here about being fair and impartial

21  and having an open mind.  And only you can tell us if you can be

22  fair and impartial.

23      Can you do that?

24      JUROR SMITH:  Yes.

25      THE COURT:  Thank you very much.

                         -86-

1          Ms. Frederick, your questions to Ms. Smith.

2          MS. FREDERICK:  When you sat on the prior drug case,

3     did you hold the prosecution to the standard of proof beyond a

4     reasonable doubt?

5          JUROR SMITH:  Yes.

6          MS. FREDERICK:  Nothing further, Judge.

7          THE COURT:  Go ahead, Mr. Rollstin.

8          MR. ROLLSTIN:  Ms. Smith, you heard my questions earlier

9     today?

10          JUROR SMITH:  Yes.

11          MR. ROLLSTIN:  Would your answers be about the same as

12     the rest of the panel?

13          JUROR SMITH:  Yes.

14          MR. ROLLSTIN:  Give each side a fair trial?

15          JUROR SMITH:  Yes.

16          MR. ROLLSTIN:  Can you call the case the way you see it?

17          JUROR SMITH:  Yes.

18          MR. ROLLSTIN:  Okay.  Fair enough.  Nothing else,

19     Judge.  Thank you.

20          THE COURT:  Okay.  Both pass for cause.

21          MR. ROLLSTIN:  Pass for cause, Judge.

22          THE COURT:  Back to you, Mr. Rollstin for a peremptory.

23          MR. ROLLSTIN:  We would like to thank and excuse

24     Mr. Gostias in Seat No. 7.  Thank you, sir.

25          THE COURT:  Mr. Gostias, if you will please stand down

-87-

1     and go back up to the main floor, sir.  They will give you

2     further instructions there.  Thank you, again.

3                    THE CLERK:  Mary Allor, Seat 7.

4                    THE COURT:  Ma'am, tell us about you, please.

5                    JUROR ALLOR:  My name is Mary Allor and I am a

6     retired professor from the University of Michigan School of

7     Nursing.

8                    THE COURT:  School of Nursing?

9                    JUROR ALLOR:  Un-hun.  And my husband is in automotive

10    sales.

11                   THE COURT:  All right.  Thank you, Ms. Allor.

12                   Have you served on a jury before?

13                   JUROR ALLOR:  Yes.

14                   THE COURT:  What kind of case?

15                   JUROR ALLOR:  I was excused.

16                   THE COURT:  You didn't make the final decision process?

17                   JUROR ALLOR:  Right.

18                   THE COURT:  And the bottom line concern here when you

19    peel it all down is about being a fair and impartial juror, is

20    just asking you to have an open mind and listen to the evidence

21    and be guided by the law that I will give you and just make that

22    fair decision.

23                   Can you and will you do that?

24                   JUROR ALLOR:  Yes, I can.

25                   THE COURT:  Thank you very much.

                              -88-

1          To you, Mr. Rollstin for questions -- I am sorry,

2  was that just one person?

3          MR. ROLLSTIN:  It was.

4          THE COURT:  I thought I missed somebody.

5          MR. ROLLSTIN:  You heard my questions earlier in the day?

6          JUROR ALLOR:  Yes.

7          MR. ROLLSTIN:  Your answer would be the same?

8          JUROR ALLOR:  Yes.

9          MR. ROLLSTIN:  Give each side a fair trial?

10         JUROR ALLOR:  Yes.

11         MR. ROLLSTIN:  Call the case the way you see it?

12         JUROR ALLOR:  Yes.

13         THE COURT:  Ms. Frederick?

14         MS. FREDERICK:  Just one quick question.

15         Ms. Allor, there is going to be medical evidence in

16  this case and in light of your expertise, I am going to ask will that

17  evidence be sufficient to prove his guilt?

18         THE COURT:  Maybe you want to rephrase that.

19         MS. FREDERICK:  I sure will.  I just thought about that.

20         In any case, let me start over.  There is going to be

21  medical evidence presented, evidence of the injuries sustained by

22  the decedent.  Will your expertise create I suppose a bias based

23  on the nature of the injury towards my client?

24         JUROR ALLOR:  I don't think so.

25         MS. FREDERICK:  Thank you very much.

                              -89-

THE COURT:  Let me just add to that if you don't mind,

Ms. Frederick.  What we want to make sure of, please, say if you

were a lawyer on the case and the lawyer might want to bring in

some legal expertise and that.  We want you to be just a citizen

fact finder and not bring in your special knowledge or background

or expertise.  That is what we are asking you to do, okay?

JUROR ALLOR:  Yes.

THE COURT:  Very well. Thank you. We understand that.

Both pass for cause.

MR. ROLLSTIN:  Pass for cause.

MS. FREDERICK:  Yes.

THE COURT:  I believe we are back to Ms. Frederick for

a peremptory.

MS. FREDERICK:  Thank you very much.  The defense would

like to thank and excuse Ms. Pettit in Seat No. 11.

THE COURT:  I am sorry, what seat number is that?

MS. FREDERICK:  No. 11.

THE COURT:  Ms. Pettit.

MS. FREDERICK:  Ms. Pettit, I am sorry.

THE CLERK:  Scott Harden, Seat 11.

THE COURT:  Mr. Harden, when you get up to your seat

and get comfortable, introduce yourself.

JUROR HARDEN:  My name is Scott Harden.  I work for a

company that measures floors for flooring installers.  Married.

My wife is a secretary.

-90-

1    THE COURT:  Okay, thank you, Mr. Harden.  You may

2 be seated there.

3    Mr. Harden, first of all, have you served on a jury

4 before?

5    JUROR HARDEN:  No, I have not.

6    THE COURT:  Have not.  Do I need to review everything

7 that we have said today?

8    JUROR HARDEN:  No.

9    THE COURT:  Okay, thank you.

10    Is there any reason why you could not and would not

11 be a fair and impartial juror, Mr. Harden?

12    JUROR HARDEN:  No.

13    THE COURT:  Okay.  Ms. Frederick, your questions to

14 Mr. Harden?

15    MS. FREDERICK:  None, Your Honor.  Thank you.

16    THE COURT:  To you, Mr. Rollstin?

17    MS. ROLLSTIN:  Mr. Harden, you heard my questions earlier

18 in the day?

19    JUROR HARDEN:  Yes.

20    MR. ROLLSTIN:  Would your answers be about the same as

21 the rest of the panel?

22    JUROR HARDEN:  Basically, yes.

23    MR. ROLLSTIN:  Give each side a fair trial?

24    JUROR HARDEN:  Yes.

25    THE COURT:  Both pass for cause as to Mr. Harden.

-91-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1          In that case, we go back to Mr. Rollstin.

2          MR. ROLLSTIN:  We are satisfied.

3          THE COURT:  Go to Ms. Frederick for a peremptory.

4          MS. FREDERICK:  The defense would like to thank and

5    excuse Mr. Marth seated in Seat No. 8.

6          THE COURT:  Mr. Marth, if you will stand down and go

7    back up to the main floor jury commission office and we will

8    give you further instructions there.  Thank you.

9          THE CLERK:  Joyce Ramsey, Seat 8.

10          THE COURT:  Go ahead and introduce yourself to us,

11    please.

12          JUROR RAMSEY:  My name is Joyce Ramsey.  I am a

13    homemaker.  My husband is a construction inspector.

14          THE COURT:  Okay, thank you, Ms. Ramsey.

15          Have you been on a jury before, Ms. Ramsey?

16          JUROR RAMSEY:  No.

17          THE COURT:  Okay.  And you understand I am sure based

18    on what has all been said up to this point that we are asking

19    you to be a fair, impartial juror.  Is there anything that you

20    are aware of that would get in the way of your being able to be

21    a fair juror, Ms. Ramsey?

22          JUROR RAMSEY:  No, but I have a terrible migraine

23    headache, and I don't know if I can listen for any length of

24    time.

25          THE COURT:  Well, did you develop that this morning

-92-

1    after listening to me.  I promise you that after --

2              JUROR RAMSEY:  When I am stressed, I do get them.

3              THE COURT:  Pardon me?

4              JUROR RAMSEY:  When I am stressed, I do.

5              THE COURT:  Did I cause some stress for you this morning?

6              JUROR RAMSEY:  No, just the drive down here was enough.

7              THE COURT:  I see.  Well, I got Tylenol back there if

8    you need that.  All right.  Other than that, you can be fair, right?

9              JUROR RAMSEY:  Yes.

10             THE COURT:  Thank you.

11             Go ahead, Ms. Frederick.

12             MS. FREDERICK:  Ms. Ramsey, inspite of your headache,

13   if compelled to remain on the jury, you would be fair and impartial,

14   correct?

15             JUROR RAMSEY:  Yes.

16             MS. FREDERICK:  Nothing further, Judge.

17             THE COURT:  Mr. Rollstin?

18             MR. ROLLSTIN:  No questions, Judge.

19             THE COURT:  Both pass for cause.

20             MR. ROLLSTIN:  Yes.

21             MS. FREDERICK:  Yes.

22             THE COURT:  Mr. Rollstin, your peremptory.

23             MR. ROLLSTIN:  We'll thank and excuse Ms. Ramsey in

24   Seat No. 8.  Thank you.

25             THE COURT:  Ms. Ramsey, if you will stand down and go back

                              -93-

1 up to the main floor.

2    THE CLERK:  Linda Lukacs, L-u-k-a-c-s, Seat 8.

3    JUROR LUKACS:  My name is Linda Lukacs.  I am a

4 registered nurse.  My husband is a mechanical contractor.

5    THE COURT:  Okay.  Did you attend nursing school at

6 U of M?

7    JUROR LUKACS:  No.

8    THE COURT:  So, the lady next to you then was not a

9 teacher then?

10    JUROR LUKACS:  No, she was not.

11    THE COURT:  Okay.  Have you served on a jury before?

12    JUROR LUKACS:  No.

13    THE COURT:  Okay.  The basic bottom line concern, Ms.

14 Lukacs, is about being fair and impartial.  Is there any reason

15 why you cannot and would not make every effort to be a fair and

16 impartial juror in this case?

17    JUROR LUKACS:  No.

18    THE COURT:  Okay, thank you.

19    Mr. Rollstin, questions to Mr. Lukacs.

20    MR. ROLLSTIN:  Ms. Lukacs, you heard my questions

21 earlier today?

22    JUROR LUKACS:  Yes.

23    MR. ROLLSTIN:  Your answers would be about the same

24 as the rest of the people?

25    JUROR LUKACS:  Yes.

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1          MR. ROLLSTIN:  You would give each side a fair trial

2   and call the case the way you see it?

3          JUROR LUKACS:  Yes.

4          MR. ROLLSTIN:  Fair enough.

5          THE COURT:  To you, Ms. Frederick?

6          MS. FREDERICK:  No questions, Judge.

7          THE COURT:  Both pass for cause.

8          Ms. Frederick?

9          MS. FREDERICK:  Defense would like to thank and excuse

10  Mr. Larabell seated in Seat 6.

11         THE COURT:  Mr. Larabell, stand down and return back up

12  to the main floor jury commission office where you were earlier .

13  They will give you further instructions there.  Thank you very much.

14         THE CLERK:  Robert Ford, Seat 6.

15         THE COURT:  Mr. Ford, when you get up there to your seat,

16  sir, introduce yourself to us, please.

17         JUROR FORD:  My name is Robert W. Ford, Jr.  I am a

18  little sick.

19         THE COURT:  I am sorry.  Take your hand from your mouth

20  so we can hear.

21         JUROR FORD:  My name is Robert Ford.  I have been a little

22  sick.  I had two heart attacks and --

23         THE COURT:  Did you inform the jury commission that you had

24  some medical problems.  Maybe I should note, are you in a condition

25  to sit here now and listen to this case?

-95-

1          JUROR FORD:  I believe I am all right.

2          THE COURT:  Pardon me?  Have you had --

3          JUROR FORD:  Well, about eight months ago --

4          THE COURT:  I am just asking because, like, for instance,

5    you can see we sit here for maybe a few hours sometimes.  We do take

6    breaks.  I try to go through this process and get the jury selected

7    as quickly as possible without having to do that but you are okay

8    with it right now.  You are okay right now?

9          JUROR FORD:  Yes.

10         THE COURT:  I assume that you are not working right now?

11         JUROR FORD:  No.  I am out on medical.

12         THE COURT:  What were you doing?

13         JUROR FORD:  Automotive machine operator.

14         THE COURT:  All right, okay.  Mr. Ford, how about prior

15   jury service, you have been on jury service before?

16         JUROR FORD:  No.

17         THE COURT:  No, okay.

18         And it is about, in this situation, being fair and

19   impartial and being able to render a fair and impartial decision

20   based on the evidence here and having an open mind when you do

21   that.  Any problem with doing that, sir?

22         JUROR FORD:  I have no problem.

23         THE COURT:  Thank you, Mr. Ford.

24         Ms. Frederick, to you for questions.

25         MS. FREDERICK:  You have heard all the questions asked?

-96-

1        JUROR FORD:  Yes.

2        MS. FREDERICK:  Just want to draw you back to one

3   particular question.  Have you ever or have you or your immediate

4   family members been the victim of a crime?

5        JUROR FORD:  Yes.

6        MS. FREDERICK:  And was that a felony or misdemeanor?

7        JUROR FORD:  Felony.

8        MS. FREDERICK:  Okay.  What is the answer going to be to

9   the conviction or being assaulted -- I am sorry, being injured by

10  a crime?

11       JUROR FORD:  I think I can be fair with it.

12       MS. FREDERICK:  I am sorry?

13       JUROR FORD:  I think I can be fair with it.

14       MS. FREDERICK:  No. No.  My question is whether or not

15  we are talking about the conviction and whether or not that person

16  or yourself was a victim?

17       JUROR FORD:  Oh, no.

18       MS. FREDERICK:  You weren't a victim.  So, you were

19  charged with a crime?

20       JUROR FORD:  No.  My son was.

21       MS. FREDERICK:  Your son.  Okay.  And are you satisfied

22  with the outcome of that particular matter?

23       JUROR FORD:  Yes.

24       MS. FREDERICK:  Okay.  And you are still able to sit

25  and be fair and impartial?

-97-

1        JUROR FORD:  Yes.

2        MS. FREDERICK:  Okay, thank you.

3        MR. ROLLSTIN:  No further questions, Judge.

4        THE COURT:  Okay.  Both pass for cause?

5        MS. FREDERICK:  Yes.

6        THE COURT:  Mr. Rollstin, your peremptory?

7        MR. ROLLSTIN:  We thank and escuse juror in Seat No. 6,

8   Mr. Ford.  Thank you.

9        THE COURT:  Mr. Ford, if you will stand down and go back

10  up to the main floor.  They will give you further instructions

11  there, sir.

12       If you are having some medical concerns up there, you can

13  let them know about being rescheduled.

14       JUROR FORD:  All right.

15       THE CLERK:  Elsie Marshall, Seat 6.

16       THE COURT:  Ms. Marshall, when you get up there to your

17  seat, please, introduce yourself to us.

18       JUROR MARSHALL:  My name is Elsie Marshall.  I have been

19  in sales and retail all my life and my husband is a supervisor in

20  a corrugation company.

21       THE COURT:  Okay.  Ms. Marshall, have you served on a

22  jury before?

23       JUROR MARSHALL:  No, sir.

24       THE COURT:  Okay.  And as simple as I can ask it, is

25  there anything that would get in the way of your being a fair juror

-98-

1    in this case?

2          JUROR MARSHALL:  Could be because my son was involved

3    in a court matter here in Murphy Hall.

4          THE COURT:  Pardon me?

5          JUROR MARSHALL:  In Murphy Hall many years ago.

6          THE COURT:  Why do you think that that would affect

7    your being a fair and impartial juror in this case.  What has

8    that got to do with this one?

9          JUROR MARSHALL:  Has nothing to do with this case.

10          THE COURT:  So, you can put all of that aside and

11    be fair in this case and disassociate whatever that is and call

12    it like you see it.  Okay.  Right.  That is all we are asking.

13    Thank you.

14          Mr. Rollstin?

15          MR. ROLLSTIN:  Ms. Marshall, was your son the victim

16    or the defendant in a case?

17          JUROR MARSHALL:  Victim.

18          MR. ROLLSTIN:  Okay.  Do you understand that obviously

19    Mr. Jones didn't have anything to do with what happened to your

20    son?

21          JUROR MARSHALL:  No.

22          MR. ROLLSTIN:  All right.  Give each side a fair trial?

23          JUROR MARSHALL:  Yes.

24          MR. ROLLSTIN:  Call the case the way you see it?

25          JUROR MARSHALL:  Yes.

-99-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1    MR. ROLLSTIN:  Nothing else, Judge.

2    THE COURT:  Ms. Frederick?

3    MS. FREDERICK:  No questions, Judge.

4    THE COURT:  Both pass for cause.

5    Ms. Frederick, peremptory?

6    MS. FREDERICK:  Ms. Marshall.  We would like to thank

7    and excuse Ms. Marshall in Seat 6.

8    THE COURT:  Ms. Marshall, if you will please stand down

9    and go back up to the main floor jury commission office.  They will

10   give you further instructions there.  Thank you very much for your

11   time and effort.

12   THE CLERK:  Roger Bius, Seat 6.

13   THE COURT:  Sir, when you get to your seat over there,

14   introduce yourself to us, please.

15   JUROR BIUS:  My name is Roger Bius.  I am an aircraft

16   maintenance planner for Northwest Airlines.  My wife is a

17   homemaker.

18   THE COURT:  Have you served on a jury before, sir?

19   JUROR BIUS:  No, sir.

20   THE COURT:  Have not.  Bottom line, sir, and you

21   heard me and the lawyers asking about being fair and impartial

22   and rendering a fair and impartial decision based only on the

23   evidence and having an open mind.  Can you do that, sir?

24   JUROR BIUS:  Yes.

25   THE COURT:  Appreciate that so much.

-100-

1          To you for questions.

2          MS. FREDERICK:  Pass, Judge.

3          THE COURT:  To you, Mr. Rollstin?

4          MR. ROLLSTIN:  Mr. Bius, you heard my questions earlier

5     in the day?

6          JUROR BIUS:  Yes.

7          MR. ROLLSTIN:  Your answer would be about the same as

8     the rest of the panel?

9          JUROR BIUS:  Approximately.

10         MR. ROLLSTIN:  Give each side a fair trial.  Would

11    your answers have varied in any significant way?

12         JUROR BIUS:  No.

13         MR. ROLLSTIN:  Nothing else, Judge.

14         THE COURT:  Both pass for cause.

15         MR. ROLLSTIN:  Pass for cause.

16         MS. FREDERICK:  Pass for cause.

17         MR. ROLLSTIN:  We are satisfied, Judge.

18         THE COURT:  Ms. Frederick?

19         MS. FREDERICK:  Thank you, Your Honor.

20         The defense would like to thank and excuse Mr. Raden

21    seated in Seat No. 9.

22         THE COURT:  Sir, would you, please, stand down,

23    Mr. Raden.  Stand down and go back up to the main floor jury

24    commission office, please.  They will give you further instructions

25    there.  Thank you, sir.

-101-

1          THE CLERK:  David Banach, Seat 9.

2          THE COURT:  Sir, tell us about yourself, please.

3          JUROR BANACH:  My name is David Banach, and I am a

4    dealer at the casino, and my wife is a medical biller.

5          THE COURT:  Mr. Banach, have you served on a jury

6    before?

7          JUROR BANACH:  No, I haven't.

8          THE COURT:  Have not.  And, again, the bottom line

9    concern is understanding what is being asked of you as a juror

10   and showing us that you would make every effort to be a fair

11   and impartial juror, would you do that, sir?

12         JUROR BANACH:  Yes.

13         THE COURT:  Thank you, sir, Mr. Banach.

14         Ms. Frederick, your questions?

15         MS. FREDERICK:  No questions, Your Honor.

16         THE COURT:  Mr. Rollstin?

17         MR. ROLLSTIN:  Mr. Banach, you heard my questions

18   earlier in the day?

19         JUROR BANACH:  Yes.

20         MR. ROLLSTIN:  Your answers will be about the same.

21   Give each side a fair trial and call it the way you see it?

22         JUROR BANACH:  Yes.

23         MR. ROLLSTIN:  Pass for cause.

24         MS. FREDERICK:  Pass.

25         THE COURT:  Mr. Rollstin?

                            -102-

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

1     MR. ROLLSTIN:  We are satisfied.

2     THE COURT:  To Ms. Frederick?

3     MS. FREDERICK:  Yes, we would like to thank and excuse

4 Ms. Lukacs seated in Seat No. 8.

5     THE COURT:  Ma'am, please, stand down, please.  Thank

6 you very much for your willingness to serve.

7     THE CLERK:  Ann Kay, Seat 8.

8     THE COURT:  Ms. Kay, introduce yourself to us, please.

9     JUROR KAY:  Ann Kay.  And I am retired from my own

10 bookkeeping business, and I am a widow.

11     THE COURT:  Thank you,  Ms. Kay.

12     Been on a jury before?

13     JUROR KAY:  Yes, I have.

14     THE COURT:  What kind of case?

15     JUROR KAY:  Civil.

16     THE COURT:  Civil case?

17     JUROR KAY:  Yes.

18     THE COURT:  Can you be fair in this case, Ms. Kay?

19     JUROR KAY:  Yes, I can.

20     THE COURT:  Thank you very much.

21     Ms. Frederick?

22     MS. FREDERICK:  Ms. Kay, you do understand all the

23 information provided to in the proof beyond a reasonable doubt and

24 the burden being on the people?

25     JUROR KAY:  Yes.

-103-

1          MS. FREDERICK:  And you would agree that if you were to

2     go back and deliberate right now that my client would be not guilty,

3     correct?

4          JUROR KAY:  I have heard no evidence, correct.

5          MS. FREDERICK:  Excellent.

6          JUROR KAY:  Right.

7          MS. FREDERICK:  Nothing further, Judge.

8          THE COURT:  Go ahead, Mr. Rollstin.

9          MR. ROLLSTIN:  You heard my questions earlier in the

10    day?

11         JUROR KAY:  Yes.

12         MR. ROLLSTIN:  Your answers would be about the same as

13    the rest of the panel and give each side a fair trial and call it

14    the way you may see it?

15         JUROR KAY:  Yes.

16         MR. ROLLSTIN:  Nothing else.

17         THE COURT:  Both sides pass?

18         MS. FREDERICK:  Yes.

19         MR. ROLLSTIN:  Yes.

20         THE COURT:  Mr. Rollstin?

21         MR. ROLLSTIN:  We are satisfied.

22         THE COURT:  Ms. Frederick?

23         MS. FREDERICK:  We would like to thank and excuse juror

24    seated in Seat No. 4, Mr. Papke.

25         THE CLERK:  Amy Bergstresser, Seat 4.

-104-

1        THE COURT:  Sir, I am sorry, please for give me.  I

2   am looking down here and you know I didn't look up.  Please,

3   forgive me, ma'am.  Introduce yourself to us, please.

4        JUROR BERGSTRESSER:  My name is Amy Bergstresser.

5   I am a medical biller.  My husband is an owner of a tool company.

6        THE COURT:  Thank you, Ms. Bergstresser.

7        Have you sat on a jury before?

8        JUROR BERGSTRESSER:  No, I have not.

9        THE COURT:  Have not.

10        And is there anything that you are aware of that would

11   prevent you from being a fair and impartial juror?

12        JUROR BERGSTRESSER:  No.

13        THE COURT:  Thank you for that.

14        Ms. Frederick, your questions?

15        MS. FREDERICK:  I have no questions, Judge.

16        THE COURT:  Mr. Rollstin?

17        MR. ROLLSTIN:  Ms. Bergstresser, you heard my questions

18   earlier today.  Your answers would be about the same as the rest of

19   the panel?

20        JUROR BERGSTRESSER:  Yes.

21        MR. ROLLSTIN:  Would give each side the fair trial.

22   Call the case the way you see it?

23        JUROR BERGSTRESSER:  Yes.

24        MR. ROLLSTIN:  No further questions.

25        THE COURT:  Both pass for cause.

-105-

1           MR. ROLLSTIN:  Pass for cause, Judge.

2           THE COURT:  Okay, Mr. Rollstin.

3           MR. ROLLSTIN:  Satisfied.

4           THE COURT:  Ms. Frederick, your peremptory?

5           MS. FREDERICK:  Thank you, Judge.  We would like to

6 thank and excuse juror seated in Seat No. 4, Ms. Bergstresser.

7           THE COURT:  Ma'am, if you will stand down, please, and

8 return to the first floor there where you were earlier.

9           THE CLERK:  Alia Essaili, E-s-s-a-i-l-i.

10          THE COURT:  Ma'am, introduce yourself to us, please.

11          JUROR ESSAILI:  My name is Alia Essaili.  I am a grinder

12 operator.

13          THE COURT:  Have you served on a jury before, ma'am?

14          JUROR ESSAILI:  No.

15          THE COURT:  How do you pronounce your name?

16          JUROR ESSAILI:  Essaili.

17          THE COURT:  Essaili.

18          And the bottom line question here is about being fair

19 and impartial.  You know, knowing what you know about this at this

20 point, can you be fair?

21          JUROR ESSAILI:  Yes.

22          THE COURT:  Thank you for that.

23          Ms. Frederick, questions?

24          MS. FREDERICK:  Do you have an opinion about this case at

25 this moment?

1          JUROR ESSAILI:  No.

2          MS. FREDERICK:  Do you have any information for which you

3    might be able to weigh my client's guilt or innocence?

4          JUROR ESSAILI:  No.

5          MS. FREDERICK:  Thank you.

6          THE COURT:  Mr. Rollstin?

7          MR. ROLLSTIN:  Ms. Essaili, you heard my questions earlier

8    in the day?

9          JUROR ESSAILI:  Yes.

10         MR. ROLLSTIN:  Your answers would be about the same as

11   the rest of the panel?

12         JUROR ESSAILI:  Yes.

13         MR. ROLLSTIN:  Give each side a fair trial?

14         JUROR ESSAILI:  Yes.

15         MR. ROLLSTIN:  Call the case the way you see it?

16         JUROR ESSAILI:  Yes.

17         MR. ROLLSTIN:  Nothing else.

18         THE COURT:  Both pass for cause?

19         MR. ROLLSTIN:  Pass.

20         MS. FREDERICK:  Yes.

21         THE COURT:  Okay.  Mr. Rollstin?

22         MR. ROLLSTIN:  Satisfied, Judge.

23         THE COURT:  Ms. Frederick, your peremptory?

24         MS. FREDERICK:  We will thank and excuse Juror No. 9,

25   Judge, Mr. Banach.

                              -107-

1        THE COURT:  Mr. Banach, sir, back to the main floor

2   if you will.  Thank you very much.

3        THE CLERK:  Leticia Crider, Seat 9.

4        THE COURT:  Ms. Crider, when you get to your seat

5   there, introduce yourself to us, please.

6        JUROR CRIDER:  I am Leticia Crider.  I work in shipping

7   and receiving.  And I am divorced.

8        THE COURT:  Thank you, Ms. Crider.  Have you served

9   as a juror before at any time, Ms. Crider?

10       JUROR CRIDER:  No.

11       THE COURT:  Okay.  And surely, you understand what

12   we are looking for here.  That is about having an open mind and

13   being fair and impartial?

14       JUROR CRIDER:  Yes.

15       THE COURT:  Can you do that?

16       JUROR CRIDER:  Yes, I can.

17       THE COURT:  Ms. Frederick, your questions to Ms. Crider.

18       MS. FREDERICK:  Is there any reason why you should not

19   be seated on this jury?

20       JUROR CRIDER:  No.

21       MS. FREDERICK:  Thank you, Judge.

22       THE COURT:  Mr. Rollstin?

23       MR. ROLLSTIN:  You heard my questions earlier in the

24   day?

25       JUROR CRIDER:  Yes.

-108-

1          MR. ROLLSTIN:  Your answers will be about the same

2    as the rest of the panel?

3          JUROR CRIDER:  Yes.

4          MR. ROLLSTIN:  Give each side a fair trial?

5          JUROR CRIDER:  Yes, I would.

6          MR. ROLLSTIN:  Call the case the way you see it?

7          JUROR CRIDER:  Yes.

8          MR. ROLLSTIN:  Fair enough.  Thank you.

9          Satisfied.

10         THE COURT:  Ms. Frederick?

11         MS. FREDERICK:  Yes, Your Honor.  We would like to

12   thank and excuse I believe it is Juror No. 14, Mr. Judd.  Thank

13   you.

14         THE COURT:  Mr. Judd, thank you, sir.  If you will go

15   back to the main floor.  Thank you very much.

16         THE CLERK:  Tina Oleary, Seat 14.

17         THE COURT:  Ma'am, introduce yourself to us, please.

18         JUROR OLEARY:  I am Tina Oleary.  I am a cosmotologist.

19   And my husband works for Northwest Airlines.

20         THE COURT:  Thank you.  I know that Northwest Airlines

21   is a big place.  Do you know Mr. Bius.  Do you happen to know

22   each other in any kind of way?

23         JUROR OLEARY:  My husband works on the ramp.

24         THE COURT:  All right.  Just curious, okay.

25         Been on a jury before, Ms. Oleary?

-109-

1        JUROR OLEARY: I am sorry?

2        THE COURT: Have you been on a jury before?

3        JUROR OLEARY: Yes, I was on a civil case.

4        THE COURT: As to this case and this being a criminal

5 case, you understand there are differences between civil and

6 criminal matters there. But you know and have heard more than

7 anybody else at this point in terms of being a fair and impartial

8 juror, can you be fair?

9        JUROR OLEARY: Yes.

10        THE COURT: Thank you very much, Ms. Oleary.

11        Ms. Frederick, questions?

12        MS. FREDERICK: None, Your Honor. Thank you.

13        THE COURT: Okay.

14        MR. ROLLSTIN: Ms. Oleary, you heard my questions

15 earlier in the day and your answers would be about the same as the

16 rest of the panel?

17        JUROR OLEARY: Yes.

18        MR. ROLLSTIN: Give each side a fair trial. Call the case

19 the way you see it?

20        JUROR OLEARY: Yes.

21        THE COURT: Any for cause?

22        MR. ROLLSTIN: No.

23        MS. FREDERICK: None, Your Honor.

24        THE COURT: Mr. Rollstin, your peremptory?

25        MR. ROLLSTIN: Satisfied.

-110-

THE COURT: Very satisfied.

You have exhausted yours, Ms. Frederick. So, we have a jury.

Those of you who remain in the spectator area, don't give any big sighs of relief. You will have to go back up to the main floor to the jury office and they will put you on another panel.

We are going to take a lunch break here. You have been sitting for a while. I want to get the courtroom cleared for a minute and then we will see where we are. Ifa 11 of you out there will go back up to the main floor, okay.

(Remaining unused jurors excused at 12:20 p.m.)

THE COURT: You see it takes a little bit of time and effort to go through this process and as I said, we wanted to make the best use of the time and try to get this to you and get the case tried and you can get back to your usual routine as quickly as possible.

But bear with us in terms of doing that. Now, I want to maintain the integrity of this process. You have promised that you can and will be fair and that you will decide this case only on the evidence introduced at this trial and in this courtroom and nothing else.

That means I want you to follow a few basic rules. One, do not discuss anything about this case with anyone or among yourselves during the course of this trial. The first time to do that will be when you go to the jury room to deliberate the case

-111-

and I will tell you specifically to talk about it. But don't do
it until then. Meaning that when you go home, family members,
just tell them in general what kind of a case it is but don't
give them any kind of a detail because it is amazing somehow
someone will start talking about and they will say, I read about.
It may be something entirely different or you may be unfairly
influenced by that.

Also, don't discuss it among yourselves during the course
of the trial because you might hear one witness and then hear another
witness and if you start lining up, taking sides and agreeing with
one person and you might hear something to change it. Wait until
you hear all of the evidence and my instructions of law and then
you get to the jury room before you start talking about it. That
way, you won't have any alliances that you have to deal with later.

It is important that you not have any contact whatsoever
with persons involved with this case, not even to ask directions,
time of day, name, or compliment anyone. Nothing. No contact
whatsoever. We do not want anything improper or the appearance
of impropriety to occur at any time.

So, avoid any and all contact with persons involved
with this case. If you see persons about, you know, the floor
here or wherever around the building and they don't say anything
to you, they are not being rude or discourteous. Don't hold
that against them in any kind of way. I ask them also not to have
any contact with you. Again, to make sure this case is tried fairly

-112-

and the only evidence that comes before you is here.

Now, we are going to take a noon break here, what we refer to as the lunch break here.  I am going to let you go there in a minute.  And as a general rule, the hours are -- we start about nine o'clock in the morning for a trial.  I know you had to come in earlier this morning, but we will be back here I am sure tomorrow morning, but you have to report in at nine o'clock, not as early as you did this morning.

The other thing that is important here is that, remember this, from this point on, from now on, you have a jury room assigned to you here on this floor.  On this floor, that is the room you will be using from now on.  During the course of this trial, that is the room that you are to be in at the designated time for us to return back to the courtroom.  Don't come into the courtroom.

Just be in that jury room and one of the deputies here will come and get you from that room.  That room, your jury room is on this floor.  I will have somebody show it to you in a minute.  It is on this floor.  If you were to look at going right out of this door right here, the door to this courtroom, and put it in a straight line, directly across the hallway to the other side of another courtroom, G-2 and immediately, almost adjoining that, G-3.

G-3, in that room, that is where the jury room, between here, this room and that room on the right-hand side is

-113-

Room G-6. That is a very large room there with tables and chairs. There is a jury assembly room. It also has I believe a snack machine and a juice machine somewhere in there back in the corner somewhere. You can use that room, too. You can use that.

But the main thing is whatever you do, if you go out of the building on your lunch break, if you stay in the building, and you go around to Greektown, wherever you go, you are on your own, but report back to your jury room here and I want you back in there at 1:45. 1:45. That gives you about an hour and roughly about 20 minutes or so for your lunch break.

We want to start at 1:45 if we can. So, be back in there at about 1:40 so we can come and get you. She is going to take you over to the jury room so you will know where that room is. I don't know if somebody wants to stay in there. You can do that. But the main thing to know where that room is and that is the room that we will be using and that is the room that you are to report and be in at about 1:40.

So, if you go now, the deputy will show you where that room is.

THE DEPUTY: Rise for the jury.

Follow me.

(Jurors excused at 12:25 p.m.)

THE DEPUTY: You may be seated.

THE COURT: Okay. We will see everybody back at about 1:40, 1:45. Mr. Rollstin, I assume that your witnesses are somewhere

-114-

1    about.

2          MR. ROLLSTIN:  I haven't seen a single one yet.

3    I am being frank.  We will see you at 1:45 .

4          (Off the record at 12:25 p.m.)

5          (On the record at 1:53 p.m.)

6          MR. ROLLSTIN:  The court inquired as to the status

7    of the witnesses before we broke for lunch.  I told you I have

8    not seen any and to this point in time that remains the current

9    status.

10         THE COURT:  I am sorry you are not kidding.

11         MR. ROLLSTIN:  No, I was not.  As much as this hurts

12    or pains me to tell you this, I am going to try to give you the

13    short version.

14         The officer in charge, obviously, has had a death

15    in the family.  Because she is not here, I took the lunch hour

16    to investigate the status of the witnesses.  I talked to -- there

17    are four civilians.  I talked to one of them.  He is going to be

18    here in the morning.  I did subpoena personally two of the

19    other civilians who were here on April 5.  That is Phillip Mason

20    and Edward Martin.  They have not appeared.

21         I am asking the court issue a material witness retain

22    bench warrant for them.  I will tender the court the necessary

23    order for that once we have had a chance to grant that.  If the

24    court grants my oral motion with regards to the police officers,

25    subpoenas were issued and given to the officer in charge on

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

1    April 5.

2    I contacted the 8th Precinct and the Evidence Technician

3    Unit. That is where the officers are all out of. None of the

4    officers who were subpoenaed received subpoenas. I contacted

5    those two places and they are going to have the officers appear

6    tomorrow morning at nine o'clock and they cannot marshall the

7    officers in time to be here for the afternoon call.

8    So, at the end of the day inasmuch as I know it is

9    going to pain the court to hear this, I don't have any witnesses

10    this afternoon. I am prepared to make opening statement and do

11    anything else the court would like to do but at the end of the

12    day, I am not going to be able to present any testimony.

13    Officer, the officer in charge, Jo Ann Miller, who

14    testified here in this matter and the court may not recall has

15    asked to be excused until Wednesday morning. That is the current

16    status.

17    THE COURT: Okay. You may say whatever you want to

18    say.

19    MS. FREDERICK: Your Honor, when the witnesses were

20    subpoenaed for the Wade Hearing, we had an issue similar to this

21    in that they failed to appear even with yourname and signature

22    on the subpoena, they failed to appear.

23    My client, obviously, is compelled to be here because

24    he is the accused. The witnesses have for the second time, I

25    guess, ignored the court order to appear.

-116-

1        With respect to the officers, inasmuch as we were all

2   aware of the trial date, they should in fact be here to testify.

3   Of course, we do have opening statements.  And if the people are

4   not prepared to go forth, once again, I simply ask the court to

5   dismiss this matter against Mr. Jones because of the fact that the

6   witnesses' apprehension or reservation or failure to appear could be

7   indicative of the potential to continue to present perjured testimony.

8        They were aware of this court date and the previous court

9   date and still have ignored the court orders to appear.  And in

10  light of that, we are prepared to proceed and if the people are not,

11  we ask that this matter be dismissed.

12       THE COURT:  The prosecution, I mean, the defense, the only

13  inconvenience I guess you might say is not haivng the trial, you know,

14  starting the trial, the calling of the witnesses this afternoon

15  which amounts to about, maybe, an hour, a couple of hours at most

16  of non-trial today.

17       And as a matter of fact, I am aware that some judges

18  take all day to pick a jury and trials don't move along much faster.

19  So, I don't think the prosecution is inconveniencing the defense

20  by requesting that little bit of time today.  So, that is not a

21  basis to dismiss the case because of that.

22       So, what I am going to do is let you bring in the jury

23  and read the opening remarks to them.  Have openings.  I am not

24  going to swear them.  I don't think that there is anything I have

25  to swear them for in openings.  I will swear them before the first

-117-

witness testifies.

The thing is if those persons don't show up tomorrow, then we have to see where we are then, I suppose.  So, anyway, we are going to go that far with this.  I will do the preliminary instructions.  Openings.  I won't swear them.  And let them go for today.  Okay.

MS. FREDERICK:  Thank you, Judge.

THE DEPUTY:  Rise for the jury.

(Jurors enter the courtroom at 1:55 p.m.)

THE DEPUTY:  You may be seated.

THE COURT:  Thanks, Dan.

Members of the jury, I remind you, a couple of things I said earlier today.  One, the time as a general rule, our schedule is to start at nine o'clock.  We will have a midday break like we did, usually, for at least an hour, sometimes a little bit longer.  We usually end the day somewhere between 4:15 and 4:30, no later than 4:30 depending on what is going on at the time.

So, you have some sense of what the schedule is like and how we will proceed with that.  And it is important, again, that you not discuss this case with anyone or among yourselves and to avoid any and all contact with persons who are involved with this case.  And, again, if you see persons about and they don't say anything to you, they are not being rude or discourteous, they also are abiding by the court rules not to have any contact with you.

So, please, keep those things in mind.  What we are going

-118-

1    to do here is now I am going to give you some preliminary

2    instructions on this case. And then we will have the opening

3    statements by the lawyers.

4        Now, the remarks which I am about to make are intended

5    as an outline of the trial and some of the legal principles you

6    will need. Briefly, I will speak to you about the function of the

7    judge in a criminal trial and your function as jurors.

8        It is my responsibility to conduct the trial of this

9    case in an orderly, a fair, and efficient manner. I rule upon

10   questions of law arising in the course of the trial and I instruct

11   you as to the law which applies to this case. It is your duty to

12   accept the law as I state it to you.

13       None of my instructions reflect any opinion on my part

14   about the facts of this case. As members of the jury, you alone

15   must decide this case. Your function is to determine the facts.

16   And remember, I said earlier that simply means that based on the

17   testimony and other evidence presented to you, you are the one

18   that kind of puts the pieces of the puzzle together and

19   essentially get a picture of what happened and you decide who

20   did what and how and so forth.

21       That is what I mean by finding the facts. You make that

22   decision. You are the sole and exclusive judges of the facts

23   and you along determne the weight, the effect, and the value

24   of the evidence as well as the credibility or believability of

25   the witnesses.

-119-

And when I say witnesses, I am talking about anyone who gets on that witness stand to testify.  Again, you must consider and weigh the testimony of each person who appears before you and you alone are to determine whether to believe that person and the extent to which any person should be believed.  It is your responsibility to consdier any conflicts in testimony which may come up during the course of the trial.

What you decide about the facts in this case is final. A trial follows long established rules of evidence.  Attorneys are trained in the rules of evidence and they are required to make objections.  I am required to rule upon these matters according to the law and the rulings do not reflect any personal opinion about the facts in this case.

Do not give any weight to my rulings or the number of rulings on either side.  I may question a witness myself.  If I do, my purpose will be to bring out something I think the lawyers may not have fully explored and will not reflect any opinion on my part about the evidence or about the case.

As mentioned to you earlier here and I reaffirm, nothing that the lawyers say during the course of this trial is in any way evidence unless I specifically tell you that there is something said by the lawyers that is evidence.  And that is only under some very narrow circumstances that I would specifically tell you that but the general rule is that nothing that the lawyers say is evidence in this case.

-120-

And that, of course, includes the questions by the lawyers put to the witnesses.  That is not evidence.  It is the answers of the witnesses which provide evidence.  Now, certainly, if a lawyer asks a question that gets a yes or no response, to understand the answer, of course, you have to focus on the question.  What I am asking you to do is not to speculate or think that a fact is true merely because one of the lawyers asks a question in such a way that assumes or suggests that that fact is true.

For an example was given earlier about the question related to do you still beat up on your spouse.  That is an example of that.  So, don't assume or speculate that a fact may be true merely because a question is asked in such a way.

I am likely to give other instructions during the trial and I will give you detailed instructions of law at the end of the trial.  Take all of my instructions together as the law you are to follow.

Now, a trial follows this procedure.  First, the prosecution attorney makes an opening statement in which he outlines his theory of the case.  Think of that as kind of a preview or overview of what he thinks the evidence will show and what his theory of the case is about.

The defense may make an opening statement after the prosecutor makes his or she may reserve it until later.  Again, these opening statements are not evidence and are only intended

-121-

to assist you in understanding the viewpoints of the parties.

Again, the evidence of the trial is brought before you.  The prosecuting attorney is allowed to present evidence first.  He may do that by calling persons to testify and may offer exhibits such as documents or physical objects.  The defense attorney has the right to question and cross-examine any witness called by the prosecutor to test the truthfulness and the accuracy of that testimony.

Following the prosecutor's presentation of evidence, the defense attorney may if she wishes present evidence but she is not obligated to do so because as I said to you earlier, the law does not require a defendant to prove his or her innocence or to produce any evidence whatsoever.

Now, after all of the evidence has been put before you, each attorney will then have the opportunity to address you in what we refer to as the closing statement which is then the opportunity for the lawyers to talk to you about the evidence that has been put before you and their thoughts about that.

But I remind you that when it comes to the closing statements by the lawyers, as with the openings, that is not evidence and only intended to assist you in understanding the theory of each side and their thoughts about the evidence.

You base your decision only on the evidence, only on the evidence.  And evidence includes the sworn testimony of persons from the witness stand, exhibits that are admitted

-122-

into evidence such as documents or other physical things that come into evidence and admitted as such, and other facts or testimony that I tell you to consider as evidence.

You are the judges of the truthfulness and the accuracy of all evidence including the testimony of the witnesses. And in judging credibility and the weight you give to that, you should use your understanding of human nature and use your common sense.

Observe each person as he or she testifies. Be alert for anything in his or her words, demeanor or behavior on the stand or for anything else and other evidence in the case which might help you to judge the truthfulness, the accuracy, and weight of that testimony.

For example, you may take into account that person's ability and opportunity to observe, his or her memory and manner while testifying, any interest or bias he or she may have, and the reasonableness of that testimony.

It is important that you keep an open mind and not decide any issue in this case until the entire case has been submitted to you for deliberation. At the conclusion of all the evidence and the final statements by the lawyers, I will then instruct you in detail on the rules and law that apply.

You will go to the jury room to deliberate and decide what your verdict will be. I say it now but I will remind you that a jury verdict in a criminal case must be unanimous. That

-123-

is must be agreed upon by all and it must reflect the individual

decision of each of you.

Proceed with your opening statement, please.

MR. ROLLSTIN:   Thank you, Judge.

Good afternoon to all of you.  Thank you for coming

back.  I am going to talk to you now.  If I were sitting where

you are at, I would want to know how long is Rollstin going to

talk.  I am going to probably take up about 15 or 20 minutes of

your time.  Let me tell you what this is about.

This is opening statement as the judge indicated.  The

things that I say are not evidence.  What this is meant to do

for you is to give you an overview of the six or seven witnesses

who I anticipate calling during the course of this trial and how

those witnesses are going to relate to the six charges that are

leveled at Mr. James Jones.  Okay.

Now, before I begin with an overview of what I think

the facts are in the case, I think in order to ahve an intelligent

review of those facts, you have to ask yourself what is it that

Mr. Jones is being charged with.  What is it that he is being

accused of having done wrong.  Okay.

First degree premeditated murder of Demetris Perdue

as Count 1.  We talked about that in voir dire a little bit.

In essence, what first degree murder captures the notion that it

engenders is the idea that the act of the killing of Demetris

Perdue is thought about beforehand.  That is the individual

-124-

considered the pros and cons of his or her conduct before he acted. Okay.

It doesn't mean that it has to be a to-do list or a lengthy period of time or a week or a day, but that there was some time for him to reflect upon his actions and what he was about to undertake.

Assault with intent to commit murder as it relates to Phillip Mason, Ahmad Akins and Joseph McCrimon. Okay. Assault with intent to commit murder again captures the idea that you have tried to kill somebody through force or violence, but you weren't successful. The person survived.

And in this particular case, there are three individuals like that. And as we talked about in voir dire, the judge is going to tell you that it is not necessary that any injury actually have been inflicted on any of those people. ANd in this particular case, there actually was an injury suffered by one of them. That is Ahmad Akins, and I will visit that in a moment here.

The fifth charge being a felon in possession of a firearm. Okay. Now, that means that we have to prove essentially two things. One, that he has been previously convicted of a felony. And number two, that he possessed a firearm during this event, the one that we are going to be talking about today here in this courtroom.

Finally, No. 6 Count would be felony firearm, and that is that he possessed a firearm during the commission of a felony. In this particular case, it would be murder or assault with intent

-125-

1    to murder.

2        All right.  With that as a backdrop as to what the charges

3    are, first of all, let me start off by telling you that this event

4    happened back on the 15th of November, the year, 2001, at 18901

5    Heyden, which is on the northwest corner of Heyden and Clarita.  And

6    the judge is right, it is over on the westside.  It is in the 8th

7    Precinct, full blocks east of Evergreen, little bit south of Seven

8    Mile.

9        This is rather modest.  The houses aren't real big.

10   Bungalows or small ranches.  And this event that occurred at around

11   five o'clock in the evening, at the end resulted in the death of

12   Mr. Demetris Perdue.  And it also resulted in Mr. Ahmad Akins

13   having been shot in the head.  Okay.  That is in a nutshell what

14   occurred there.

15       Now, I am going to tell you right now during this trial,

16   you are not going to hear one stitch of evidence that he possessed

17   a gun.  You are not going to hear one stitch of evidence that he

18   pulled the trigger.  Okay.

19       Now, you may be sitting there asking yourself right now,

20   okay, Rollstin, why am I here.  Well, we talked about that earlier

21   during the course of the voir dire.  The idea of aiding and abetting.

22   Okay.

23       At the end of the trial, the proofs are going to be very,

24   very concise on the fact that James Jones encouraged and assisted

25   another individual in shooting and killing Demetris Perdue and

-126-

1   Ahmad Akins, striking him in the head and also shooting in the

2   direction of Joseph McCrimon and Phillip Mason. Those people are

3   the victims in this crime.

4        Okay. They are there on the northwest corner of Heyden

5   and Clarita, 18901 Heyden Street. Again, it is the westside of

6   Heyden. That is where Ahmad Akins lived back on the 15th of

7   November, last year, and really, this event, one of the events

8   that I think as a jury that almost universally wants to be known

9   in a criminal case is the why.

10       You always get to the who and the what and the where

11  and the when and the how, but the why is something that I think

12  the jury usually wants to know about. And the why in this case

13  begins actually the day before.

14       And the judge is going to tell you, you know, motive

15  is not an element to the crime and motive doesn't have to be proven

16  but there can be testimony about motive because it may be of

17  some import about who committed the crime or where it was committed,

18  when or where or the other items that go into a case.

19       Now, the day before the crime, James Jones was robbed.

20  Okay. He is stuck up by a guy with a gun whose identity we don't

21  know, but during that time, Phillip Mason and Edward Martin see

22  this event occur. It is not too far from the 18901 Heyden Street

23  address where Ahmad Akins and these four, and they are all young.

24       Phillip Mason, Edward Martin and Joseph McCrimon and

25  Ahmad Akins are all either 18 or 19 at the time of this event.

-127-

Okay.  So, they are all younger in age and they see James Jones
-- Edward Martin and Phillip Mason -- get robbed the day before.
They are all from this neighborhood. They all live in that area.
And they know James Jones.  They have known him around the
neighborhood.

Edward Martin and Phillip Mason and Joseph McCrimon
all know him from around the neighborhood.  And his nickname is
Fresh.  And you are going to hear him referred to during the
course of the trial as Fresh.  It is that event of James Jones
getting robbed the day before that leads to the shooting on the
15th of November at 18901 Heyden Street.

This is what caused this to occur because they were
close enough, Phillip Mason and Ed Martin, were to this robbery
where Mr. Jones thought maybe they had something to do with it.
Okay, and they were there.  And so, therefore, he is going to get
his piece of the pie. Mr. Jones is.  And the next day, acting
in retaliation, he pulls up at the corner there of Heyden and
Clarita in front of Mr. Akins' home or Phillip Mason and Ed Martin
and Joseph McCrimon and Ahmad Akins.

Just about the time that he pulls up in this green
Oldsmobile Aurora, Mr. Jones does as the driver, okay, Mr. Akins
is entering his home. And he goes into the house and while he is
in there, the green Aurora that is being driven by Mr. Jones
pulls around the corner.  Turns right onto Clarita and goes
towards Evergreen.

-128-

1          Now, there are two other people inside the Oldsmobile.

2    They're men, also.  One of them is in the front seat passenger.

3    The other one is in the back seat by himself.  Now, this is where

4    the premeditation, deliberation facts will come into this case.

5    As they go by, you are going to hear the testimony of Ed Martin

6    and Phillip Mason and Joseph McCrimon, it is going to be pretty

7    clear, they were driven, vernacular.  They were looking at us

8    real hard.  They came by.  They were looking at us there on the

9    corner.

10         Again, Mr. Martin, Mr. Mason and Mr. McCrimon on the

11    corner there in front of Mr. Akins'. And as the green Aurora

12    driven by James Jones and occupied by these two other men, pulls

13    up to the stop sign there, they looked at him real hard.  The

14    people in the car real hard to the people in the street.  The

15    Oldsmobile makes a right.  Goes down Clarita.  And it is gone

16    for about two or three minutes.  Okay.

17         During this time Mr. Akins is inside his home and he

18    is coming out of his house. And he is on the front porch of the

19    house when the green Oldsmobile reaches.  This is the point in

20    time it is, the shooting begins.

21         We are talking about premeditation, deliberation.  The

22    evidence is going to be very clear that this car when it went by

23    the first time, the people inside it were looking at the kids

24    on the street there.  And they were looking at them real hard.

25    They were grimming.  And when the car went around the block or

-129-

wherever it went for those two or three minutes while it was gone,

when it came back, it came back with a very clear intent and that

was to do evil, to bring death to Demetris Perdue.  Also, shoot

at Edward Martina nd Phillip Mason and Joseph McCrimon out there.

Okay.

The premeditation, deliberation comes in the essence of

the car pulls up. They see their victims.  They are going to go

around the block.  When they come back, the shooting begins.  This

wasn't a mistake, ladies and gentlemen, is the point I am trying

to make here.  The testimony is going to be very clear that -- the

testimony will be very clear that when this green Oldsmobile Aurora

came back, there was no mistake about what happened.

They came back and they acted very quickly.  They fired

somewhere between 20 and 30 shots at the young men that were there

on the corner.  And what happens is you are going to hear the

testimony of these men.  They are there on the corner and the

Oldsmobile after having been seen once comes back two or three

minutes later.

Now, it is coming back in the same direction it was

coming from the first time, southbound Heyden in the Seven Mile

area, only this time now, the car is coming at a much faster

rate of speed.  It is being driven by James Jones and really,

what is occurring from this point forward is James Jones is

putting the car into a perfect firing position for the man in the

back seat to use an AK47 and to pour 20 to 30 rounds, to shoot

-130-

30 or 30 times from that back window in the direction of these four young men who were out there on the corner.

And when all the testimony is done, you will come to the same conclusion any reasonable person would, I think, and that is it is a miracle they all weren't killed. Ahmad Akins gets shot in the head and Demetris Perdue is shot twice and he dies.

The testimony is going to be very clear that Ahmad -- the injuries to Mr. Perdue are such that he is actually shot in the back while he is running away and he is also shot once in the leg while he is running away. And it is those injuries that cause his demise a few hours later at Sinai Grace Hospital.

And one of the medical examiners will come in and testify about that. And I think probably the most important part of that testimony is going to be that once the shooting began, they all turned and ran. And that consistent with the injuries that Mr. Perdue sufffered, the act by Mr. James Jones of driving this vehicle in the way that he did is such that but for his placing that shooter in the position that he was able to put him in by getting the car right there in front of the house, stopping it and allowing the shooter to fire 20 to 30 times and then turn right again on Clarita and make good the escape.

The law -- the judge is going to give to you is that anybody who encourages or assists another individual in committing the crime is just as guilty as the person who commits it. And

-131-

in this particular case, the driving of this vehicle by Mr. Jones

and, again, the weapon that was used in this case. The testimony

is going to be is an assault type rifle, not a pistol. It is not

a small gun that can be secreted where you can suggest, well,

the window was rolled down, the driver didn't know he was going

to begin shooting.

The events of this case is not like that at all. The

events of this case is very clear. It was a circling the block,

a hard look, returned a few minutes later. A very high-powered

rifle. Shoot 20 or 30 times. Okay.

Now, you are going to hear from Ofrs. Clark and Cook

and Curry and Troller and Yakimovich and Crawford and Fitzhugh.

Those are police officers that made the scene afterwards and

processed the scene. None of them are going to be able to

testify for you that James Jones is the guy that did the shooting.

So, you will not hear from those police officers which

really, quite frankly, will be the waste of your time. You will

hear from a couple of them when the event occurred, what occurred

and we will get some photographs of the scene for you.

The point that I am trying to make is this. This

case, the identification of James Jones is made through Edward

Martin and Joseph McCrimon. And I want you to keep in mind, you

know, that the idea of a mistaken identity was proposed to you

during voir dire. And one of the things that you are going to

be -- that is going to be demonstrated through the testimony,

-132-

it is going to be real obvious that Ed Martin knows James Jones

and he has known him in fact for quite a while in the neighborhood.

He knows his nickname is Fresh.  He ahs seen him around many, many

times.

This is not an event like an armed robbery that

happens in a dark alley and the person doesn't know the other

individual and it is poor lighting.  This car circled twice.

Both times Ed Martin got a very good look at the individual

who was the driver and he is very certain about who it was.

In fact, you will hear that they even went to a lineup just

to ensure that they had the right person and identified him

individually in the lineup as the individual who was the driver

of the car.

And I think at the end of the testimony, it is going to

be very clear to you, two things, number one, the crime was

committed, the six crimes that we are talking about.  And number

two, that James Jones was the driver of the green Aurora that

put the shooter in the position to do what he did, ultimately

killing Demetris Perdue and injuring Ahmad Akins and shooting

at Joseph McCrimon and Phillip Mason.

Thank you very much.

THE COURT:  Ms. Frederick.

MS. FREDERICK:  Thank you, Your Honor.

I want to begin by saying that Demetris Perdue is

deceased and Ahmad Akins was glazed on the head with the bullet.

-133-

And I am a defense attorney. And this man is innocent until proven guilty beyond a reasonable doubt.

The fact of the death is unfortunate. The nature of the injuries are equally as unfortunate. That doesn't make this man guilty. You have got a so-called eyewitness who conveniently now knows this man from the neighborhood.

At the scene, no location, no address, no concrete identification. Yes, you are going to hear about a lineup. You are going to hear abut some irregularities in that lineup. They are saying my client was robbed the day before the shooting. And they are saying that they happened to be present during this robbery. That they witnessed this so-called robbery.

He was robbed. And he went to the police station and made out a report like any one of you would have. He gave his name. He gave a list of the items taken. He gave a description of the individuals involved. Doesn't make sense that he would turn around and participate in something like this because now the police are already aware that he was robbed.

He didn't know these people. He described them. So, how would he know where to go. Could be that the eyewitness knows him from the robbery. He didn't know them because he went to the police and said as much. He gave a description of the events, items taken, and as best he could, the people that robbed him was a nighttime robbery with a gun.

Now, now, that we have Demetris Perdue, the deceased.

-134-

We have Ahmad Akins injured, and a host of other people allegedly assaulted.  It is convenient that possibly the armed robbers are now fingering the victim.  That is one of my positions.  That is one of my positions.

The other would be why the irregularities in the lineup. If you know him, why do you need assistance in picking him out of a lineup.  What would be the benefit of going to the police station and reporting the robbery and then turning around and allowing yourself to be seen doing a drive-by shooting.  It does not make sense.  It does not make sense.

The theory of aiding and abetting would be satisfied if you accept the one sole individual eyewitness who says I know him.  One of the other witnesses knew him.  They state as much in the preliminary on-the-scene police reports. They don't know him.  There is a crowd of people standing around after a huge incident and there is a name that's being tossed around.  There is a description that varies from person to person.

They don't know him.  One one of them says that he knows him.  The others are, well, I heard.  That is insufficient for a caselike this.  Either you know him or you don't but don't say that you do just because you heard the name buzzing around the crowd where there is someone who has been shot.

My name could have come up.  Does that make me guilty of murder.  Anybody's name could have come up.  And yes, there is such a thing as mistaken identity, and sometimes the guilty

-135-

conscience will put things in your mind.

Would a person commit a drive-by shooting on people that know him. Not likely. Because if he had the wherewithal to round up the other two people and the shooter, why does he need to go.

My client is innocent of the charges. You will find substantial irregularities in the testimony. The case will not be proven beyond a reasonable doubt under any theory. Aiding and abetting, no. He was not driving this vehicle.

Yes, Demetris Perdue was fatally injured, but that doesn't mean that the man sitting in that chair has to be the one that did it.

Thank you.

THE COURT: Members of the jury, because of some concerns here right now about getting everybody together, we are going to stop here for the day. I have already consulted with the lawyers about his and we need to address some things out of your presence. So, I am going to let you go for the day. But understand, again, that we will be continuing with this tomorrow morning at nine o'clock.

Mr. Rollstin mentioned that the officer in charge is having some family concerns with a death in the family. And the officer in charge is usually the person who has the responsbility of getting the witnesses and subpoenas and all of those kinds of things that may have created some concern.

-136-

1    Just to understand that we will continue with this

2    tomorrow morning and I will let you go for today. I forgot

3    to say to you and explain normally what happens to show your

4    being here for whatever days that you are here, we normally

5    give you a letter of some kind after you have finished and

6    at the time that you are formally excused from any further

7    service on this case.

8    So, understand that you will be given that at the

9    appropriate time. Now, again, I remind you not to discuss

10   this case with anyone or among yourselves and avoid any and

11   all contact with persons who are involved with this case.

12   And 9 o'clock. Don't have to be worried about being here as

13   early as you were this morning.

14   So, I will give you a little bit mroe time to sleep

15   in, but be here, be in your jury room on this floor, on this

16   floor here at nine o'clock in the morning. Everybody understand.

17   Okay. Be safe and we will see you tomorrow morning.

18           THE DEPUTY: Rise for the jury.

19           (Jurors excused at 2:32 p.m.)

20           THE DEPUTY: You may be seated.

21           THE COURT: I am sorry, we are off the record.

22           MR. ROLLSTIN: Thank you, Judge.

23           MS. FREDERICK: Thank you, Your Honor.

24           (Matter adjourned at 2:33 p.m.)

25           -    -    -

                       -137-

1

R E P O R T E R ' S    C E R T I F I C A T E

2

3    STATE OF MICHIGAN    )
                          )
4    COUNTY OF WAYNE      )    ss.

5

6

7            I, CLARA SHAH, CSR-2602, an Official Court Reporter

8    in and for the Third Judicial Circuit Court for the County of

9    Wayne, State of Michigan, do hereby certify that I have

10   reported stenographically proceedings had in the above-entitled

11   cause, and I do further certify that the foregoing transcript

12   constitutes a full, true and complete transcript of said

13   stenographic notes.

14

15

16

17   _____
     CLARA SHAH, CSR-2602
18   OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

-138-