1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN,

                    -vs-                    Case No. 01-013853

                                            Hon. Thomas E. Jackson

JAMES ALFRED JONES,

                    Defendant.

_____/

JURY TRIAL - VOLUME 3

        PROCEEDINGS HAD AND TESTIMONY taken in the above-entitled

cause before the HONORABLE THOMAS E. JACKSON, Judge, Criminal Division,

Third Judicial Circuit Court, Courtroom G-1, Frank Murphy Hall of Justice,

1441 St. Antoine, Detroit, Michigan, on Wednesday, May 22, 2002.

        APPEARANCES:

                MR. WILLIAM A. ROLLSTIN, (P40771),
                    Assistant Wayne County Prosecutor,
                    On behalf of the People of the State of Michigan.

                MS. LEESA R. FREDERICK, (P53372),
                    On behalf of Defendant James Alfred Jones.

                -   -   -

                CLARA SHAH, CSR-2602
                OFFICIAL COURT REPORTER



THE CORBY GROUP  1-800-255-5040

LASER STOCK FORM FMSRN

I     N     D     E     X

WITNESS                                          PAGE

JOANN MILLER

    Direct Examination by Mr. Rollstin          3

    Cross-examination by Ms. Frederick         12

    Redirect Examination by Mr. Rollstin       19

CLOSING ARGUMENTS
    By Mr. Rollstin                            28
    By Ms. Frederick                           44

REBUTTAL ARGUMENT by Mr. Rollstin               51

JURY INSTRUCTIONS                               61

JURY VERDICT                                    87


E     X     H     I     B     I     T     S

IDENTIFICATION                         MARKED    RECEIVED


N     O     N     E

-2-

1                Wednesday, May 22, 2002

2                Detroit, Michigan

3                At about 9:26 a.m.

4                -    -    -

5                THE DEPUTY:  Rise for the jury.

6                (Jurors enter the courtroom at 9:26 a.m.)

7                THE DEPUTY:  You may be seated.

8                THE COURT:  Thank you.

9                Good morning to all.  Okay, Mr. Rollstin, your next

10      witness, please.

11               MR. ROLLSTIN:  Thank you, Judge.

12            J O A N N     M I L L E R    ,

13  having been first duly sworn by the Clerk at 9:26 a.m., was examined

14  and testified as follows:

15               THE CLERK:  You can be seated.

16               DIRECT EXAMINATION

17  BY MR. ROLLSTIN:

18  Q     Good morning.

19  A     Good morning.

20  Q     Can you tell us your name, please?

21  A     JoAnn Miller.

22  Q     Ms. Miller, how are you employed today?

23  A     I am a police officer with the City of Detroit assigned to Homicide

24      Section.

25  Q     How long have you been a police officer?

1   A      15 years.

2   Q      I want to take you back in time to the 16th of November, the

3          year, 2001.  Were you assigned to be the officer in charge of

4          this case involving the homicide of Demetris Perdue?

5   A      I was.

6   Q      Okay.

7                  After being assigned the case, did it come to your

8          attention there were certain witnesses who might be able to

9          identify the driver of the car involved in the shooting?

10  A      Yes.

11  Q      Okay.  Did you eventually meet with Mr. Edward Martin?

12  A      I did.

13  Q      Did you eventually meet with Mr. Joseph McCrimon?

14  A      I did.

15  Q      Okay.  When was the first time you met with them personally?

16  A      That would have been on the 16th, I believe.

17  Q      Okay.  Of November?

18  A      Yes.

19  Q      2001?

20  A      Yes.

21  Q      And where did you meet with them at?

22  A      At one of their homes on Heyden.

23  Q      Okay.  When you went there, did you bring anything with you?

24  A      I did.

25  Q      What did you bring?

-4-

1    A    I brought a police photograph of a young man.

2    Q    Okay. Is that young man in court today?

3    A    He is.

4    Q    Can you point him out for us, please?

5    A    He is sitting at the defense table with the braids and, I believe,

6         that is a blue-purple shirt.

7              MR. ROLLSTIN:  Identifying Mr. James Jones for the

8         record, Your Honor.

9    BY MR. ROLLSTIN:

10   Q    Tell me, if you will, why you brought a photograph of Mr. James

11        Jones to this meeting with Mr. Martin and Mr. McCrimon?

12   A    At that point, I simply had a street name of Fresh.

13   Q    Okay.

14   A    And I was attempting to identify who Fresh was.

15   Q    Okay. Had Mr. Martin given that street name of Fresh as being the

16        driver of the car?

17   A    In the statements, yes.

18   Q    Okay. How did you put a photograph together with a street name,

19        Fresh?

20   A    Mr. McCrimon mentioned in his statement that he had witnessed

21        a robbery on teh 14th where Fresh was actually robbed.

22   Q    Okay, and did Mr. Martin also mention the same robbery?

23   A    I believe so.

24   Q    Okay. Now, the robbery they indicated that they witnessed of

25        Mr. Fresh being robbed, with that information, how did you develop

-5-

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

```
 1        a name of the person Fresh?

 2   A    I contacted the 8th Precinct.  Supposedly, the robbery had happened

 3        at Heyden and Seven Mile.

 4   Q    Is taht in the 8th Precinct?

 5   A    It is.

 6   Q    Go ahead.

 7   Q    And I was able to obtain a police report for a robbery in fact at

 8        that location on the 14th.

 9   Q    Did the police report indicate who was the victim of that robbery?

10   A    It did.

11   Q    And who was that?

12   A    Mr. Jones.

13   Q    Okay.

14             With that name now, what did you -- how did you use

15        that to get a picture of him?

16   A    I went to -- after running his name, I went to the Detroit Police

17        Department photo lab.

18             THE COURT:  Hold on a minute, please.  I am concerned

19        about where you are going with this, okay.  If you are going to

20        -- I know that he has a felon in possession, prior felony, but I

21        don't know where you are going with this in terms of -- may I see

22        you at side-bar for a minute, please.

23             MR. ROLLSTIN:  Sure.

24             (Bench discussion held off the record and outside the

25        jury's hearing.)

                                -6-
```

1          THE COURT:  Listen to his question and just answer

2     his question, ma'am.

3  BY MR. ROLLSTIN:

4  Q    Ofr. Miller, you went to the photo lab, correct?

5  A    Yes.

6  Q    You got a picture of him?

7  A    Yes.

8  Q    I am going to show you what is marked here as proposed Exhibit

9     No. 11.  Is that the photo you obtained?

10 A    Yes, it is.

11 Q    Did you -- is that the photo you brought with you when you met

12    with Mr. Martin and Mr. McCrimon on the 16th of November?

13 A    It is.

14 Q    Okay.  Did you show them that photo?

15 A    I did.

16 Q    Did you ask them any questions after displaying that photo to

17    them?

18 A    I asked them if they knew this person.

19 Q    What was Mr. Martin's response?

20 A    He said that is him.  That is Fresh.

21 Q    What is Mr. McCrimon's response?

22 A    He said that is Fresh.

23 Q    Okay.  Based on that information, what did you do?

24 A    At that point, I contacted the 8th Precinct and set up with the

25    investigator where Mr. Jones would come in and possibly view some

                            -7-

1     photographs of who in fact had robbed him.

2    Q    Okay.  Did Mr. Jones appear?

3    A    Yes, he did.

4    Q    Was he arrested at that point?

5    A    Yes, he was.

6    Q    For this homicide?

7    A    Yes.

8    Q    And, also, for the individuals having been shot at there --

9    18901 Heyden?

10    A    Pardon me?

11    Q    There was a homicide at 18901 Heyden?

12    A    Yes.

13    Q    And there was also a number of people that were shot at, is that

14    correct?

15    A    That's correct.

16    Q    After he was arrested, was there a lineup conducted?

17    A    Yes, it was.

18    Q    All right.  Were their lawyers present at the lineup on behalf

19    of Mr. Jones?

20    A    Yes, there was.

21    Q    What is the purpose of having those lawyers there?

22    A    To conduct a fair and proper lineup.

23    Q    Okay.  Was his lawyer, Ms. Frederick, allowed to attend?

24    A    Yes.

25    Q    Okay.  Did Mr. Martin view the lineup?

-8-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1   A   Yes he did.

2   Q   Okay.  I am going to show you what is marked as Exhibit No. 12

3       here.  Can you tell us what this document is?

4   A   This is the standard form we used at a police show-up for photo

5       lineup.

6   Q   Okay.  Is that the lineup form that was used for Mr. Edward

7       Martin?

8   A   Yes, it is.

9   Q   When was the lineup conducted?

10  A   On the 18th.

11  Q   Of November?

12  A   Yes.

13  Q   2001?

14  A   Yes.

15  Q   Where was it conducted at?

16  A   The Second Precinct.

17  Q   What time of the day was it conducted?

18  A   At approximately 5:55 p.m.

19  Q   Okay.  How many other people were in the lineup besides Mr. Jones?

20  A   Four.

21  Q   All right.  Total of five then?

22  A   Yes.

23  Q   All right.  You attended this lineup, is that correct?

24  A   Yes, I did.

25  Q   Did Mr. Martin identify anybody in the lineup?

-9-

A   Yes, he did.

Q   Who did he identify?

A   He identified Mr. Jones.

Q   Was there any uncertainty in Mr. Martin's identification of
    Mr. Jones?

A   No.

Q   Did he hesitate at all when he identified him?

A   None.

Q   Did he use any language that itmight be him or could be him or
    anything like that?

A   He did not.

Q   Okay.  Did Mr. McCrimon view the lineup?

A   He did.

Q   Are witnesses allowed to view the lineup at the same time as
    they stay in the room together?

A   No.

Q   Okay.  Why is that?

A   For the simple reason we don't want one to overhear what the other
    one is saying and pick him out on that alone.

Q   Fair enough.  I am handing you what has been marked as Exhibit
    13.  What is that document?

A   This is a copy of the same -- of a different show-up identification
    but on the same day.

Q   Okay.  And is that the lineup sheet for Mr. Joseph McCrimon?

A   It is.

-10-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

Q    All right.

      When he viewed the lineup, did he identify anybody?

A    He did.

Q    Who was that?

A    It was Mr. Jones.

Q    Okay, and what did he say when he identified him?

A    He said initially he said they said he was driving.

Q    Okay.  Did he say anything else?

A    He said that is the guy I saw driving.

Q    Okay.  Did he say anything else?

A    Yes, he said she had a picture of him.

Q    Okay.  The "she" would be you, correct?

A    Yes.

Q    And the picture of him would be Mr. Jones?

A    Correct.

Q    And that would be Exhibit No. 11, is that right?

A    Yes.

Q    Okay.

      Now, then did Mr. Phillip Mason also view the lineup?

A    He did.

Q    I am going to show you what has been marked as Exhibit No. 14.

      Is that Mr. Mason's lineup sheet?

A    Yes, it is.

Q    And when Mr. Mason viewed the lineup, did he identify anybody?

A    He did not.

-11-

1    Q    Okay.  Is he in the room separately from -- he is in there by

2         himself viewing the lineup, correct?

3    A    Yes.

4    Q    All three are in there by themselves, is that correct?

5    A    That's correct.

6    Q    Are they allowed to meet at all in between viewing the lineup?

7    A    No.

8    Q    Okay.  Ofr. Miller, thank you for being with us today.

9              MR. ROLLSTIN:  I have no further questions.

10             THE COURT:  Go ahead, please, Ms. Frederick.

11             MS. FREDERICK:  Thank you.

12             CROSS-EXAMINATION

13   BY MS. FREDERICK:

14   Q    You are correct in recalling that there were attorneys present

15        at the lineup.  There were two, correct?

16   A    That's correct.

17   Q    One would have been Mr. Shrewsberry, the show-up attorney,

18        correct?

19   A    That's correct.

20   Q    And he is appointed by the state to be a neutral and objective

21        observer, right?

22   A    That's true.

23   Q    And I had been with you from the time of the arraignment on the

24        warrant to the evening of the lineup, correct?

25   A    That's correct.

                              -12-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1   Q   And I was present in the room when the lineup took place, correct?

2   A   That's correct.

3   Q   And the first witness to come in was Mr. Edward Martin, correct?

4   A   I believe so, yes.

5   Q   Okay.  And when Mr. Martin came in, he stated that Mr. Jones

6        was driving, not shooting, but driving, correct?

7   A   That's correct.

8   Q   And the second individual to come into the room was Joseph

9        McCrimon, correct?

10   A   That's correct.

11   Q   And he stated something to the effect that that is the one she

12        showed us the picture of, correct?

13   A   Yes.

14   Q   He also stated that they said he was driving, correct?

15   A   That's correct.

16   Q   And in your view, is that an identification?

17   A   Yes.

18   Q   How so?

19   A   Because he also stated that is the guy I saw driving.

20   Q   I didn't hear that.  I heard they said he was driving and that

21        that is the one she showed us the picture of, correct, that is

22        what he said?

23   A   No.  He also said that is the one I saw driving.

24   Q   Okay.  Now, the third individual comes in.  He makes no ID?

25   A   That's correct.

1   Q   Now, as far as transport of witnesses on that day, we waited

2         several hours for you to locate your witnesses, correct?

3   A   Yes.

4   Q   And you did in fact bring all three witnesses in together, correct?

5   A   Yes.

6   Q   And I guess they live within a block radius or on the same block,

7         correct?

8   A   Yes.

9   Q   And so you picked up Edward Martin, Joseph McCrimon, and Phillip

10        Mason?

11   A   Yes.

12   Q   And you brought them over from Heyden Street to the Second

13        Precinct to view the lineup?

14   A   Correct.

15   Q   Okay. And at that time, did you choose to refresh their memory

16        by showing them the photograph again?

17   A   No, I did not.

18   Q   So when he said she just showed us the picture, he was mistaken?

19   A   I don't believe he said she just. I think he said she had a

20        photo of him.

21   Q   You weren't here at the hearing on the issue of the lineup,

22        correct?

23   A   Yes.

24   Q   As the officer in charge, correct?

25   A   Yes.

-14-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1    Q    And you heard the testimony of the show-up attorney, Mr.

2         Shrewsberry, correct?

3    A    Yes.

4    Q    Okay. And from his notes and from his testimony, he made

5         certain objections at the lineup, didn't he?

6    A    Yes.

7    Q    Okay. And do you recall what those were?

8    A    I believe one of them was your client was the only one in

9         braids. I am not sure if he addressed the white T-shirt or not.

10   Q    Was there any mention of the fact that the lineup, of all five

11        individuals, my guy was the only one not wearing a coat?

12   A    I don't recall that.

13   Q    Okay. Now, did he make any comment as to Mr. McCrimon, I guess,

14        acknowledgement of having had the opportunity to view a photograph

15        of my client?

16   A    No. I believe you did.

17   Q    Okay. Now, with respect to the photograph and the reason

18        for showing the photograph, did the 8th Precinct fax over or

19        somehow get to you the police report made out on my client on

20        the 14rh?

21   A    Yes.

22   Q    And how did you receive that?

23   A    I believe it was faxed.

24   Q    Okay. Now, if you recall, did Mr. Jones at any location on that

25        statement say my name is James Jones. I live at, but they call

-15-

1    me Fresh?

2    A    I don't believe so.  I don't recall.

3    Q    Okay.  So, of all the individuals who had the misfortune of

4         having had been victims of crime, why would you assume that this

5         was Fresh?

6    A    I didn't really assume that was Fresh, but he just happened to

7         be a gentleman that was robbed at the location on the date that

8         they said the robbery occurred.

9    Q    Why only show one photo?

10   A    That was the only person robbed on the 14th at that location.

11   Q    But in fairness --

12   A    That there was a police report for.

13   Q    But in fairness, if you want the witnesses to identify someone,

14        you generally put a photo array together, correct?

15   A    If they don't know him.

16   Q    Okay.  And so you assumed that this person was the person

17        that they knew?

18   A    No, not at that time.

19   Q    So, after you showed them the photograph?

20   A    Right.

21   Q    You say that was on the 16th?

22   A    Yes.

23   Q    This was the day after or the day that Mr. Perdue passed,

24        passed the morning of the 16th, correct?

25   A    I thought he had passed -- excuse me.

                              -16-

1    Q    Okay.

2    A    On the 15th.

3    Q    I thought it was the morning of the 16th.  In any event, on the

4         16th, you showed the photograph?

5    A    Yes.

6    Q    On the 17th, you arranged somewhat of a sting and you set him

7         up to come into the 8th Precinct to view a lineup containing

8         some of the individuals that robbed him, correct?

9    A    Correct.

10   Q    And when he was taken into custody, you don't have a warrant

11        for his arrest at the time, do you?

12   A    Not at that time, no.

13   Q    Okay.  And basically, you tricked him into custody, correct?

14   A    Yes.

15   Q    And from that point, you tricked him into custody and then you

16        showed his photograph to three potential witnesses on the way

17        to the lineup?

18   A    That is not true.

19   Q    Well, according to Mr. McCrimon, it is true?

20   A    I gave them their statements on the way to the lineup.  I did not

21        show them a photo.

22   Q    Okay.  Now, with respect to the manner in which you conducted

23        the lineup and the witnesses, why would they all be together,

24        transported together.  Couldn't that taint the other as far as

25        identification?

                              -17-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1    A    I am not sure what you mean, excuse me.

2    Q    Why would you travel with potential witnesses on a case like this

3         together?

4    A    Because they were all witnesses.  I am not sure what you mean.

5    Q    That is fine.

6              And why would you show each of the individuals the

7         photograph when they were together?

8    A    On the porch.

9    Q    Wherever they were?

10   A    They were standing there.

11   Q    Okay, and you didn't think it would be somewhat prejudicial

12        to show the picture to a group of people where anyone of them

13        could encourage the other to make an ID?

14   A    No.

15   Q    Okay.  Which of the witnesses mentioned the robbery to you

16        first, was that going to be Edward Martin or Joseph McCrimon?

17   A    I believe I read it in the statements.  And I believe it was in

18        Mr. McCrimon's statement.

19   Q    Okay.  And did Mr. McCrimon state that he knew Mr. Jones in his

20        statement?

21   A    He had seen him in the neighborhood.

22   Q    Okay.

23             And what about Mr. Martin, did he claim to know Mr. Jones?

24   A    Yes, from the neighborhood.

25   Q    From the neighborhood.  And he stated that he was a witness to a

                                    -18-

1    robbery that Mr. Jones was a victim of?

2    A    I believe Mr. McCrimon was the only one that was a witness to

3    the robbery -- excuse me, my throat is dry.

4    Q    Okay.  So, according to your recollection, do you have notes

5    regarding this issue?

6    A    Notes?

7    Q    Regarding the robbery issue as far as their statements to you?

8    A    I don't have notes, no.

9    Q    Now, you stated that Mr. Martin walked right into the lineup

10    room and without hesitation identified Mr. Jones, correct?

11    A    That is correct.

12    Q    He wouldn't have reason to hesitate if he had seen a photograph,

13    would he?

14    A    I am sorry?

15    Q    He wouldn't have reason to hesitate if he had just seen a photograph,

16    would he?

17    A    I am not sure what you mean by that.

18         MS. FREDERICK:  Nothing further, Judge.

19         THE COURT:  Okay.

20         REDIRECT EXAMINATION

21    BY MR. ROLLSTIN:

22    Q    Ofr. Miller, with regards to arresting somebody without a warrant,

23    when a felony has been committed, is a warrant required if you

24    have probable cause?

25    A    No.

-19-

1       MR. ROLLSTIN:  No further questions.

2       THE COURT:  Any others, Ms. Frederick?

3       MS. FREDERICK:  Nothing else.

4       THE COURT:  Nothing else.  Thank you.

5       MR. ROLLSTIN:  Can Ofr. Miller be excused, Judge?

6       THE COURT:  Yes, you may be excused.

7       MR. ROLLSTIN:  Thank you very much.

8       People rests, Judge.

9       THE COURT:  Okay.

10          Members of the jury, that means you have heard all

11   of the evidence by the prosecution and as I said to you, the

12   prosecution always has the burden of proof and at no time does it

13   shift to the defense side where the defense has to prove anything.

14          I just want to take a few minutes to kind of get a

15   sense of where we are right now and then we will be back and if

16   there is further testimony, we will do that and then we will

17   move on to the closing statements.  So, before we do the closing

18   statements, the lawyers do have the right to look at and know

19   what my instructions are.  So, we are going to try to get all

20   of that together right now so when we come back in here,  we

21   can go right through.

22          So, say, about no more than seven or eight minutes or

23   so.  Don't go too far.

24       THE DEPUTY:  Rise for the jury.

25       (Jurors excused at 9:47 a.m.)

-20-

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

1    THE DEPUTY:  Please, be seated.

2    THE COURT:  Ms. Frederick, do you have any idea what

3  is going on?  Are you going to call anybody to testify?

4    MS. FREDERICK:  No, Your Honor.  We are going to rest.

5    THE COURT:  You are going to rest?

6    MS. FREDERICK:  Yes, Your Honor.

7    THE COURT:  Can we make a record with you and your

8  client that you have discussed with him and he understand that he

9  has the right to take the witness stand and that you all both

10  agree that this is the way you want to go with this.

11    Will you make a record on that, please?

12    MS. FREDERICK:  Absolutely.  You want to do it now,

13  Judge?

14    THE COURT:  Yes, please.

15    MS. FREDERICK:  I have advised my client of his right

16  to testify on his own behalf.  I have encouraged him not to do so.

17  And he agrees and he will not be testifying today, Your Honor.

18    THE COURT:  Okay.  Do you mind just asking him that he

19  agrees with you or whatever?

20    MS. FREDERICK:  Please, Judge.

21    Is that a correct statement?

22    THE DEFENDANT:  Yes.  Yes, it is.

23    THE COURT:  Very well. Thank you.  I want to make a

24  record on it because you know how that comes up later.

25    MS. FREDERICK:  Yes.

-21-

1      THE COURT: Thank you.

2      So, at this point, we can talk about proposed instructions,

3   okay.

4      Mr. Rollstin, are you asking for any lesser under the

5   aiding matter?

6      MR. ROLLSTIN: No.

7      THE COURT: I have aiding and abetting. And I have the

8   first and second degree as is required. I have assault with intent

9   to murder and the remaining here.

10      Ms. Frederick, anything you want to bring to my attention

11   about proposed instructions?

12      MS. FREDERICK: No, Your Honor, those that you have

13   cited, those are fine.

14      THE COURT: Are you looking at any kind of lessers?

15      MS. FREDERICK: No.

16      THE COURT: Okay, very well. Let me do this then. I

17   have put together I think in the notebook here what I think is -- I

18   know you wanted identification.

19      MS. FREDERICK: Definitely.

20      THE COURT: I think I have put together here in the

21   notebook what I think are the ones that we will need for this,

22   and I am going to give both of you the opportunity to look at

23   this and then thereafter we will bring the jurors back and continue

24   with the case. So, do that.

25      Mr. Rollstin and Ms. Frederick, here is a notebook of the

-22-

1    proposed instructions here.  You can look at those and take your

2    time and mull those over and we will come back on the record and

3    I will see if there is anything that you want to bring to my

4    attention.  And then thereafter we will call the jurors in.  So,

5    take about 10 or 15 minutes.

6              (Pause.)

7              THE COURT:  Anything else about the instructions?

8              MR. ROLLSTIN:  Nothing.

9              THE COURT:  Ms. Frederick?

10             MS. FREDERICK:  May I have a second, Your Honor?

11             THE COURT:  Sure.

12             (Discussion held off the record.)

13             MS. FREDERICK:  Your Honor, I have objections to two

14   instructions.

15             THE COURT:  Those being?

16             MS. FREDERICK:  8.4, inducement.  I guess in my view,

17   it seems repetitious of the aiding and abetting instruction.

18   Reason I just don't want it, we have got aiding and abetting and

19   it has been thoroughly explained, case law and all.

20             THE COURT:  But that is all part of the instruction,

21   you know, in terms of defining what kind of inducement it may

22   be necessary to be weighed by the jury.  That is such an intricate

23   part of that instruction.  So, I fail to see the basis for the

24   objections so it is noted, but I think I am duty bound to give

25   that instruction so the jury can know what it is that they are

                              -23-

1      looking at.  Noted for the record.

2               What is the other one?

3               MS. FREDERICK:  8.5, mere presence.  I understand

4      that that is in most cases, it would be a defense attorney's

5      saving grace, however, I don't want to allow the jury the

6      opportunity to even consider that he was there.  Our position

7      is that he was not there.  And taht is a fallback position

8      to put him in the position of being the driver of this car.

9               THE COURT:  Ms. Frederick, you can contend that he

10     wasn't there.  That is your defense.  The prosecution can

11     contend that he was there because that is what their theory

12     of the case is.  You can propound your perspective theories

13     about that but as the judge here who is the operator of the

14     law, I am also duty bound to explain to the jury the applicable

15     law, you know, in the case so that they can decide whether your

16     theory is right or the prosecution's theory is correct about

17     that.

18               That is kind of like, you know, just kind of let the

19     lawyers stand up and argue and just blindly let the jury go into

20     the jury room and decide what they want to decide without any

21     guidance from the court as to the applicable law that goes with

22     that.  And the inducement and the mere presence are all, I think,

23     wrapped up into that.

24               I respect what you are saying that certainly from a

25     defense perspective, that is the kind of instruction you would

                              -24-

want. Say, the mere fact that somebody is there doesn't mean
anything. But I don't think even giving that that it says one
way or the other that he is or was; it is just that the jury has
to understand what the applicable law is and to understand what
they must do.

I have seen so many cases come back because a judge
didn't give proper instructions, you know, to the jury based
on the nature of the facts and circumstances of the case, even
to the point of seeing a major, I think it was a homicide case
being reversed by a panel of the Court of Appeals because the
judge in giving the instructions used the word "and" where the
word "or" should have been or something like that.

So, I think that kind of like suggests the kind of
reasons that often pop up in that and what the judge's
responsibility is and should be with that.

You have the right to argue your theory that he wasn't
and, of course, the prosecution that he was, but I have to
tell the jury what they can consider in deciding whether they
believe you or believe the facts that you are presenting or
believe those by the prosecution.

So, I note your objection but I am going to give both
of those, okay.

MS. FREDERICK: Accepted.

THE COURT: Anything else?

MS. FREDERICK: Nothing.

-25-

1    THE COURT: Very well. We will bring the jury in.

2    THE DEPUTY: Rise for the jury.

3    (Jurors enter the courtroom at 10:08 a.m.)

4    THE DEPUTY: You may be seated.

5    THE COURT: Note that the jurors are in the courtroom,

6    please.

7    MR. ROLLSTIN: Yes, Your Honor.

8    THE COURT: All right. I am sorry, members of the

9    jury, as I said to you earlier, the prosecution always has the

10   burden of proof and at no time does that shift to the defense

11   side where the defense has to do anything or carry any kind

12   of a burden or present any evidence whatsoever.

13   Just for the record, I will inquire of Ms. Frederick

14   how do you stand right now, Ms. Frederick, okay?

15   MS. FREDERICK: I am sorry, Judge?

16   THE COURT: How do you stand right now in terms of --

17   you rest?

18   MS. FREDERICK: Oh, yes. I am sorry.

19   THE COURT: State that for the record.

20   MS. FREDERICK: The defense rests, Your Honor.

21   THE COURT: Okay. I want to make sure that we understand

22   that for the record that means that you heard all of the evidence

23   in the case and now is the time for the final statements by the

24   lawyers.

25   That has been given different kinds of names. Sometimes

-26-

you hear summation, closing arguments, and different names that are given for that, but what it really amounts to is the opportunity now for the lawyers to speak to you about the evidence that has been put before you and their thoughts and theories about that.

The opening statement was kind of like an overview or a preview of what they think the evidence will show based on what their understanding of the case. Now, they can talk to you about the evidence that has been put before you and their thoughts and theories about that and inferences that can be drawn and so forth.

But I remind you, again, that what the lawyers say is not evidence in the case. The evidence is the testimony from that witness stand, the exhibits admitted into evidence. That is the evidence in the case. And when I say the exhibits admitted into evidence, keep in mind that if somebody used something like an officer witness used a report to refresh their memory, it is not marked as an exhibit, admitted as such, then it is not an exhibit. It is used for a limited purpose. So, again, those things that are marked as exhibits are the things that you will be able to see.

If in the course of the statements to you someone says something different about the facts and the evidence than what you as a group recall, let your collective memories control about that. Certainly, mistakes can be made in trying to recall all of the different things that have been said.

The lawyers also have the right to speak to you about

-27-

matters of law during the course of their statements to you, but I remind you that I will give you the final instructions of the law to be applied and you will follow that as I will give it to you.

The procedure is that the prosecutor speaks to you first and defense counsel. And after defense counsel speaks, the prosecutor may come back and make rebuttal remarks to those made by defense counsel. So, if you give your attention now, please.

Mr. Rollstin, you may proceed.

MR. ROLLSTIN: Thank you, Judge.

Good morning, everybody. Thank you, again, for being here. Your sacrifice continues, okay, and we appreciate the fact that there are probably other things that you would rather be doing on Monday, Tuesday, and today than being down here at the Frank Murphy Building. But one of the things that I think occurs fairly quickly in a homicide trial especially is once you are here as a juror and you get a little time under your belt and take a little bit of the testimony, you begin to see pretty quickly the importance of what we are doing down here to both sides. To the Perdue family and Mr. Jones and his family, certainly, it is an important day and it doesn't take long to identify that this is an important event, okay.

Now, with that being said, you know, we thank you for being here. Now, what I am going to do for the next 15 or 20 minutes, principally going to cover two areas. Number one, talk

-28-

a little bit about the law and, number two, talk about the seven witnesses and the 16 exhibits that were had during the course of the testimony here yesterday and Monday, okay.

Number one, burden of proof starts here and ends here. It is on the prosecution. And that is fair when you think about it. If you point the accusatory finger, you should be the one that bears the burden of proof, okay.

Now, what does the burden of proof apply to. Does it apply to every fact and circumstance that is testified to during the course of the trial. No, it does not. It applies to the elements of the crimes charged. Okay, and I will visit that in a moment here.

What is the burden of proof and what standard are we held to, what hurdle has to be cleared before you can return a verdict of guilty. It is proof beyond a reasonable doubt. It is not proof beyond all possible doubt. It is not proof beyond any doubt. Not proof beyond all doubt.

Proof beyond a reasonable doubt. Nothing more, nothing less. And you all promised that you wouldn't let me wither away at that. You wouldn't allow anybody else to inflate it.

Burden is what we ordered. Hold us to our burden of proof. Call the case the way you see it. Okay.

Now, talk a little bit about aiding and abetting. I am going to revisit this issue in a moment, but the concept of aiding and abetting captures the notion that a person who helps,

-29-

encourages or assists a crime is just as guilty as the person who actually commits the crime.

And, again, you know, we talk about what is fair and what is right and a lot of these rules kind of revolve around that idea. What is fair. And you know, the idea behind aiding and abetting is the notion that we are not going to let somebody who convinces another person to act on their behalf essentially to escape responsibility for that action just because they weren't the one who had their hand on the gun at the time the event occurred. Okay.

Now, let's talk a little bit about what claims are charged because, again, I think to have an intelligent review of the facts, you have got to begin with what is it that Mr. Jones is being charged with and what is it that we are saying that he did wrong that is contrary to our law here in the State of Michigan.

Okay. First degree murder; assault with intent to commit murder, being a previously convicted felon in possession of a firearm, possession a firearm during the commission of a felony, that being murder or assault with intent to commit murder.

First degree murder. What is the idea behind that. Number one, you caused the death of another person. Now, remember aiding and abetting provides us with the idea that you don't have to be the actual person on the trigger. You only

-30-

1    have to intend for the crime to occur and encourage or assist

2    in its occurrence.  So you either cause the death or aid and

3    abet in causing the death of Demetris Perdue.  And when you do

4    so, you premeditate it, think about it ahead of time.  You

5    deliberate it.  You consider the pros and cons of your conduct.

6              The judge is going to tell you the law doesn't mandate

7    what length of time is required.  That is up for you to decide.

8              Let's talk about second degree murder here in a moment.

9    How it differs from first degree murder but suffice it to say,

10   that you don't have to have an hour, you don't have to have a day

11   or you don't have to have a week.  You don't have to have a

12   to-do list, the things that you are going to do before you commit

13   the crime to show premeditation.

14             The person has to have the opportunity for meaningful

15   reflection.  The idea is that he thinks about his conduct before

16   he does it and that he acts.  During voir dire, we used the example

17   of a traffic light changing from yellow to red and how we size up

18   the situation.  We decide how we want to conduct our affairs and

19   then we act accordingly.

20             And when we are doing that in a fairly important event

21   in our life, and the reason that I say that is, you know, if we

22   enter that intersection against a red, there is a real selfish

23   reason not to do that. And I believe that we as human beings tend

24   to act with fairly selfish motives most of the time.  And when I

25   say, selfish, I don't mean that in a negative way.  I am saying

-31-

that when we act as individuals, we usually have a reason for
what we are about to do.

In other words, when you survey your own life on a
day-to-day basis and you ask yourself how much of what I do is
done by happenstance or is done by mistake or is done without
thought, when you ask yourself that question, you will come
to the conclusion, I think, that very little of what you do in
your daily life is done without some forethought. Okay.

Returning to the traffic light scenario, you know,
if you enter that intersection against the red, you may meet
another vehicle who is crossing the intersection on the green.
You could be injured. You could be killed. People who were
in your vehicle who may be important in your life could be
injured, also. Okay.

So, you are making a pretty important decision there
in that example and you are doing it in a matter of a few
seconds at most and the example taht, you know, what this really
shows us is that you can premeditate and deliberate an important
event in a rather short period of time.

Now, the case at hand doesn't share the same time
frame of the traffic light example does. It shares a time frame
of somewhere between two and five minutes depending on the
witnesses, okay. The time for the car to circle the block.

Now, if you go back to what I have talked about before
and the idea that we as individuals don't do a lot by mistake,

-32-

1    and we tend to act with a deliberate idea in our head of what we

2    are trying to achieve, we would ask ourselves, that car rounded

3    the block and came back two or three minutes later, I don't

4    really think there is a big dispute in the case or the testimony

5    or the evidence that that is what occurred. That this car rounded

6    the block and came back somewhere between two and five minutes

7    later.

8        Let's for a moment think about it in our minds, what

9    occurred during that two or three minutes inside that car and

10   what reasonable inferences can we draw. You know, first of all,

11   ask yourselves, what happened when the car came back on the second

12   occasion. There is no doubt that this is a drive-by shooting.

13       You know when you look at the photographs in the

14   case and the Exhibit 10 which is the sketch, and when you are all

15   done here and you go to thejury room, you can have your foreperson

16   write a real simple note, we would like to see all of the exhibits,

17   all of these will be sent in for your review. So, I can appreciate

18   the fact that those of you in the back row don't have quite the

19   view of the people in the front row do.

20       When you look at, for instance, Exhibit No. 2 here

21   which is the left-hand window of 18901 Heyden, it has got a

22   bullet hole through it, okay. And Exhibit 3 shows a closeup of

23   that. Exhibit 4 is the peak of 18911 Heyden. It has got two

24   bullet holes in it. The BMW that is parked in that driveway

25   has a bullet strike to the left front quarter panel. Okay.

-33-

1   18919, this house has a -- what I think can be

2   characterized as a grazing bullet strike on the left side of

3   the house as you look at it from the street.  What I mean by

4   that is the bullet is coursing along the vinyl siding of the home

5   and would indicate that the bullet was traveling in somewhat of

6   a -- almost a parallel direction of that wall, if you will, okay.

7   And you know there was testimony that the car rounded

8   the corner and kept firing the gun from the back passenger seat.

9   And that would be consistent with this kindof damage to 18919

10  Heyden, okay.  There is a bullet hole through that window that

11  is close to that grazing damage that is there.

12  So, you know by showing you these photos, I tell you

13  I think the evidence supports the notion that there was a

14  drive-by shooting there.  If you look at the injury of Ahmad

15  Akins and Phillip Mason, there is really not a doubt that this

16  is a drive-by shooting.

17  So, we return now to this idea of premeditation,

18  deliberation, and the idea of what happened in that car as

19  it rounded the block.  It came by the first time and you know

20  sometimes a witness's testimony captures the event much better

21  than any words that lawyers like myself or Ms. Frederick could

22  ever use.

23  And words of Mr. Martin I thought were very telling

24  in the course of the trial, and that was they were grimacing

25  at us.  Okay.  Remember the testimony of Mr. Martin when they

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

went by, they were grimacing at us. What does that mean.
They were looking at us real hard. Okay. And, again, the people
in that car, they were acting in a way, first of all, they were
acting in concert. And, also, they are acting in intentional
fashion.

Now, they come back two to five minutes later and
what erupts. The drive-by shooting. ANd it is not like this
is a mistake or this is an event where the passenger in the car
gets into some verbal altercation with somebody out in the
street and pulls out a pistol and starts shooting. This is a
car that drives by one time. Grims at the people on the street.
Comes back two or three minutes later and they have an assault
rifle being manned by the guy in the back seat with the window
down, back against the door, foot up against the passenger
door, firing 20 to 30 rounds in the direction of the people on
that corner.

So, again, premeditation and deliberation. Two to
five minutes that occurred between the first drive-by and the
seocnd drive-by. They were setting up. They drove by. They
surveyed the situation. They drove down Clarita. Clarita runs
east and west. Now, they follow the same route on the second
occasion.

In other words, not only did they survey the scene
when they were going to drive by and bring evil to that area,
but they even surveyed their escape route down Clarita. Make

-35-

1  that block a second time. The same thing happens. Only this time,

2  they talk about how the car approached on the second occasion. I

3  mean it is coming down at a much faster rate of speed. Why is that.

4  Because that is the element of surprise. That is a tactical

5  advantage to people in that car. They are going to move in to get

6  themselves into place quickly so that the people on that corner

7  don't have a chance to disperse.

8      You know, we talk about aiding and abetting and

9  encouraging, assisting or helping another person to commit the

10  crime. The driver of that car who has clearly been identified

11  as James Jones is putting the person who is on the trigger in

12  the best possible position he can be in to put fire or to shoot

13  the gun into that crowd on that corner there.

14      And not only that, even as the car makes the corner,

15  he slows its rate of speed. He actually brings it to a stop

16  on the corner for a moment so that the person can fire the weapon

17  at the people. And as he moved around the corner, you heard the

18  testimony of Edward Martin and Mr. McCrimon. They talk about how

19  the car moved around the corner in somewhat of a slow fashion

20  and that allows the guys in the back seat to have an extended

21  period of time.

22      Instead of firing from east to west as the car makes

23  the corner, he is now able to change his angle of fire from

24  south to north but still keeps the victims of that crime in his

25  sight, okay.

-36-

1     Aiding and abetting, encouraging a crime, and also,

2  did they have time to think about it during that two to five

3  minute period in that car.  Absolutely, they did.  Absolutely.

4  They came back there with a purpose.  We talked about it as I

5  suggested earlier.  We as individuals act with purpose.  We act

6  with intent.  When they came back there, they were acting in

7  concert. They came together. They fought together and they

8  escaped together.  They all did it inside of a car that was being

9  driven by Mr. James Jones.  Okay.

10     As to assault with intent to commit murder, you have

11  to intend to kill the person.  You have to perpetrate some type

12  of assault on the individual.

13     Now, if there is an injury, you can consider that when

14  you think about whether or not this was assault with intent to

15  commit murder.  Think about the kind of weapon that was used.  A

16  high-power assault rifle.  Think about the number of rounds that

17  were expended.  20 to 30.  Think about what the direction of the

18  gun was pointed when it was fired at the individuals there in

19  the street.  Think about the results of those 20 to 30 rounds.

20  One person killed. One shot in the head.

21     Let me tell you, Mr. McCrimon, (sic), who is in court today,

22  the luckiest day of his life was November 15th, 2001. Should

23  have gone out and bought a lottery ticket.  You saw that injury

24  at the top of his head.  If that injury had been an inch lower,

25  this would be a double homicide case.  Assault with intent to

-37-

1    commit murder.  Assault the person who tried to kill him.

2         You can consider a injury when you think about

3    whether or not that crime was committed.  Okay.

4         Felon in possession of a firearm.  We have got a

5    certified document, Exhibit No. 16.  It is a certified document

6    of Mr. Jones' prior conviction.  If you believe that he aided

7    and abetted in the possession of a firearm in this case, he is

8    guilty of being a felon possession a firearm, and that would

9    be Count 5.

10        Felony firearm, the same charge really, only it

11   involves do you possess a firearm in the commission of another

12   event, that being murder or assault with intent to commit

13   murder here.  That is absolutely what occurred.  He is assisting

14   and encouraging the other person in possession of that weapon

15   when they are driving by and they are shooting at the

16   individuals on that street there.

17        But for his ability to drive the car and put the

18   person into firing, the position he was in, this event doesn't

19   occur.  Okay.

20        I have talked to you now for just short of 20 minutes.

21   I am going to get ready to sit down.  This case is a fairly

22   straightforward case.  This is really two issues that you will

23   grapple with as jurors.  And the one is pretty straightforward.

24   Well, actually, they both are.  One is whether or not there

25   is premeditation, deliberation; and the other is whether or

                              -38-

not the witnesses have identified the correct person. Okay.

The judge is going to give you an instruction that I don't think any of the 14 of you actually need but I am going to beg that you definitely listen and heed to it. And what I am talking about is the instruction about your ability to judge the credibility of witnesses. And what it really boils down to, that instruction, is the idea of, you know, as the witnesses testified there, do you believe what they are saying. Okay. And do you believe Ed Martin when he tells you James Jones is the guy who was the driver of the car that day.

I mean do you believe Joseph McCrimon when he tells you that he saw James Jones drive the car around the block the first time, two to five minutes before the car came back and shooting erupted.

And let me suggest, also, that it is a very reasonable inference for you to conclude that Joseph McCrimon's identification, if he is the driver the first time, he is the driver of the second time.

The identification of Mr. James Jones is the second issue that I think you will probably discuss when you are in your deliberations and you should ask yourselves this. Did Ed Martin's testimony when I looked at him testify, did he seem uncertain about the identification.

You know there are some identifications in the cases for instance of armed robbery in a dark alley where the individual

-39-

or the person is robbed, doesn't know the person who robs them.
Okay. You know that witness. He may say I think that is him. It
sure looks like him, the right height, the right built. I didn't
know him beforehand, but I think that is the guy, and that witness,
you look at and that is testimony that you might have difficulty
with as a juror, and I can appreciate that.

But you know the witness who knows the defendant prior
to the event is a much different animal. That witness who knows
or is familiar with, and you know we use the word, I know the
person differently. Some people think the idea that I know the
person means I am familiar with them. I know his family or his
friends or I know him from work. Some people think I know the
witness means I am familiar with him visually. I have seen him
around the neighborhood. I think the best way to describe it
is I am familiar with the person. Okay. I have seen him before.
I have spoken with him.

Ed Martin even has smoked marijuana with James Jones
before. Okay. This is not a mystery man to Ed Martin. Nor is it
a mystery man to Joseph McCrimon. And Joseph McCrimon also
knows him from around the neighborhood and has seen him many
times.

And you know, say what you will, but in our city, if
you live in a neighborhood very long, I mean you begin to know
and become familiar with the individuals that live in the block,
live in the next block over and live in the next block up. Okay.

-40-

1    And one of the reasons I asked all of those witnesses

2  how long have you been over there, how long have you been over in

3  the Heyden-Clarita area because that is important. That is an

4  important component of this case and they all have been over

5  there for many years. They are young men. They are 18, 19, 20

6  years old.  At the end of the day, they have all grown up over

7  there.

8    Now, with that in mind, you look at Edward Martin's

9  testimony.  And ask yourself do I feel comfortable in his level

10  of certainty.  The notion has been thrown out there that this is

11  a mistaken identity case.  Okay, one of the things that I broached

12  with a couple of you during voir dire is the idea that when a

13  mistaken identity occurs, you know if I turn around and I think

14  that JoAnn Miller is somebody who she is not, I am mistaken about

15  it.

16    I go to her and I say, you know, hey, how are you,

17  Sue.  And then JoAnn turns around and you know, you begin to

18  realize in a matter of seconds, I am sorry.  I am wrong.  I

19  thought you were somebody else.

20    This -- the facts of this case are not in any way

21  parallel or analogous to that situation.  There has never been

22  a time, and I think John Yakimovich is the police officer that

23  testified yesterday, is very telling about this.  He arrives

24  shortly after the shooting and Mr. Perdue is still there.  EMS

25  hasn't transported him and so is McCrimon (sic).

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

1   And as the event is there and the crowds are building

2   on both sides of the street and you know it is not a situation

3   that lends itself to manufacturing, if you will, information.  He

4   asked Edward Martin to give him information about the event.  And

5   what is the one thing that is in his report that he testifies to

6   about what Edward Martin tells him.

7       That Fresh was the driver of the vehicle within minutes

8   after the event.  Edward Martin is asked some questions by

9   Ofr. Yakimovich and he is immediately identified Fresh as the

10  driver of the vehicle.  Not it might be Fresh or it could be

11  Fresh or I think it is Fresh.

12      And then we ask ourselves does that testimony agree

13  with other evidence in the case and you look at Joseph McCrimon's

14  testimony and he say, hey, I saw the guy come around the first

15  time.  That is the guy who did it.  James Jones.  Went to the

16  lineup, picked him out as the person who I saw come around the

17  first time.

18      Now, there is some questions about, well, the photographs.

19  Well, Ofr. Miller goes out and -- we really can't arrest somebody

20  and put them in a lineup until you have identified them as the

21  perpetrator of the crime.  Now, she goes out and she shows Ed

22  Martin and Joseph McCrimon the photograph and asks them is this

23  Fresh.  And you heard how she developed the photograph.  It was

24  through their statements and an armed robbery that happened the

25  day before and the information at the 8th Precinct.

-42-

1    They say, yes, that is him. They take him to the

2    lineup. The lawyer is present. They put him through the exact

3    procedure that the law requires. Okay. Think about the other

4    side of the coin. If that lineup wasn't done, there would be

5    probably a general complaint lodged about, well, they didn't do

6    a lineup. There is a complaint when you showed them a photo

7    ahead of time, if you don't do the lineup, there is a complaint

8    where you should have done a lineup certainly.

9        So, the argument flows both way but at the end of the

10   day, you have got to ask yourselves this, do I think Edward

11   Martin who knows what he is talking about when he points to

12   James Jones and you saw his demeanor on the witness stand there,

13   did he have any uncertainty in his voice. When he testified

14   about his identification, did he in any way waiver or seem like

15   he maybe didn't know what he was talking about. Absolutely not.

16       Same thing with Joseph McCrimon when he testified. He

17   has got a slightly different demeanor than Edward Martin does.

18   When you really look at his testimony, was there anything about

19   it that made you think, well, I don't really think this kid knows

20   what he is talking about. And in terms of if you really want to

21   manufacture a case, you know, Joseph McCrimon really didn't seem

22   like he was only going along with what Ed Martin is saying.

23       He would say I saw him the first time and I saw him

24   the second time. And that is not his testimony. He is honest

25   with you and he says, the car came back the second time. The

-43-

1    shooting started and I didn't see the driver.  Okay.  So, he was

2    being honest with you about that.

3        You have been kind to me and I run over about five

4    minutes of what I said I would.  I am going to sit down now and

5    when I do, Ms. Frederick is going to have a chance to address you.

6    I am going to ask you to give her the same kind of attention as

7    you have given me.  When she is done as the judge then has told you,

8    I will have the chance to make the final remarks to you.  The reason

9    that we get to go last is two-fold.

10        Number one, we have the burden of proof.  And number

11   two, when I make my final remarks to you, I will be limited to

12   only addressing items that Ms. Frederick brings up during her

13   closing.

14        Thank you very much.

15        THE COURT:  Go ahead, Ms. Frederick.

16        MS. FREDERICK:  Thank you, Your Honor.

17        Good morning, ladies and gentlemen of the jury.

18        THE JURY:  Good morning.

19        MS. FREDERICK:  The case doesn't come across to me

20   straightforward and clear-cut as the People would have you see it.

21        Joseph McCrimon, first person I want to discuss.  He

22   doesn't say I saw him driving.  You will have an exhibit that

23   says in the officer's own hand, they said he was driving.  On the

24   witness stand, Mr. McCrimon said, well, Ofr. Miller only picked

25   up Edward Martin and myself.  Ofr. Miller said she had all three.

                              -44-

Phillip Mason said she had all three.  Edward Martin says I wasn't there.  I didn't ride with them.  Edward Martin says I saw him get robbed from my driveway.  Joseph McCrimon says we saw him get robbed from the alley.

When the drive-by occurs, and let me get this point clear, there is no dispute that Demetris Perdue is deceased.  It is unfortunate.  Terrible incident.  Ahmad Akins was injured.  The exhibits simply illustrate a drive-by and that it was done with some high-powered weapon and there were damages to the homes and the cars around where this incident took place.

The exhibits do not bring Mr. Jones into this fray. Edward Martin does. And with his comrades, he furthers his story. Now, the middle of the shooting with the high-powered weapon, could you all say it was 20 or 30 shots unless you talked about it.  If everybody is running, someone is injured, someone is down, who is counting.  Until after the fact, there was some discussion, and that is clear there are clear-cut inconsistencies.

Now, with the theory of aiding and abetting, before we get to the fact of the murder and the fact of the assaults with intent to murder, you have to handle his so-called role.  We don't need to discuss the fact that a person died.  There is no disputing that.  You don't need to discuss the fact that Mr. Akins was injured.

Was he the driver is the issue.  And I don't think so. If these individuals knew him and Mr. Martin for the first time

-45-

1    testified I had just smoked a blunt with him two days prior.  I

2    have been on this case from the beginning and never heard that

3    until yesterday.  But then that is to support the independent

4    basis for the identification.

5         He needs to say that he knows him because now he has

6    identified him as the driver of the car.  So, now, to support

7    that identification, we have a prior relationship so close in time

8    that I couldn't even be mistaken two days before this occurred.

9    He says I smoked a blunt with him.  Not in the police reports,

10   not in prior testimony.  Yesterday, it was two days prior.

11        Joseph McCrimon.  I know him from the neighborhood.

12   Well, then, why didn't you identify him clearly at the lineup.

13   They said he was driving.  It is not an identification.  Don't

14   be fooled.  They said he was driving is not that is the one I

15   saw driving.  That is James Jones.  It is not that is Fresh.  It

16   is somebody told me that No. 3 is driving.  I was there.  I know

17   what he said.  I know his demeanor.  He commented on the photograph

18   he had just seen.

19        If they know him, why again do I need to show a photograph.

20   Pick him out. And sure, we are going to argue as defense attorneys

21   that the lineup is necessary and why didn't you hold a lineup.

22   Because when you don't hold a lineup and you got a guy, that is a

23   problem.  And when you do hold a lineup improperly, we need to

24   know because he is going to be here looking at life.  So, yes,

25   that is the dichotomy of the lineup.

                              -46-

1        It is necessary and it must be done fairly.  The

2  investigation against Mr. Jones commenced only because like

3  any one of you, he went to the police station and reported a

4  robbery.  He says, I was robbed at gunpoint.  They took my

5  stuff.  This is all I can give you in the way of a description

6  and he left.  Maybe, his stuff was insured.  Maybe, it wasn't

7  that important to him but maybe he just needed to do what all

8  citizens do, and that is report an offense.  He was offended.

9        You would have gone to the police station, too.  And

10  if the person that robbed you was murdered, should you be tied

11  somehow into that because you were a victim.  No.  Mr. Martin

12  was emphatic and dramatic and arguably sincere, but I say,

13  incredible because now he is closer in time to his relationship

14  or association with Mr. Jones.

15        Now, for the first time Mr. Perdue is hanging off

16  the fence lifeless.  No.  I don't think so.  What is likely

17  is that they did rob him.  He didn't know it.  He didn't know

18  them.  He goes to the police station.  He doesn't say these are

19  some kids that I see around the neighborhood. They live on Heyden

20  Street.  He doesn't say it is the guy I smoked marijuana with.

21  I know him.

22        He says black male, hooded jacket.  Two of them.  One

23  put a gun to my head. He does not say you canfind them on Heyden

24  Street because he doesn't know where they are.  He doesn't know

25  who they are.

-47-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

Maybe these lifelong neighborhood friends are not such innocent kids. And the unfortunate thing is sometimes you have got to pay for that kind of stuff.

I have a son. Never want to lose him, especially not to violence. So, I feel for her. But this is her son and he didn't drive the car. He wasn't there. Edward Martin may know more than Edward Martin is saying. We will never know. But when you look at the testimony, ask yourselves why is it that one guy says the officer picked up all three of us and the other guy says she only picked up two. And why is it that she showed us the photograph on the way to the precinct.

Oh, but no, we saw the photograph. Why lie. What would be the point. Maybe, I am guilty of something. Sure, the name was mentioned here, there, Fresh. So the officer says give me James Jones' police report from the prior day. She didn't request all the armed robberies or whatever. She said, give me James Jones.

How does she go to James Jones based on Fresh. How many armed robberies occur against the black male in the 8th Precinct that day. Did she review all of that. No. She whips out a photograph. Shows it to these people. They say, yes.

Usually a photo array is more than one photo just so that you know, it is fair and objective and honest. If I show you one photograph, I am suggesting something, and that is what happened.

-48-

So now you have to ask yourselves do you absolutely

trust Edward Martin.  Are you comfortable with Joseph McCrimon.

Ahmad Akins, I trust him.  Absolutely.  He was shot in his

head as he exited his house.  He didn't lie about that. But

I am concerned about Joseph and Edward, and I am concerned

about Mr. Mason.  He says, well, no, I really didn't know him.

I know that there are two Caprice cars in my neighborhood.

And so after I said in my statement that I didn't

know him, I went on to describe him.  So, I got confused and

befuddled and turned around yesterday because that kind of

didn't make sense.  Didn't make sense that he would say to

the officer, no, I don't know this person.  Didn't see this

person. And then in the next paragraph of the statement describe

him.

He didn't pick him out of the lineup because he was

being honest.  Joseph McCrimon said they said because he was

being honest.  Sometimes that kind of happens.  You don't mean

to do the right thing.  He didn't mean to say she showed us the

photograph.  Sure, he didn't, but he did.  And I was standing

there and I heard him.  He probably didn't intend to say, that

is the one they said was driving.  He probably meant to say

it was No. 3 driving, but it didn't come out that way.

Look at his lineup sheet.  It didn't come out as an

ID.  It came out as an admission.  There is something going on

here other than what was stated.  They probably robbed this

-49-

person.  Probably felt like that was what was going on when the shooting started, but they didn't see him.  Edward Martin said and everybody else followed because maybe Edward Martin is guilty of something as well.

Please, pay close attention or try and recall the testimony.  Please, try and remember not just the elements of the offenses because much of that has been satisfied with the fact of the death.  Much of that has been satisfied with the fact that Mr. Akins was injured.

The question is who set in motion this situation, not that it happened. The crux of this case is the theory of aiding and abetting.  You don't have to ask yourselves if Demetris Perdue is deceased.

To get to the premeditation and deliberation on the part of my client, you have to accept Edward Martin, Joseph McCrimon and Phillip Mason's claim that they saw him at 5 p.m. November 15th over a passenger set up in a drive-by.  You have to accept that a person doing a drive-by would stop and grimace me. I am coming back to shoot you.

I don't think so.  Doesn't make sense.  But that makes it convenient for the witness who says, I saw him.  It also is convenient to say I smoked a blunt with him two days ago.  I don't think so.

And I ask that you give this case as much thought as you would give any case that concerned because this does concern

-50-

you because your decision stays with you no matter what you do,
where you go, give it the time that it requires. Give it fairness,
consideration and passion because charging him with a crime,
several crimes, any one of which could put him in prison for
the rest of his life. Would you want someone you knew to be in
there on this testimony.

Remember, again, the exhibits are for absolute facts.
Yes, houses were shot up. Cars were shot up. People were shot
up. One individual died. That is easy. The hard part is
reconciling the testimony with the theory of aiding and abetting.

Thank you.

THE COURT: Thank you. Go ahead, please.

MR. ROLLSTIN: Thanks, Judge.

Okay. I think the first thing that you have got to ask
yourselves is what is the defense. Let's quantify or kind of
define what is defense in the case. Keep in mind they have no
burden of proof. But what is it that is being offered as to why
the elements haven't been proven beyond a reasonable doubt.

There is only two defenses to a homicide. One is I
did it but -- I did it but it was in self-defense. The guy pulled
a gun. I did it but I was insane. I am mentally ill and, therefore,
I can't be criminally responsible for my action. I did it but it
was an accident. I was cleaning my gun and it went off by
mistake. Somebody got killed. Obviously, that is not the
situation here.

-51-

1    The other defense is I didn't do it. Okay. Those are

2    the two defenses in a homicide case. All there is. So, in this

3    particular set of facts, obviously, drives the defense in that

4    direction. I have got to claim it is not me. That is the

5    argument that has to be postured in this case because I can't

6    claim that I did it but it was justified. The facts of this

7    case don't lend themselves to that.

8    So, the defense has been self defined by the nature of

9    the event. So, if we begin with that idea, there is only two

10   defenses, and really, they're really painted into the corner,

11   if you will, in terms of what they have to assert as the defense.

12   Identification. Okay.

13   Well, the -- there is kind of a conflict in which

14   has been offered during the closing remarks on behalf of Mr. Jones

15   and as I make my rebuttal comments to you, I in no way seek to

16   impugn the integrity of Ms. Frederick. I mean she is a lady,

17   and I don't in any way make any personal comment upon her.

18   The only comment that I make is on the arguments that

19   are postured on behalf of Mr. Jones. Okay. Now, part of the

20   defense is, well, the witnesses are inconsistent. Okay. And

21   that is why you can't believe them. And then at another point

22   in time, there is the claim that the witnesses had time to discuss

23   the case. And you know, that is why the number of rounds are

24   the same between all the witness and, therefore, you can't believe

25   them because of that fact.

-52-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1      So, at different points in time, you know, the argument

2  is used depending on how it favors Mr. Jones.  Then the witnesses

3  are consistent where you can't believe them because they got

4  together and they got their story squared away.  when the witnesses

5  are inconsistent, the idea they are not telling you the same thing,

6  they aren't reliable.  It is or it isn't kind of an example of

7  the two-sided arguments being used at different points in the

8  case.

9      Any time you get multiple witnesses who testify about

10  an event like this, you are going to have some inconsistencies.

11  It is just a natural human part of the way that we perceive

12  things and remember things and cognitively process things.

13      Whenever you have multiple witnesses to an event, there

14  is never going to be a lock step.  Okay.  So, let's again ask

15  yourselves what is the defense in this case, and the defense is

16  identification.  Now, part of -- I think what you have got to ask

17  yourselves is, you know Ofr. Yakimovich, okay.  He is the young

18  guy that gets there on the scene and gets the early -- they go

19  lights and sirens and they are there within a couple of minutes

20  after the event.

21      What is the first thing that comes out of Edward Martin's

22  mouth.  Fresh was the driver.  Okay.  Now, you know the idea is

23  what has been offered in closing remarks on behalf of Mr. Jones

24  is this idea, it is kind of a bifurcated or a two-part idea.  One

25  of it is, well, they manufactured the identification against

-53-

1    Mr. Jones. And the other is they really couldn't have seen

2    what they said they saw.

3         All right. So, let's talk about that first item

4    first. They manufactured this identification against Mr. Jones.

5    They are lifelong friends. Well, if they manufactured the

6    identification, how come Phillip Mason, when he went into the

7    lineup didn't identify the guy, okay. I mean, Phillip Mason

8    is the third witness who went in the lineup and he didn't

9    identify anybody.

10        So, the defense is they manufactured the identification.

11   Well, number one, you look at what Ofr. Yakimovich tells you and

12   he says, every early on, literally minutes after the event, he

13   got Ed Martin saying Fresh is the guy who did it. And then you

14   go to the identification process itself in the lineup and you

15   ask yourselves did everybody identify.

16        Remember, Ahmad Akins in his statement says I didn't

17   see the driver's face. Okay. And Phillip Mason walks into the

18   lineup and says I can't identify anybody. So, this is a

19   manufactured identification. Why aren't they all identifying.

20   And the answer to the question is obviously, and I will state

21   it real quickly.

22        The idea is that it is not a manufactured identification.

23   The testimony is what it is and some of the people can identify

24   and some cannot.

25        Okay. Now, the other part of that identification case

-54-

is that they're wrong about who they are identifying. Okay. Now,

for a moment, you know, let's revisit the idea that we as

individuals act with purpose and intent and that is not a lot

that we do by mistake. Well, when you think about the testimony

of Ed Martin and what he said he saw in terms of caroling down

the street the first time, you know, before he got shot and

Joseph McCrimon got shot at.

Now, part of the idea is taht the identification was

suggested to them by Ofr. Miller. She showed them the photograph.

Is this Fresh. Yes, it is and a lineup was conducted. Well, now,

an individual who is shot at has a great motive, is probably

highly motivated, if you will, to correctly identify the person

who perpetrated that act against them. Okay.

And the reason that I say that is you have done an

evil thing to me. I am going to make sure that I identify the

right person. And it is a natural human desire to want to seek

retribution for a wrong that has been imposed on you.

Now, what the suggestion is that Ofr. Miller showed

him the photograph and they said, oh, yes, that is the person

because you are suggesting that is who I should pick out. And

what I am suggesting to you is that is not how we as humans,

I mean, we as individuals conduct our affairs.

If you get shot at, somebody -- Ed Martin wants to

identify the right person. You can watch his demeanor on the

witness stand and he is not the kind of person that is going to

-55-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1    be suggesting as to who they can identify. His testimony is

2    real straightforward. That is the guy who did it. There is no

3    doubt in my mind. Okay.

4         Now, to a certain extent, part of the argument that

5    is put out for Mr. Jones' benefit is this idea that they robbed

6    him the day before they got what they deserved. Okay. That is

7    kind of what, you know, they didn't conduct their affairs properly

8    and they ended up getting what they deserve.

9         Well, the flaw in the logic of that argument is if that

10   is the case, then he is definitely the guy who is in the driver

11   seat of the car because the idea of they got what they deserve

12   captures the notion that he had every reason to go out and do

13   a drive-by shooting on these guys. Okay.

14        So, if you want to attach yourselves to that argument,

15   that argument flows in one direction, and it is to the

16   identification of James Jones as being the shooter and having

17   a motive to want to commit the crime.

18        Now, one of the things that the judge is going to

19   tell you is we don't have to prove motive. Okay. But as I said

20   in my opening remarks, the Why I think is usually something the

21   jury wants to know about. It is natural desire. It is a natural

22   inclination, if you will.

23        Now, they told you about an event that happened the

24   day before. And if that is what gives rise to the crime, so be

25   it, but the bottom line is there is no way any of us can say

-56-

1    that they got what they deserve. Nobody deserves to be judge,

2    jury and executioner.

3           We don't have the death penalty in Michigan. James

4    Jones, as sure as I am standing here doesn't have the right to

5    go out and seek his own retribution as none of us do. Okay.

6           Now, with that being said, part of the remarks on

7    behalf of Mr. Jones are critical of the identification process

8    and what I mean by that, they went out and they showed him

9    photographs. When you really think about it, what other option

10   did Ofr. JoAnn Miller have than to go to the two people and

11   the testimony was that there was a robbery at a specific

12   location in the 8th Precinct.

13          She investigated that. Found there was a robbery.

14   Named the -- got the name of the person that filed the report.

15   Got a photograph of him and went out to the individuals and

16   said, if this is the guy that you noted -- actually, her testimony

17   is more -- is not even that. Her testimony this morning was,

18   hey, do you know this person. They said, yes, that is Fresh.

19   Okay.

20          Now, remember, consider that human emotion, you know,

21   you get shot at. You want to make sure you identify the right

22   person because then what good does it do you as an individual

23   to say I got shot at, the guy that shot at me I didn't convict

24   him. I convicted some other poor guy. That doesn't do anything

25   to you in terms of what you would have as the natural design for

-57-

1   the person who wronged you.

2           He says that is Fresh.  That is the guy that shot at us.

3   Now, you ask yourselves is that consistent with what he told

4   Yakimovich two days before right after the event.  Absolutely.

5   Fresh was the driver of the vehicle.   Okay.  All right.  I am

6   just about done and then I am going to sit down.

7           There was some comment that was made on behalf of

8   Mr. Jones about of a case.  He is facing a long stretch in the

9   state prison system.  It is his entire life.  One of the things

10  -- there is two points I would make on this.  Number one, the

11  judge is going to instruct you, point of law, that you are not

12  to consider penalty.

13          And that is like saying don't look at the paint elements

14  as it walks in the door.  You are not to consider penalty and I

15  beg you not to do that.  The reason that is the case is really

16  two-fold.  Number one, the judge imposes the sentence, okay.  And

17  he is bound by the law to impose a lawful sentence.  You as jurors

18  don't have to worry about that.  Okay.  That is not your

19  responsibility.

20          I mean your responsibility is to call the case the way

21  you see it and decide a fair trial.  You all promised that you can do

22  that.  So, the judge is going to tell you that sentencing is not

23  a consideration for you to be worried about.  He will handle that.

24  Okay.  And the reason that is fair is because the second point that

25  I want to make is sentence is based upon your conduct.  Okay.

-58-

1        When you commit a misdemeanor, 90-day offense possibly,

2   then that level of conduct is the kind of sentence you will be

3   facing.  Assault and battery, for instance.  You commit a

4   serious event like homicide, then you are going to be facing a

5   very serious possible sentence.  So, it is not like he gets any

6   consideration or that he should get a break because he commits

7   a serious offense that has a big sentence possibility.  Okay.

8        At the end of the day, the judge is going to tell you

9   he will do the sentencing.  Don't be worried about it.  Okay.

10  Now, with that in mind and there was also some comment about the

11  decision will stay with you.  Okay. And that you are about to

12  make an important decision and that this decision is going to

13  stay with you.

14       Well, that may be the case, and that is part of what,

15  the price we pay for living in a free society.  We govern

16  ourselves.  We come in and we get charged with a crime.  You get

17  12 people to decide your case but the point that I make is this,

18  what was it that brought you all down here.  Your jury summons.

19       We talked about that in the opening, in voir dire.

20  And we talked about that is the thing that brought you all

21  here.  Now, why did you get a jury summons.  Because there was a

22  trial that had to be conducted.  Okay.  Why was there a trial

23  that had to be conducted.  Because of the conduct of that man

24  in concert with two other people that ended the life of Demetris

25  Perdue and shot Ed Martin, Joseph McCrimon, and Philip Mason.

-59-

1          Okay.  So, the cause of your decision that you are about

2     to make is because of James Jones and his conduct.  Okay.  So,

3     don't fear that decision at all.  The judge will instruct you,

4     you know, that he is here to make sure things are fairly

5     conducted.  And at the end of the day, there is an appellate

6     process, okay.  So, don't fear your decision.

7          I am going to leave you with these notes.  You all took

8     an oath to render a true and just verdict based on the evidence,

9     okay.  Simply put, that is what your mission is and that is

10    what your job is here as jurors.  And all of the evidence in

11    this case exclusively points to one person and one person only,

12    and that is James Jones as being the individual who aided and

13    abetted the homicide of Demetris Perdue and also the assault

14    with intent to commit murders of Phillip Mason and Joseph

15    McCrimon, Ed Martin and also that he possessed a firearm and

16    that he aided and abetted in the possession of the firearm

17    in the commission of a felony.  And that he is a prior convicted

18    felon and he also possessed a firearm in that situation, was not

19    authorized to do so.

20         Now, your verdict and your promise during voir dire

21    was to call the case fairly based upon the evidence, okay.  All

22    the evidence in this case points to Mr. Jones.  We are going to

23    ask respectfully that you return a verdict of guilty on all

24    six counts.

25         I want to thank you very much for your time and effort.

                                  -60-

1    THE COURT: Thank you.

2    Members of the jury, I am about to give you the

3    instructions that apply here, but before I do that, a couple of

4    things I want to emphasize that are a part of my general

5    instructions, but I feel the need to particularly give attention

6    to based on some of the statements I heard by the lawyers.

7    I try not to interrupt or disrupt when the lawyers

8    are making their closing arguments, but I told you before and

9    I tell you again that the law that is to be applied in this case

10   and the instructions is that which I will give you and what the

11   lawyers say is not evidence and nor is what the lawyers say

12   conclusive on the law.

13   Particularly, there was something in the statement made

14   about what the penalty might be. You are not to be in any

15   judged or guided by what the penalty might be in this case. That

16   is not of your concern in any way. You are to decide the facts.

17   The same reasoning goes with some mention about the appellate

18   process. You are to decide the facts in this case. You are the

19   final statement about what the facts are, how you see those.

20   Don't look at that and say, well, if you do something wrong about

21   this, there is some appellate process that deals with that. Don't

22   be guided in any way by any of that. So, you are to decide the

23   facts of this case.

24   I will be recording the instructions as I give them

25   to you.

-61-

1          JUROR NO. 14:   Judge, can you speak up jst a little bit?

2          THE COURT:   I am sorry, forgive me, please.   Is there

3 any volume on my mike, please.   I will be recording the instructions

4 as I give them to you.

5          Members of the jury, the evidence and arguments in this

6 case are finished and I will not instruct you on the law.   That is

7 I will explain the law that applies to this case.   Remember, that

8 you have taken an oath to return a true and just verdict based

9 only on the evidence and my instructions on the law.   You must not

10 let sympathy or prejudice influence your decision.

11          As jurors, you must decide what the facts of this

12 case are.   This is your job and nobody else's.   You must think

13 about all of the evidence and the testimony and then decide what

14 each piece of evidence means and how important you think it is.

15 This includes whether you believe what each of the witnesses said.

16          What you decide about any fact in this case is final.   It

17 is my duty to instruct you on the law.   You must take the law as

18 I give it to you.   If a lawyer says something different about the

19 law, follow what I say.   I have already given you some instructions

20 about the law.   You must take all of my instructions together as

21 the law you are to follow.   You should not pay attention to some

22 and ignore others.

23          Again, it is your job to decide what the facts of this

24 case are and to apply the law as I give it to you and in that way,

25 to decide the case.

A person accused of a crime is presumed to be innocent. This means that you must start with the presumption that the defendant is innocent. This presumption continues throughout the trial and entitles the defendant to a verdict of not guilty unless you are satisfied beyond a reasonable doubt that he is guilty.

Every crime is made up of parts called elements. The prosecutor must prove each element of a crime beyond a reasonable doubt. The defendant is not required to prove his innocence or to do anything. If you find that the prosecution has not proven every element of a particular crime beyond a reasonable doubt, then you must find the defendant not guilty of that crime.

A reasonable doubt is a fair, honest doubt growing out of the evidence or lack of evidence. It is not merely an imaginary or possible doubt, but a doubt based on reason and common sense. A reasonable doubt is just that. A doubt that is reasonable after a careful and considered consideration of the facts and circumstances of this case.

When you discuss the case and decide on your verdict, you may only consider the evidence that has been properly admitted in this case, therefore, it is important for you to understand what is evidence and what is not evidence. Evidence includes only the sworn testimony of the witnesses and the exhibits admitted into evidence and anything else I told you to consider as evidence.

Many things are not evidence and you must be careful

-63-

1    not to consider them as such.  I will now describe some of the

2    things that are not evidence.  The fact that the defendant is

3    charged with a crime and is on trial is not evidence.  Likewise,

4    the fact that he is charged with more than one crime is not

5    evidence.  The lawyers' statements and arguments are not evidence.

6    They are only meant to help you understand the evidence and each

7    sides' legal theories.

8            The questions that the lawyers put to the witnesses are

9    also not evidence.  You should consider these questions only as

10   they give meaning to the answers provided by a witness.  You should

11   only accept things the lawyers say that are supported by the

12   evidence or by your own common sense and general knowledge.

13           My comments, rulings, questions, and instructions are

14   also not evidence.  It is my duty to see that teh trial is

15   conducted according to the law and to tell you the law that applies

16   to this case.  However, when I make a comment or give instructions,

17   I am not trying to influence your vote or express a personal opinion

18   about the case.  If you believe that I have an opinion about how

19   you should decide this case, you must pay no attention to that

20   opinion.  You are the only judges of the facts and you should decide

21   this case based on the evidence.

22           If at any time during the trial I have excluded evidence

23   that was offered or stricken testimony that was heard, do not

24   consider those things in deciding the case.  You make your decision

25   only on the evidence I let in and nothing else.

                                -64-

1    You should use your own common sense and general

2    knowledge in weighing and judging the evidence, but you should

3    not use any personal knowledge you may have about a place,

4    person, or event. Again, you must decide this case based only

5    on the evidence admitted during this trial.

6        Now, in a criminal case, facts can be proved by

7    direct evidence from a witness or an exhibit. Direct evidence

8    is evidence about what one actually see or hear. For example,

9    if someone said they were outside or they looked outside and

10   they actually saw rain falling, that is, of course, direct

11   evidence that it is raining.

12       Facts can also be proved by indirect or circumstantial

13   evidence. Circumstantial evidence is evidence that normally

14   or reasonably leads to other facts. So, for example, if a

15   person comes from outside and that person is carrying an

16   umbrella and wearing a raincoat covered with small drops of

17   water, you may not be able to see outside that it is raining,

18   but that would be circumstantial evidence that it is raining.

19       You may consider circumstantial evidence. Circumstantial

20   evidence by itself or a combination of circumstantial and direct

21   evidence can be used to prove the elements of a crime. In other

22   words, you should just consider all of the evidence that you

23   believe.

24       As I said before, it is your job to decide what the

25   facts of this case are. You must decide which persons you

-65-

1    believe and how important you think that testimony is. You do not

2    have to accept or reject everything a witness says. You are free

3    to believe all, none, or part of any person's testimony. In

4    deciding which testimony you believe, you should rely on your own

5    common sense and everyday experience. However, in deciding

6    whether you believe a person's testimony, you must set aside

7    any bias or prejudice you may have based on the race, gender

8    or national origin of that witness.

9         Now, there is no fixed set of rules for judging whether

10   you believe a witness, but it may help you to think about these

11   kinds of questions. Was that witness able to see or hear

12   clearly, how long was that witness watching or listening. Was

13   anything else going on that might have distracted that witness.

14   Did the witness seem to have a good memory. How did that witness

15   look and act while testifying here before you. Did the witness

16   seem to be making an honest effort to tell the truth or did the

17   witness seem to evade the questions and argue with the lawyers.

18        Does that person's age and maturity affect how you

19   judge that testimony. Does that person have any bias, prejudice

20   or personal interest in how this case is to be decided. In

21   general, does that person have any special reason to tell the

22   truth, any special reason to lie. All and all, how reasonable

23   does that witness's testimony seem when you think about all the

24   other evidence in this case.

25        Sometimes the testimony of different persons will not

-66-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1    agree and you must decide which testimony to accept.  In doing

2    that, think about whether the disagreement involves something

3    important or not and whether you think someone is lying or simply

4    mistaken.

5         People see and hear things differently and witnesses

6    may testify honestly but simply be wrong about what they thought

7    they saw or remember.  It is also a good idea to think about which

8    testimony agrees best with the other evidence in the case.  However,

9    you may conclude that a person deliberately lied about something

10   that is important on how you decide this case.  If so, you may

11   choose not to accept anything that person said.

12        On the other hand, if you think the person lied about

13   some things and told the truth about others, you may simply accept

14   that part of the testimony you think is true and ignore the rest.

15        I don't know if we had a stipulation in this case, but

16   when the lawyers agree on a statement of facts, these are called

17   stipulated facts.  And you may regard such stipulated facts as

18   true but you are not required to do so.

19        Now, there has been some evidence that a witness made

20   an earlier statement or said something that did not agree with

21   that person's testimony during this trial.  For example, if the

22   person has testified to something here on teh witness stand and

23   then is asked about a statement that that person may have made

24   back when or some prior testimony in another court proceeding,

25   I am talking about that kind of a situation and the person is being

-67-

1    asked about whether or not they said something different before

2    as to what they have testified to you here in this trial.

3          You must be very careful about how you consider that

4    evidence. That statement was not made during this trial. So,

5    you must not consider it when you decide whether the elements

6    of the crime have been proven. On the other hand, you may use

7    it to help you decide whether you think that person is being

8    truthful here in testifying before you.

9          So, consider carefully what that person may have

10    said prior to testifying here in this trial. Ask yourself if

11    that witness made that statement, whether it was true and whether

12    it differs from that witness's testimony here in this trial.

13    Then remember that you may only use it to help you decide whether

14    you believe that person's testimony here in this court and this

15    trial.

16          However, if that person testified that the earlier

17    statement was true or if that early inconsistent or allegedly

18    different statement was given under oath subject to the penalty

19    of perjury at another court proceeding, then it may be considered

20    as proof of the facts that are in that statement.

21          You have heard testimony from the witness who was a

22    police officer. That testimony is to be looked at and judged

23    by the same standards you use to evaluate the testimony of any

24    other witness who takes the witness stand. There mere fact that

25    a person is a police officer does not make that testimony any

-68-

more or less believable than that of any other person who
testifies here.

Now, as I said to you a couple of days ago, every
defendant has the absolute right not to testify. When you
decide the case, you must not consider the fact that he did not
testify. It must not affect your verdict in any way.

One of the issues in this case is the identification
of the defendant as the person who committed the crime or crimes.
The prosecutor must prove beyond a reasonable doubt that the
crimes were committed and that the defendant was the person
who committed the crime.

In deciding how dependable an identification is,
think about such things as how good a chance the witness had
to see the offender at the time, how long that witness was
watching, whether the witness had seen or known the offender
before, how far away the witness was, whether the area was well-
lighted, and the witness's state of mind at that time.

Also, think about the circumstances at the time of the
identification such as how much time had passed since the crime,
how sure the witness was about the identification, and the
witnesses state of mind during that identification. You may also
consider any time that the witness or witnesses failed to identify
the defendant or made an identification or gave a description
that did not agree with that person's identification of the
defendant during this trial.

-69-

You should examine the person's identification carefully. You may consider whether other evidence supports that identification because then it may be more reliable. However, you may use the identification testimony alone to convict the defendant as long as you believe the testimony and you find that it proves beyond a reasonable doubt that the defendant was the person who committed the crime or crimes.

You may consider whether or not the defendant had a reason to commit the alleged crime but a reason by itself is not enough to find the person guilty of a crime. The prosecution does not have to prove that the defendant had a reason to commit the alleged crime or crimes. He only has to show that the defendant actually committed the crime and that he meant to do so.

Now, I want to talk about the concept of aiding and abetting. Aiding and abetting is not like a separate charge. It is just a theory of law, a principle of law that is part of the law that allows you to determine whether the -- look at whether the defendant is a principle actor or a person, as the person who directed the alleged crime as someone who aided and abetted that crime.

The law says that he who aids and abets is considered to be a principal in the eyes of the law. Therefore, it was not necessary for the prosecution to charge the defendant in this case only as a principal actor. That is that the person that directly committed the crime or crimes.

-70-

1   The prosecution is permitted to contend that the
2   defendant was either the principal offender or an aider and
3   abettor of the crimes charged.  In order to aid and abet another
4   to commit a crime, it is necessary that the defendant wilfully
5   associates himself with that criminal venture and wilfully
6   participated in it as he would in something he wishes to bring
7   about.  That is to say taht he wilfully seeks by some act to make
8   that criminal venture succeed.  And that is wilfully done if done
9   voluntarily and intentionally with the intentional intent to
10  do something the law forbids.

11      In this case, the defendant is charged with committing
12  several crimes here.  The murder, assault with intent to murder,
13  possession of a firearm or intentionally assisting someone else
14  in committing those crimes.

15      Anyone who intentionally assists someone else in
16  committing a crime is as guilty as the person who directly
17  commits it and can be convicted of that crime as an aider and
18  abettor.

19      To prove this charge, the prosecutor must prove each
20  of the following elements beyond a reasonable doubt.  First, that
21  the alleged crime was actually committed either by the defendant
22  or someone else.  It does not matter whether anyone else has
23  been convicted of that particular crime.

24      Second, that before doing the crime, the defendant
25  did something to assist in the commission of that crime.

-71-

Third, the defendant must have intended the commission
of that crime but must have known that the other person intended
its commission at the time of giving the assistance.  It does not
matter how much help, advice or encouragement the defendant gave.
However, you must decide whether he intended to help another
commit the crime or whether his help, advice or encouragement
actually did help, advise or encourage the crime.

To be convicted as an aider and abettor, the defendant
must have had the requisite intent himself or participated in the
crime while knowing that his co-participant possessed the requisite
intent.  To be convicted as an aider and abettor of a crime that
required specific intent, the defendant must have had the specific
intent himself or participated while knowing that his co-participant
had that specific intent.

Even if the defendant knew that the alleged crime was
planned with being committed, the mere fact that he was present
when it was committed is not enough to prove that he assisted
in committing the crime.

Now, the first instruction I am going to give you as
to Count 1 has to do with first degree premeditated murder.  And
the law recognizes that when you consider first degree murder,
you also have to look at second degree murder.  And I will explain
what that means here in a minute.

Now, understand, again, that even though I may read this
in the sense of the defendant being the principal actor, you are

-72-

1  allowed to look at this as an aider and abettor.

2      The defendant is charged with the crime of first

3  degree premeditated murder or aiding and abetting this. To

4  prove this, the prosecutor must prove the following elements

5  beyond a reasonable doubt. First, that the defendant caused

6  the death of Demetris Perdue, that is that Demetris Perdue

7  died as a result of gunshot wounds either by the defendant or

8  that the defendant aided and abetted in that to occur.

9      Second, that the defendant intended to kill Demetris

10 Perdue or that he aided and abetted that as I have explained

11 that to you in the specific intent required.

12      Third, that this intent to kill was premeditated,

13 that is thought out beforehand.

14      Fourth, that the killing was deliberate which means

15 that the defendant considered the pros and cons of the killing

16 and thought about and chose his actions before he did it.

17      There must have been real and substantial reflection

18 for long enough to give a reasonable person a chance to think

19 twice about the intent to kill. The law does not say how much

20 time is needed. It is for you to decide that enough time

21 passed under the circumstances of this case. The killing cannot

22 be a result of a sudden impulse done without thought or reflection

23      Five, that the killing was not justified or excused

24 or done under circumstances that reduced it to a lesser crime.

25      The crime of first degree premeditated murder requires

-73-

1     proof of a specific intent. This means that the prosecution must

2     prove not only that the defendant did certain acts,but that he did

3     the acts with the intent to cause a particular result.

4              For the crime of first degree premeditated murder, this

5     means that the prosecution must prove that the defendant intended

6     to kill with premeditation and deliberation or with the aiding

7     and abetting theory and the required specific intent that is

8     required with that. And that the defendant's intent may be proved

9     by what he said, what he did, how he did it or by any other facts

10    and circumstances that are a part of the evidence.

11             You must think about all of the evidence in deciding what

12    the defendant's state of mind was at the time of the killing. The

13    defendant's state of mind may be inferred from the kind of weapon

14    used, the type of wound inflicted, the acts and words of the

15    defendant and any other circumstances surrounding the killing.

16             You may infer that the defendant intended to kill if he

17    used a dangerous weapon in a way that is likely to cause death

18    or aided and abetted someone else in doing that. Likewise, you

19    may infer that the defendant intended the usual results that

20    followed from the use of a dangerous weapon. A gun is a dangerous

21    weapon.

22             Premeditation and deliberation may be inferred from

23    the actions of the defendant which show planning or from any

24    other circumstances surrounding the killing.

25             The prosecution need not prove a motive for a killing,

-74-

LASER STOCK FORM FM5RN

THE CORBY GROUP 1-800-255-5040

1    but you may consider evidence of motive in deciding if there

2    was premeditation and deliberation. Motive itself does not prove

3    premeditation and deliberation.

4         Now, the law says that if you find the defendant guilty

5    of murder, you, the jury, it is your duty to state the degree

6    of murder in your decision. That is whether he is guilty of

7    first degree murder or guilty of second degree murder.

8         I have just given you the instructions about first

9    degree murder. The difference between first degree premeditated

10   murder and second degree murder is that for first degree,

11   premeditated murder, the defendant must have actually intended

12   to kill and have premeditated the victim's death and have

13   deliberated and substantially reflected upon the killing

14   beforehand or aided and abetted that as I have defined that

15   for you.

16        Such premeditation, deliberation is not required

17   for second degree murder. For second degree murder, the

18   defendant must have actually intended to kill or intended to

19   do great bodily harm or have created a very high risk of death

20   or great bodily harm with knowledge that death or great bodily

21   harm was the probable cause of his act. And, again, the aiding

22   and abetting theory applies there.

23        Now, as I said, you may consider the charge of second

24   degree murder. To prove this, the prosecutor again must prove

25   the following elements beyond a reasonable doubt. First, that

-75-

1  the defendant caused the death, aided and abetted in the death

2  of Demetris Perdue, and that is that Demetris Perdue died as a

3  result of gunshot wounds by someone and by the defendant or that

4  the defendant aided and abetted the same.

5  Second, that the defendant had one of these three states

6  of mind or aided and abetted with that state of mind. He intended

7  to kill or he intended to do great bodily harm or he knowingly

8  created a very high risk of death and great bodily harm knowing

9  that death or such harm would be the likely result of his actions,

10  and that the killing was not justified, excused under the

11  circumstances that reduce it to a lesser crime.

12  Now, other charges here, the next two or three -- I see

13  Counts 2, 3 and 4 are all the same. Those are charges of assault

14  with intent to murder involving Phillip Mason in count 2, Edward

15  Martin in Count 3 and Ahmad Akins in Count 3. I am going to just

16  give these to you at one time rather than reading them three times.

17  So, in Counts 1, 2, 3 and 4, the defendant is charged

18  with the crime of assault with intent to murder. To prove this

19  charge, the prosecutor must prove each of the following elements

20  beyond a reasonable doubt. And, again, you can use the principle

21  aiding and abetting here.

22  First, that the defendant tried to physically injury

23  another person. Second, that when the defendant committed the

24  assault, he had the ability to cause an injury or, at least,

25  believed that he had that ability. Third, that the defendant

-76-

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

intended to kill the person he assaulted and the circumstances
did not really excuse or reduce the crime.

Now, the crime of assault with intent to murder requires
proof of a specific intent. This means that the prosecution must
prove not only that the defendant did certain acts, but that he did
the acts with the intent to cause a particular result.

For the crime of assault with intent to murder, this
means that the prosecution must prove that the defendant intended
to kill or that he aided and abetted with that specific intent.
As I said, to be convicted as an aider and abettor of a crime,
that requires specific intent, the defendant must have had that
specific intent himself or participated in the crime while
knowing that his co-participant had that specific intent.

Now, the next count there, I believe that is Count 5
we are talking about here. Possession of a firearm by a
convicted felon.

The defendant is charged with having possessed, used,
transported, received a firearm in this state after having been
convicted of a felony. To prove this charge, the prosecutor
must prove each of the following elements beyond a reasonable
doubt.

First, that the defendant possessed, used, transported,
sold or received a firearm in this state or aided and abetted
same.

Second, that the defendant was convicted of a felony.

-77-

Third, that the requisite amount of time and circumstances has not passed that would eliminate the defendant from the required application of the law. Meaning that the law says that if you are a convicted felon, you can't become eligible to have a firearm until so many years. I think it is three years after the time or the conviction or the time from the service of the sentence. I think we already have some information about that here in the record.

And lastly, the defendant is charged with a separate crime of possession a firearm at the time he committed or attempted to commit the crime of murder, assault with intent to murder.

To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt. First, that the defendant committed or attempted to commit the crime of murder and/or assault with intent to murder as I have defined those for you. It is not necessary, however, that the defendant be convicted of that crime.

Second, at the time the defendant committed or attempted to commit the crime of murder or assault with intent to murder, he knowingly carried or possessed a firearm in aiding and abetting same.

The evidence must convince you beyond a reasonable doubt that the crime occurred on or about the date of November 15th, 2001 within Wayne County.

-78-

1    Now, when you go to the jury room, the first thing you

2 will do is choose one of your members as your foreperson. And

3 that person and foreperson should see to it that your discussions

4 are carried on in a business-like way and that everyone has a

5 fair chance to be heard.

6    A verdict in a criminal case must be unanimous. In

7 order to return a verdict, it is necessary that each of you

8 agrees on that verdict. In the jury room, you will discuss the

9 case among youselves, but ultimately, each of you will have to

10 make up your own mind. Any verdict must represent the individual

11 considered judgment of each juror.

12    It is your duty to talk to each other and make every

13 reasonable effort to reach agreement. Express your opinions and

14 the reasons for them and keep an open mind as you listen to your

15 fellow jurors. Rethink your opinions and do not hesitate to

16 change your mind if you decide you were wrong. Try your best to

17 work out your differences. However, although you should try

18 to reach agreement, none of you should give up your own honest

19 opinion about the case just because other jurors disagree with

20 you or just for the sake of reaching a verdict. In the end, your

21 vote must be your own and you must vote honestly and vote in

22 good conscience.

23    Possible penalty must not influence your decision. It

24 is the duty of the judge to fix the penalty within the limits

25 provided by law.

-79-

If you want to communicate with me while you are in the jury room, please, have your foreperson write a note and give that to the deputy who will be at or near your jury room. It is not proper for you to talk directly with me, the lawyers, court officers or anybody about this case during your deliberation process.

As you discuss the case, you must not let anyone, not even me, know how your voting stands. By that I mean, if there is a need for you to write a note or appear in the courtroom before reaching a unanimous decision one way or the other, do not at any time disclose how voting may stand in any kind of a way.

If you want to look at all of the exhibits that have been admitted into evidence, you may have those in the jury room.

I have recorded these instructions on audiocassette tape. If you think you need to ehar them, you may ask for that. You may have that tape. But as you discuss this case, you should think about all of my instructions throughout this entire trial as the law that you are to follow.

You will also have with you in the jury room a verdict form. If you reach a unanimous agreement as to your verdict in accordance with these instructions, your foreperson will complete the form. The foreperson will write in the verdict that you all agree on and the foreperson will sign and date

-80-

the form.

The foreperson will then send a note by the deputy that you have reached your verdict. Do not in that note in any way say what that verdict is in any way. And the foreperson will hold the verdict form and wait until you are called into the courtroom.

Again, if you agree upon a verdict and you want me to know about that, just have the foreperson send a note by the deputy that you have reached your verdict. Don't say what that verdict is. Simply say that you have agreed upon a verdict or something to that effect after you have considered all of the charges here.

Now, the form of the verdict form is as follows. There is a heading for the case. Instructions, the jury finds as follows as to each count, please, write in the verdict agreed on by all the jurors. Write guilty or not guilty in the space provided.

In Count 1, that is where we have the first degree murder and second degree murder. You have to decide if you find that there was murder, that it was one or the other. The point I want to make about this is this. If you find the defendant guilty of first degree murder, do not consider the charge of second degree murder. If you are unable to agree as to first degree murder or find him not guilty as to that, then you can look at second degree murder.

The main point I want to make about that one is you can find the defendant not guilty of both. If you find the defendant

-81-

guilty as to one or the other as to Count 1, then there is

Count 2 --- I am sorry --- I need to get Ann-Therese out here.

All right. There is a mistake on this form.

As to Count 2, assault with intent to murder Phillip

Mason; Count 3, assault with intent to murder Edward Martin;

Count 4, assault with intent to murder Ahmad Akins.  Count 5 --

I am sorry, go back to Count 2.

Again, that is assault with intent to murder as to

Phillip Mason.  Guilty or not guilty.  Count 3, assault with

intent to murder as to Edward Martin.  Guilty or not guilty.

Count 4, assault with intent to murder regarding Ahmad Akins.

Guilty or not guilty.

Count 5, possession of a firearm by a convicted felon.

Guilty or not guilty.  Count 6, possession of a firearm in

commission of a felony.  Guilty or not guilty.

Now, when you go to the jury room, the first thing

you will do is select one of your members to act as foreperson.

That person will preside over your deliberations.  Elect your

foreperson, but do not begin to deliberate the case until you

get the verdict form.

Okay.  Now, as you can see, that there are 14 of you

there in the jury box.  The law says that only 12 of you can

actually go in and decide this case.  I take the precaution

of making sure that we have extra numbers there just in case

something happens and somebody can't continue, we  want to be

LASER STOCK FORM FMSRN

THE CORBY GROUP  1-800-255-5040

able to complete the trial and not have to start over again.

Occasionally, things do happen.

I have had situations where somebody may have gotten sick, emergency comes up.  I want to ask the clerk to draw the name of two of you from the jury box here.

And both deputies sworn, please.

(Deputies sworn by the Court at 11:40 a.m.)

THE COURT:  Who do we have?

THE CLERK:  Monyaka Burnett.

THE COURT:  Who is that, again?

THE CLERK:  Monyaka Burnett.

THE COURT:  Ms. Burnett is in Seat No. 12, okay.

THE CLERK:  And Mary Allor.

THE COURT:  And Ms. Allor is in Seat No. 7.

Ms. Burnett and Ms. Allor, do either of you have any kind of personal belongings over there in the jury room that you need to retrieve.  If so, we are going to ask you to get those now and come back here to the courtroom so I can formally excuse you.

You have anything over there, Ms. Burnett?

JUROR NO. 12:  No.

THE COURT:  Hold on right there, okay.

Mr. Rollstin, anything about the instructions you want to bring to my attention as given?

MR. ROLLSTIN:  No, Your Honor.

-83-

1        THE COURT:  You, Ms. Frederick?

2        MS. FREDERICK:  None, Your Honor.

3        THE COURT:  Here is what we are going to do for the

4   12 of you.  I am going to send you to the jury room in a few

5   minutes.  When you get that verdict form, deliberate the case.

6   Talk about it.  Elect your foreperson then deliberate the case

7   only when all 12 of you are there in the jury room to do that.

8   Don't talk about it except when all 12 of you are there in the

9   jury room to deliberate the case.  That is the only time

10  you will do that.  When any person leaves for whatever reason,

11  rest room, walk out, stop.  Do it when all 12 of you are present.

12       We do intend to, unless you have a verdict, you won't

13  leave as early as you did yesterday and the day before.  You are

14  going to be hear to about 4:15 or 4:30.

15       Now, with that in mind, we will get you a lunch break

16  somewhere between the hour.  Probably, say, I am thinking maybe

17  right around, maybe, 12:30 or one o'clock.  We will let you know.

18  You will get at least one hour for a lunch break.  When you come

19  back off of your lunch break, then you will continue to deliberate

20  the case and you will deliberate the case until 4:15 or thereabouts,

21  4:20 unless you have reached a decision before then.

22       If you have not reached a decision by the time the day

23  is over, you have to leave about 4:15, 4:20 or so.  You will

24  return tomorrow morning, the 12 of you will return tomorrow

25  morning at nine o'clock to your jury room here and you will

-84-

1    continue with your deliberations.  It is very unlikely that I

2    will bring you back -- Ms. Allor, you may stay out of the jury

3    box.  You may step over here.  You will stay out of the --

4    you will deliberate the case again, you will come in at nine

5    o'clock in the morning to your jury room and you will continue

6    with your deliberation process.

7          So, keep that in mind in terms of how we are with

8    this.  So, it is unlikely that if you do not reach a decision

9    today that you will be brought back to the courtroom.  You will

10   be excused from the jury room either by myself or one of the

11   deputies.  Come back tomorrow monring at nine o'clock and

12   continue on with this.

13         Everybody understand that?  Okay.  So, the 12of you

14   may now go to the jury room.  Okay.

15         THE DEPUTY:  Rise for the jury.

16         THE COURT:  Ms. Burnett and Ms. Allor, if you will

17   step over here, please.  Ms. Burnett and Ms. Allor, you step

18   down.  I will talk to you in a minute.

19         (Jurors excused at 11:43 a.m.)

20         THE COURT:  Okay.  Please, be seated.

21         Ms. Allor and Ms. Burnett, you are free to go now,

22   be about your usual business or routine.  But let me ask this of

23   the two of you.  I am not going to formally excuse you yet in

24   the sense of relieving you of all obligations to this case

25   because sometimes something happens, you know, along the way

                              -85-

1   and we have to call somebody back in.

2          I am going to ask you to leave a phone number where you

3   can be readily reached by with my clerk here. And I will let you

4   know if there is a need for you to come back in here. But,

5   otherwise, just go on about your usual routine and if there is

6   a necessity to do that, we will let you know. Okay.

7          And we will just pull one of the names out like that.

8   So, if you will leave a number with the clerk, we will do that.

9   Otherwise, you are free to go, okay.

10         Mr. Rollstin and Ms. Frederick, if you are not going

11  to be readily available, let the clerk know where you can be

12  reached  and before you become unavailable at the lunch break

13  time. I haven't decided yet when that is. Make sure before you

14  go to lunch or become unavailable where we can reach you if you

15  are out on your lunch break and the same applies for the end

16  of the day before you would leave.

17         I got that impression from somewhere -- the end of

18  the day, before they leave at 4:30, make sure that they have

19  gone for the day before you become available. I don't want

20  them to come to a decision and then not be able to find the

21  lawyers. Okay. Other than that, let the clerk know where you

22  can be reached.

23         MR. ROLLSTIN:  Exhibits, Judge.

24         THE COURT:  Yes, hand those to the court reporter,

                            -86-

1    please, and they will take those, okay.

2              (Off the record at 11:45 a.m.)

3              (On the record at 2:12 p.m.)

4              THE COURT:  While we are waiting for the jury to come

5    in here, let me say to all persons in this courtroom which

6    has any allegiance.  When this verdict is announced and this

7    jury comes in here and does this, I will not tolerate any type

8    of response from anybody on any kind of way.  No acting out in

9    any kind of way to that jury's verdict.

10             Anybody who violates can be subject to contempt of

11   court and be immediately put in jail.

12             THE DEPUTY:  Rise for the jury.

13             (Jurors enter the courtroom at 2:14 p.m.)

14             THE DEPUTY:  You may be seated.

15             THE COURT:  Mr. Rollstin and Ms. Frederick, we will

16   note the presence of the jurors in the courtroom, please.

17             MR. ROLLSTIN:  Yes, Your Honor.

18             MS. FREDERICK:  Yes, Your Honor.

19             THE COURT:  Thank you.

20             Members of the jury, I have received a note that you

21   have reached a verdict.  Before I have that announced and

22   published openly here in the courtroom, let me verify as to

23   Count 1 where ther are the charges of first degree murder,

24   second degree murder, the lesser included, one way or the other,

25   you all agree, am I correct with that?

-87-

1        THE JURY:  Yes.

2        THE COURT:  As to Count 2, one way or the other, you

3    all agree, am I correct with that?

4        THE JURY:  Yes.

5        THE COURT:  As to Count 3, one way or the other, you all

6    agree, am I correct with that?

7        THE JURY:  Yes.

8        THE COURT:  As to Counts 4, 5, and 6, one way or the

9    other, you all agree, too?

10       THE JURY:  Yes.

11       THE COURT:  Listen to her questions very closely and

12   respond accordingly.

13       THE CLERK:  Would the foreperson please stand and state

14   your name for the record.

15       JURY FOREPERSON:  Theresa Pappas.

16       THE CLERK:  Have you reached a unanimous decision as

17   to the present charge of Count 1, first degree murder?

18       JURY FOREPERSON:  Yes.

19       THE CLERK:  What is your decision?

20       JURY FOREPERSON:  Guilty.

21       THE CLERK:  As to Count 2, upon Phillip Mason, assault

22   with intent to murder?

23       JURY FOREPERSON:  Guilty.

24       THE CLERK:  As to Count 3, Edward Martin, assault with

25   intent to murder?

-88-

1          JURY FOREPERSON:  Guilty.

2          THE CLERK:  As to Count 4, Ahmad Akins, assault with

3     intent to murder?

4          JURY FOREPERSON:  Guilty.

5          THE CLERK:  Count 5, possession of a firearm by a convicted

6     felon?

7          JURY FOREPERSON:  Guilty.

8          THE CLERK:  Count 6, possession of a firearm in the

9     commission of a felony?

10          JURY FOREPERSON:  Guilty.

11          THE CLERK:  All members of the jury, please, stand and

12     raise your right hands.  Listen to your verdict as recorded by the

13     court.

14          You say upon your oath that you find the defendant,

15     James Jones, guilty of Count 1, first degree murder; guilty of

16     Count 2, assault with intent to murder; guilty of Count 3, assault

17     with intent to murder; guilty of Count 4, assault with intent to

18     murder; guilty of Count 5, possession of a firearm by a convicted

19     felon, and guilty of Count 6, possession of a firearm in the commission

20     of a felony so say you, Ms. Foreperson; so say you, all members of the

21     jury, is this your verdict?

22          THE JURY:  This is our verdict.  Yes.

23          THE CLERK:  You can be seated.

24          THE COURT:  Members of the jury, I am going to do a response

25     that we refer to as polling the jury.  Basically, what it is, I am

-89-

1   going to ask you the questions about the verdict and go by seat

2   numbers.  That question being having heard the verdict as announced

3   and recorded in the record that you find the defendant, James A. Jones

4   in Case No. 01-13853, that is that you find the defendant guilty

5   in Count 1 of first degree murder, guilty in Count 2, assault with

6   intent to murder, guilty in Count 3, assault with intent to murder,

7   guilty in Count 4, assault with intent to murder, guilty in Count 5,

8   possession of a firearm by a convicted felon, guilty in Count 6,

9   possession of a firearm in the commission of a felony.

10         I ask you is that and was that your verdict, Juror in

11   Seat No. 1?

12               JUROR NO. 1:  Yes.

13               THE COURT:  Juror in Seat No. 2?

14               JUROR NO. 2:  Yes.

15               THE COURT:  Juror in Seat No. 3?

16               JUROR NO. 3:  Yes.

17               THE COURT:  Juror in Seat No. 4?

18               JUROR NO. 4:  Yes.

19               THE COURT:  Juror in Seat No. 5?

20               JUROR NO. 5:  Yes.

21               THE COURT:  Juror in Seat No. 6?

22               JUROR NO. 6:  Yes.

23               THE COURT:  Juror in Seat No. 8?

24               JUROR NO. 8:  Yes.

25               THE COURT:  Juror in Seat No. 9?

-90-

LASER STOCK FORM FMSRN

THE CORBY GROUP 1-800-255-5040

1    JUROR NO. 9: Yes.

2    THE COURT: Juror in Seat No. 10?

3    JUROR NO. 10: Yes.

4    THE COURT: Juror in Seat No. 11?

5    JUROR NO. 11: Yes.

6    THE COURT: Juror in Seat No. 12 -- I am sorry, 13,

7    forgive me.

8    JUROR NO. 13: Yes.

9    THE COURT: Juror in Seat No. 14?

10    JUROR NO. 14: Yes.

11    THE COURT: Okay, members of the jury, that will complete

12    your service in this case. I want to thank you for your time and

13    effort and patience with this.

14    And I really, you know, understand that when jury duty

15    is not easy particularly where some kind of cases and circumstances

16    you have to make a decision about that. But as been indicated

17    already, you are here kind of like a referee, you know, when somebody

18    does something, you are here just to make sure that the process works

19    and rights are properly accorded and to call it as you see it.

20    People choose to do things that they do. They set the

21    stage for whatever comes later. So, I know that it may be difficult

22    sometimes and you may have to meditate over it or whatever other way

23    you might look at it, but you only came here to make the call based

24    on the evidence.

25    So, this will complete your service on the case. For those

-91-

1   of you who need or want a letter to show your presence here for the

2   last three days, if you will go back to the jury room, we will

3   provide you with the letters that you will need and then once you

4   get that letter, you will be able to go.

5        So, for those of you who don't need that letter, of course,

6   you are free to go now and be about your usual business or routine.

7   And well, if you have got a couple of minutes though over there in

8   the jury room, I will speak to you briefly and we will make sure

9   that everybody gets out of the building okay here.  So, if you will

10  go back to the jury room now, we will assist you.

11       THE DEPUTY:  Rise for the jurors.

12       (Jury excused at 2:19 p.m.)

13       THE COURT:  Please, be seated.  Okay, thank you.

14       The jury having returned a verdict as indicated and

15  recorded for the record, the court will accept the judgment and

16  have the appropriate judgment entered as a matter of record.

17       The matter will be set for a sentencing date of when?

18       THE CLERK:  June 20th.

19       THE COURT:  Is June 20th okay for your respective

20  calendars.

21       Thursday, June 20th, Mr. Rollstin and Ms. Frederick?

22       MR. ROLLSTIN:  Yes, Judge.

23       MS. FREDERICK:  The matter is referred.

24       THE COURT:  The matter is referred.  Defendant is remanded.

25  Thank you all.

                        -92-

1       (Matter concluded at 2:20 p.m.)

2

3   R E P O R T E R ' S   C E R T I F I C A T E

4

5 STATE OF MICHIGAN  )
            )  ss.
6 COUNTY OF WAYNE  )

7

8     I, CLARA SHAH, CSR-2602, an Official Court Reporter

9 in and for the Third Judicial Circuit Court for the County of

10 Wayne, State of Michigan, do hereby certify that I have reported

11 stenographically proceedings had and testimony taken in the

12 above-entitled cause, and I do further certify that the foregoing

13 transcript constitutes a full, true and complete transcript of

14 said stenographic notes.

15

16

17

18     _____

19   CLARA SHAH, CSR-2602
    OFFICIAL COURT REPORTER

20

21

22

23

24

25

       -93-