| STATE OF MICHIGAN<br>Third Judicial Circuit Court | PRAECIPE<br>FOR<br>MOTION | CASE NO.<br>01-13853-01 |
|---|---|---|

THE PEOPLE OF THE STATE OF MICHIGAN

-vs-

James Jones
*Defendant*

TO THE ASSIGNMENT CLERK:

Please place a Motion for (here state nature of motion in brief form) _Ginther Hearing and New Trial_

on the Motion Docket for _Fri, May 30, 2003_ before Judge _Thomas E. Jackson_

Date: _May 8_, 20 _03_.

Jacqueline J. McCann  P58774
*Attorney for Defendant*   *Michigan State Bar #*

645 Griswold Suite 3300, Detroit 48226
*Address*

(313) 256-9833
*Telephone*

NOTE: UNDER MCR 2. 107(c) (1) OR (2)

**PROOF OF SERVICE**
(7 Days notice required)

I swear that on _May 8, 2003_ I served a copy of the attached motion and praecipe upon the Wayne County Prosecutor, Third Judicial Circuit Court, Criminal Division Section by ~~(mail)~~ (personal) service. *(Cross one out)*

Sworn and subscribed before me

on: _May 8, 2003_

_Joanne M. Maitz_
*Notary Public*

_Wayne_
*County*

_9-2-2005_
*My Commission Expires*

*Attorney for Defendant*

7 Day Notice waived _____
                              *Date*

*Prosecuting Official*   *Michigan State Bar #*

[Stamp: PROSECUTOR'S OFFICE MAY 08 2003 RESEARCH TRAINING & APPEALS]

Form #1                               PRAECIPE FOR MOTION

STATE OF MICHIGAN

IN THE WAYNE COUNTY CIRCUIT COURT

| | |
|---|---|
| PEOPLE OF THE STATE OF MICHIGAN | Court of Appeals No. 244062 |
| Plaintiff-Appellee, | Circuit Court No. 01-13853-01 |
| -vs- | Honorable Thomas E. Jackson |
| JAMES JONES | |
| Defendant-Appellant. / | |

WAYNE COUNTY PROSECUTOR
Attorney for Plaintiff-Appellee
_____

STATE APPELLATE DEFENDER OFFICE
Attorney for Defendant-Appellant
_____/

## MOTION FOR *GINTHER* HEARING AND NEW TRIAL

**NOW COMES** Defendant-Appellant **JAMES JONES**, through his attorneys, the **STATE APPELLATE DEFENDER OFFICE**, by **JACQUELINE J. McCANN**, Assistant Defender, and moves this Honorable Court for an evidentiary hearing (Ginther hearing) and to grant him a new trial, stating in support:

1. A jury convicted Mr. Jones of first-degree premeditated murder, 3 counts of assault with intent to murder, felon in possession of a firearm, and felony firearm, before the Honorable Thomas E. Jackson, on May 22, 2002. Attorney Leesa R. Frederick (P53372) represented Mr. Jones in all court proceedings in this matter.

2. Judge Jackson sentenced Mr. Jones to the mandatory term of life without the possibility of parole, three terms of 14 years and 3 months to 25 years for the assault convictions, 2 to 5 years for the felon in possession offense, and the consecutive 2 year term for felony firearm, on June 20, 2002.

3. The Court filed a Claim of Appeal on Mr. Jones' behalf and appointed appellate counsel on September 23, 2002, pursuant to the indigent defendant's request for appellate counsel timely filed on June 28, 2002.

4. This Court has jurisdiction over this motion, pursuant to MCR 7.208(B)(1) and MCR 6.431(A)(2).

5. Mr. Jones asserts that he was denied the effective assistance of trial counsel, where trial counsel failed to present his alibi defense, failed to call the line-up attorney to discredit the identification testimony at trial, and failed to call Mr. Jones at the <u>Wade</u> hearing and trial.

6. <u>Summary of Trial Case</u>. It was alleged that Mr. Jones was the driver of a green Aurora in a drive-by shooting at a group of young men on the corner of Heyden and Clarita streets, resulting in the death of Demetrius Perdue and injury to Ahmad Akins, on November 15, 2001, around 5 pm. Edward Martin identified Mr. Jones as the driver on the initial pass and on the shooting pass. Joseph McCrimon identified Mr. Jones as the driver on the initial pass and testified that he did not observe the driver on the shooting pass. Both claimed to have loosely known Mr. Jones from the neighborhood. Martin claimed to have smoked marijuana with him approximately one day before the shooting. Phillip Mason testified at trial that he could not identify the driver, but he gave the police a description of the "driver" that did <u>not</u> match Mr. Jones. Mason testified he gave the police that description because Martin had told him the driver

2

was "Fresh", who drove a gold Caprice. So Mason had described the individual he knew to drive a gold Caprice. The proposed motive for the shooting was that Mr. Jones believed some of the individuals on that corner to have been involved in robbing him the day before.

<u>Wade hearing.</u> The day after the shooting, Officer Joanne Miller showed the young men a single photo, that of Mr. Jones. Martin and McCrimon picked him out of a line-up the following day. According to the line-up attorney, Mr. Jones appeared substantially different from all of the other line-up participants: he was clean shaven, had a substantially different hairstyle, and had on a white T-shirt, while all the others had on jackets. Mr. Jones was also at least 20 pounds lighter than anyone else in the line-up. Though a photograph is normally taken of the line-up as a matter of procedure, none was taken in this case. According to the line-up attorney, though McCrimmon picked Mr. Jones out of the line-up, when asked what Mr. Jones had done, McCrimmon replied, "[N]othing. The guy that just left out of here [Martin] said he was driving." McCrimmon also stated at that time that Mr. Jones was the individual that Miller showed him a picture of.

The Court denied the motion to suppress the identifications, finding that it was not improper to show the witnesses the photo of Mr. Jones, that it was not convinced the line-up was improper, and that, at least, Martin had an independent basis for his identification anyway.

7. A criminal accused is entitled to the effective assistance of counsel. US Const; Ams VI, XIV; Const 1963, art 1, sec 20; <u>Strickland</u> v <u>Washington</u>, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984); <u>People</u> v <u>Pickens</u>, 446 Mich 298; 521 NW2d 797 (1994).

8. To be effective, defense counsel must investigate, prepare, and timely assert all substantial defenses. <u>People</u> v <u>Lewis</u>, 64 Mich App 175; 235 NW2d 100 (1975); <u>Kimmelman</u> v <u>Morrison</u>, 477 US 365; 106 S Ct 2574; 91 L Ed 2d 305 (1986); <u>Beasley</u> v <u>United States</u>, 491 F2d

3

687 (CA 6, 1974). A defense is substantial if it may have made a difference in the outcome of the trial. People v Kelly, 186 Mich App 524, 526; 465 NW2d 569 (1990).

9. In this case, trial counsel was retained and informed of Mr. Jones' alibi defense by Mr. Jones and family members. The shooting occurred on November 15, 2001, around 5 pm. Alibi defense: On that day, Mr. Jones' girlfriend Aneesah Broadnaux had a job interview in the late afternoon, no later than 4 pm. She dropped Mr. Jones off at his mother's house prior to her interview, between 3 and 4 pm. (Mr. Jones' mother had recently had surgery and he would go to the house to help her out.) While Mr. Jones was visiting with his mother, his grandmother brought his little sister home from school. At that point, Mr. Jones was showering. Mr. Jones ate there and talked with his mom and sister. His girlfriend returned for him after her interview and they went back to the hotel room where they were residing, for the rest of the night. (Please see Appellate Counsel's Affidavit, attached as an offer of proof.)

10. Mr. Jones believed that trial counsel was going to present the alibi defense. Then on the Thursday prior to trial, trial counsel visited him at the jail and told him that she would not run it because juries do not believe alibis presented by family members. (See Appellate Counsel's attached affidavit.)

11. Mr. Jones could have testified that he had never had any personal contact with the complaining witnesses, as described at trial. He also could have testified to his alibi defense. (See Appellate counsel's attached affidavit.)

12. The failure to investigate and present witnesses who may testify in a manner favorable to the defendant constitutes ineffective assistance where there is a reasonable probability that their testimony would have changed the outcome of the case. People v Johnson, 451 Mich 115; 545 NW2d 637 (1996); People v Bass, 247 Mich App 385; 636 NW2d 781 (2001); Workman v

4

Tate, 957 F2d 1339 (CA 6, 1992). See also People v Pickens, supra at 327 ("[D]efense counsel's failure to properly file notice of an alibi **was inexcusable neglect**", where she was aware of the potential testimony nearly three months prior to trial, yet failed to file the notice or move for an adjournment to correct her error. However, because the defendant waived production of the alibi witness at the Ginther hearing, without explanation, there is no record evidence of the alibi, and thus he cannot establish that there was a reasonable probability that the outcome of the trial would have been different.)

13. While there is a presumption that counsel's performance constituted "sound" trial strategy, a finding that counsel was operating according to a "strategy" does not insulate his decisions from review. See Washington v Hofbauer, 228 F3d 689, 704 (CA 6, 2000); Martin v Rose, 744 F2d 1245, 1249 (CA 6, 1984). A reviewing court is obligated to assess whether that strategy was constitutionally deficient. Id.; People v Dalessandro, 165 Mich App 569, 578; 419 NW2d 609 (1988).

14. A defendant does not need to show that counsel's error(s) more likely than not altered the outcome of the trial nor show by a preponderance of the evidence that the outcome was determined by the error(s); he need only show that there is a *reasonable probability* that, but for counsel's unprofessional error(s), the result of the proceeding would have been different. Strickland, supra 466 US at 693-694.

15. Summary. The alibi defense was a substantial defense in its own right and would have complemented the misidentification defense. Further, the testimony of the line-up attorney had it been presented at trial would have strengthened the misidentification defense. Further, Mr. Jones testimony at the Wade hearing that he had never had personal contact with Martin would have undermined the credibility of the supposed independent basis for identification. It

5

was not a sound strategic decision not to present Mr. Jones testimony at the <u>Wade</u> hearing or the line-up attorney's testimony at the trial. It was not a sound strategic decision not to present the alibi defense. There is more than the required reasonable probability that but for counsel's errors and omissions, individually or cumulatively, that the outcome of the case would have been different. Trial counsel's ineffective assistance denied Mr. Jones a fair trial.

16. An evidentiary hearing is necessary because some of the facts necessary to a determination of the issue are not of record. <u>People</u> v <u>Ginther</u>, 390 Mich 436, 443-444, 212 NW2d 922 (1973); <u>Pickens, supra</u> (see paragraph 12 above).

**WHEREFORE**, Defendant-Appellant **JAMES JONES** moves this Honorable Court to hold an evidentiary hearing (<u>Ginther</u> hearing) and grant him a new trial.

Respectfully submitted,

**STATE APPELLATE DEFENDER OFFICE**

BY: _/s/ Jacqueline J. McCann_
**JACQUELINE J. McCANN (P58774)**
**Assistant Defender**
3300 Penobscot Building
645 Griswold
Detroit, Michigan  48226
(313) 256-9833

Dated:  May 8, 2003

6

# APPENDIX A
# (OFFER OF PROOF)

STATE OF MICHIGAN

IN THE WAYNE COUNTY CIRCUIT COURT

**PEOPLE OF THE STATE OF MICHIGAN**   Court of Appeals No. 244062

    Plaintiff-Appellee,   **Circuit Court No. 01-13853-01**

-vs-   **Honorable Thomas E. Jackson**

**JAMES JONES**

    Defendant-Appellant.

_____/

### AFFIDAVIT OF APPELLATE COUNSEL

STATE OF MICHIGAN )
                    ) ss.
COUNTY OF WAYNE )

    **JACQUELINE J. McCANN,** being first sworn, states the following:

1. I am appellate counsel in the above-captioned case.

2. James Jones has told me the following:

   a. On November 15, 2001, on the way to her interview, Aneesah Broadnaux dropped him off at his mother's home around 4 pm. His mother, Diane Jones, had had surgery and was recovering. While at his mother's home, he showered. His grandmother, Juanita James, knocked on the bathroom door while he was inside. After he came out of the bathroom, he watched television, snacked, and visited more. Aneesah came back for him around 5:30 pm. The two of them returned to the hotel room, he resided at, for the rest of the night.

   b. He gave the above information to his attorney Leesa Frederick and believed that she was going to present the alibi defense at trial. Then, on the Thursday before trial, Ms. Frederick told him she was not going to use the alibi because juries do not believe alibis from family.

   c. He had never had any personal contact with the complaining witnesses, as described at trial.

3. Diane Jones has told me the following:

   a. She is James Jones' mother. She had surgery shortly before November 15, 2001 and was recovering at home on that date.

   b. On November 15, 2001, James called her in the afternoon to say he was on his way over and ask if she needed anything. James' girlfriend, Aneesah, dropped him off at her home about 30 minutes before her daughter, James' sister, came home from school. Her mother, Juanita James, brought her daughter home from school at about 3:45 pm. James stayed there for a few hours. At some point, while he was there, her neighbor, Regina, came over. At some point, Aneesah returned with food. Eventually, Aneesah and James left.

   c. She discussed all of this with James' attorney Leesa Frederick right away. The attorney told her that she would subpoena the neighbor, Regina, as well.

4. Aneesah Broadnaux has told me the following:

   a. On November 15, 2001, she had a job interview at around 3 or 4 pm. On her way there, she dropped James Jones off at his mother's home. She went to the interview. While there, she took two tests. She believes she spent about an hour at the interview. She then went back to James' mother's home to get James. They stayed there a while. They had some food. She and James then returned to the hotel.

   b. She does not recall being contacted by James' attorney.

5. Juanita James has told me the following:

   a. She is James' grandmother. On November 15, 2001, she picked up her granddaughter, James' sister, after school, and took her home to James' mother's place. She and the girl arrived at James' mother's around 4 or 4:15 pm. She heard someone in the bathroom. Diane said that it was James. She left.

   b. She told this to James' attorney.

JACQUELINE J. McCANN

Subscribed and sworn to before me
May 8, 2003.

_____
Notary Public, Wayne County, Michigan
My commission expires: _____