1          STATE OF MICHIGAN

2     IN THE THIRD JUDICIAL CIRCUIT COURT - (WAYNE COUNTY)

3   THE PEOPLE OF THE STATE OF MICHIGAN

4              -vs-              Circuit Court No.
                                   01-13853
5   JAMES ALFRED JONES,

6            Defendant(s).

7   _ _ _ _ _ _ _ _ _ _ _ _ _ _ /

8

9                  MOTION

10    Before the HONORABLE THOMAS E. JACKSON, Circuit Judge,

11      Detroit, Michigan, on Friday, December 19, 2003.

12

13  APPEARANCES:

14  For the People:        FRANK J. BERNACKI, (P-26352)
                           Assistant Prosecuting Attorney
15                         1441 St. Antoine
                           Detroit, Michigan 48226
16                         (313) 224-5777

17  For the Defendant:     JACQUELINE J. McCANN, (P-58774)
                           State Appellate Defender Office
18                         645 Griswold, Suite 3300
                           Detroit, Michigan 48226
19                         (313) 256-9833

20  REPORTED BY:           VERDA J. TURNER, RPR, CSR-0102
                           Official Court Reporter
21                         (313) 224-6921

22

23

24

25

1

ORIGINAL

1                                INDEX

2
WITNESSES:                                              PAGE
3
Leesa Frederick
4        Direct Examination by Ms. McCann                    4
         Direct Examination Continued by Ms. McCann          17
5

6   OTHER MATERIAL IN TRANSCRIPT

7   Closing Argument by Ms. McCann                           19
    Closing Argument by Mr. Bernacki                         26
8   Rebuttal Argument by Ms. McCann                          31

9                              EXHIBITS

10
    None marked
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        Detroit, Michigan
 2                Friday, December 19, 2003 - 11:39 a.m.
 3                       - -      - -      - -
 4            THE COURT:  We're calling docket number
 5     01-13853, the People of the State of Michigan versus
 6     James Jones.
 7                 For the People.
 8            MR. BERNACKI:  Oh, good morning, your
 9     Honor.  Frank Bernacki, assistant prosecuting attorney
10     appearing on behalf of the People.
11            MS. McCANN:  Good morning, your Honor.
12     Jacqueline McCann on behalf of James Jones.
13            THE COURT:  So we, Mr. Jones is being,
14     entering the courtroom now from the lockup, so he's
15     present.
16                 This is a continuation of a Ginther
17     hearing or a post-conviction hearing that initially
18     commenced I think on June the 27th earlier this year, and
19     we did have testimony from the defendant, from a Dianna
20     Jones, from a Juanita James and from a Anessah Broadnax,
21     A-N-E-S-S-A-H, B-R-O-A-D-N-A-X, and it was indicated at
22     that time that trial counsel was not able to be here
23     because of illness, some physical conditions, and this
24     was put off awaiting the opportunity for trial counsel to
25     be here.
```

3

```
 1                          Am I right with that?
 2                     MS. McCANN:  Yes, your Honor.
 3                     THE COURT:   Okay.  So are we ready to
 4      proceed now?
 5                     MS. McCANN:  We are.
 6                     THE COURT:   Okay.
 7                     MS. McCANN:  And we'll call Leesa
 8      Frederick to the stand.
 9                     COURT CLERK:  Give her your name.
10                     THE WITNESS:  Leesa Frederick.
11                     COURT CLERK:  Raise your right hand.
12                     Do you solemnly swear or affirm that the
13      testimony you're about to give in the matter now pending
14      will be the truth?
15                     THE WITNESS: I absolutely do.
16                     COURT CLERK:  You can we seated.
17                          LEESA FREDERICK,
18      called as a witness at 11:41 a.m., testified as follows:
19                          DIRECT EXAMINATION
20      BY MS. McCANN:
21  Q.  Good morning.  Could you state your name again for the
22      record, please?
23  A.  Leesa R. Frederick.
24  Q.  Thank you.  And we're glad that you could be with us here
25      this morning.
```

4

```
 1  A.  I'm glad to be here.

 2  Q.  Ms. Frederick, were you representing Mr. Jones in this

 3      matter in the trial level?

 4  A.  Absolutely.

 5  Q.  Do you recall --

 6                  THE COURT:  Let me ask that you pull that

 7      microphone closely just a little bit towards you.

 8                  THE WITNESS:  How's that?

 9                  THE COURT:  Okay, that's better.

10  Q.  (By Ms. McCann)  Do you recall when your representation

11      started in terms of the proceedings?

12  A.  I'd like to think that the proceedings started as far as

13      my representation on November 17th, which was around the

14      time Mr. Jones was taken into custody.

15                  MS. McCANN:  And I'm just refreshing my

16      memory on the year, your Honor.

17                  THE WITNESS:  That would have been 2002.

18  Q.  (By Ms. McCann)  2000 and?

19  A.  2.

20  Q.  2002.  Might it have been 2001 if the trial was in May of

21      2002?

22  A.  Oh, I'm sorry, it was.  Okay.

23  Q.  At that point when had you been admitted to practice law?

24  A.  May 2000.

25  Q.  What kind of experience did you have in terms of criminal
```

```
 1            representation at that point?
 2   A.   I had started at the Defender's Office as a public
 3        defender, and from there I started -- continued the
 4        public defense work through court appointments after
 5        leaving the Defender's Office and obviously picked up
 6        some retained work.  Mr. Jones was one of those cases.
 7   Q.   Had you had a murder case before?
 8   A.   No.
 9   Q.   When you learned the circumstances of the, of the
10        offense, the allegations against Mr. Jones, did you have
11        occasion to discuss potential defenses with him?
12   A.   Sure.
13   Q.   Can, can you tell us if a discussion about alibi
14        occurred?
15   A.   Yes, definitely.
16   Q.   What was your understanding regarding the terms of the
17        alibi defense?
18   A.   There were different alibi witnesses covering the same
19        period of time, I suppose.  The first thing that was
20        presented to me was that he was at his mother's
21        apartment, that he had been dropped there at
22        approximately 3:00 p.m. on the date of the incident by
23        his girlfriend, maybe give or take a half-an-hour.  I
24        think she said that she had an interview at 3:00, so she
25        probably obviously dropped him off before 3, and that he
```

```
 1          was there until she returned to pick him up.
 2     Q.   Do you remember what time frame that sort of went until?
 3     A.   From his mother she told me that during the time he was
 4          there after his being dropped off he made some lunch for
 5          her and she told me that she really couldn't recall
 6          because she was on some pain relievers or something, but
 7          she approximated it at 4:30.
 8     Q.   And that was mom?
 9     A.   That was, yes, his mother.
10     Q.   Did you -- of the people you talked to, maybe we can
11          start there, who did you talk to?
12     A.   I talked to Anessah Broadnax, who is the girlfriend.  I
13          talked to his mother Diane Jones. I guess maybe a month
14          or two later I spoke with his grandmother.  I tried to
15          contact another young lady.  I think it was Tamara.  I'm
16          not sure of the last name.  And then there was another
17          gentleman that came up just before trial, and I don't
18          remember his name either.
19     Q.   So this was, you were aware of this, say, before
20          preliminary examination or --
21     A.   Yes, I was.
22     Q.   Okay.  Was it -- what was your understanding as far as
23          where James went after leaving his mother's apartment and
24          who was with him?
25     A.   I think Anessah told me that they, after she picked him
```

7

1       up they went to Marvin Gardens in Southfield off of

2       Telegraph.

3   Q.  Did they tell you how long they were there or what time

4       frame that would have extended the alibi out to?

5   A.  I'm not even sure that I have a time, a precise time.

6       All I understand it to be is that after she picked him up

7       they went there and that they were always there.

8   Q.  And that they were always there?

9   A.  Yes.

10  Q.  So was it your understanding that it covered the time

11      frame of the alleged shooting?

12  A.  I guess you could say that.

13  Q.  Okay.  Did, did you intend to use the alibi or what was

14      your thinking in regard to it?

15  A.  It was a difficult situation with Ms. Broadnax.  I

16      definitely intended to use the alibi and any other

17      information I could use.  My goal was not to avoid using

18      some information that could have been helpful to him.

19      However, on the night that he was taken into custody I

20      spent more than seven hours with Ms. Broadnax, and we

21      discussed continuously what precisely happened, when it

22      happened, because I was trying to get a writ for him to

23      be released from custody because there was an issue as to

24      the way he was taken in.

25              Subsequently she changed her mind and, you

8

1   know, cried and had a lot of issues. I even asked her

2   mother -- James' mother to talk with her, because if this

3   story is true I need her to put the story before the

4   jury.

5               Well, she told me -- you know, obviously,

6   I needed that story to be true as his counsel, but she

7   told me continuously that, you know, I can't say that, I

8   won't say that. And I even, you know, went by her house,

9   took her to breakfast over at IHOP on Middlebelt, spent

10  several hours with her on that day, and then took her to

11  the mall to get employment interviews with people that I

12  knew that were in management, trying to help her, I

13  guess, settle down and just tell me what happened, trying

14  to help her out as a person as well. And even with a

15  subpoena she told me "I cannot, I cannot, I cannot".

16  Q.  When she was saying that did you interpret it as she was

17      too nervous to come to trial or that she -- how did you

18      interpret that?

19  A.  I obviously interpreted it two ways, either it could be

20      damaging to have her crumble and go to pieces in front of

21      the jury if she weren't telling the truth or that she was

22      going to, you know, have a breakdown and still would be

23      looked at as something that was false, so my inclination

24      was not to have her before the jury and then perjure

.25     herself and make him look like, you know, he's lying. My

9

```
 1          goal was obviously to have him acquitted and not to put

 2          forth information that might be considered false.

 3    Q.    So you were concerned that the jury wouldn't find it

 4          credible?

 5    A.    Right, because of her demeanor and her wavering and her

 6          refusal to testify.

 7    Q.    When did you reach that decision in your mind in relation

 8          to the trial?

 9    A.    Well, quite frankly I was concerned from the time I met

10          her, and I had asked his mother to kind of talk to her

11          and find, you know, just to find out where she was,

12          because she was -- I guess her personality -- I'm not a

13          psychologist, but I guess her personality was nervous, so

14          I felt like, okay, maybe she's just a little upset

15          because of the circumstance, so I kind of continued to

16          talk to her, work with her.  I met with her, had lunch

17          down here as well on one court date that Mr. Jones had,

18          just trying to see where she was and, you know.

19                      And then I also found the story credible,

20          but then when she told me I can't say that, I says what

21          do you mean.  She just said I can't, you know, and I'm

22          like, well, tell me what do you mean, do you mean you're

23          nervous, do you mean -- she said -- I said is it the, you

24          know, the victim's family, is that bothering you, and I

25          went into all of that with her, and she said it was that
```

```
 1        and I can't say that.

 2                    So I enlisted the assistance of his

 3        mother, and we pretty much had come to the conclusion

 4        once she's gonna testify, then no, she's not, then yes,

 5        she is.  And, you know, I didn't, you know, have an

 6        option at that point.  I didn't want her to testify like

 7        that.

 8   Q.   Did you consider putting on the alibi defense through the

 9        others without her?

10   A.   I had hoped to -- well, you might want to find out or ask

11        me what their information was, because it was disjointed

12        in the sense that his grandmother said that when she

13        dropped his sister off from school, Paris, that his

14        mother told him -- told her that James was there, and I

15        said okay, good, did you see him? No.  Did you talk to

16        him? No.  Then she asked me do you want me to lie.  I'm

17        like, what did you hear.  She said I heard water running.

18                         THE COURT:  Who said that?

19                         THE WITNESS:  His mot -- his grandmother.

20                         THE COURT:  Oh, okay.

21                         THE WITNESS:  Asked if I, you know, wanted

22        to suggest, you know, and I'm like no, did you hear him

23        or see him.  She said no, I just heard water running.

24        So, I mean, at that point that witness was -- so after I

25        talked to her I talked to his mother again and she told
```

11

1      me that the reason she couldn't testify for him was

2      because she was a former police officer and she had some

3      issues and I'm like, you know, you need to help me here,

4      did you -- do you know what time.  She says no, I was

5      sleep.  I'm like, okay, what time did you go to sleep.

6      She said I don't know.  I said was your daughter home.

7      She said no.  So that gives us some time around the 3:00

8      window.  He was there at that time.

9                      So I was able to put him there between the

10     time Anessah dropped him off and maybe the time the

11     grandmother dropped his sister off but she didn't see

12     him, she didn't talk to him, so I was really -- I mean, I

13     couldn't piece it together without Anessah.

14  Q.  (By Ms. McCann)  All right, so you could put him there

15     when, by his testimony when Anessah dropped him off?

16  A.  Right.

17  Q.  And by grandma's testimony or mom's testimony as to --

18  A.  How long he stayed.

19  Q.  How long he stayed. Okay.

20                      Did you say that mom didn't want to

21     testify?

22  A.  She told me that she couldn't, and I asked her why and

23     she explained to me some issues that she had, some

24     residual issues she had with the police department.

25  Q.  Was that in terms of she felt had harassment of the

12

1     police department as a former employee?

2  A.  I believe that and some other -- you know, we didn't

3     really get into it.  I mean, she may have expressed it

4     but it wasn't noteworthy because it, you know, it seemed

5     like a real block to where I was trying to go, so I know

6     that she said, you know, she had a problem, and so I felt

7     like if she wasn't willing or able, because she fell back

8     on the position that she was sleep because of the

9     medication.  So, I mean, between that and the issue of

10    the police department --

11  Q.  When did you communicate to James, the defendant, that

12    you weren't going to be using the alibi?

13  A.  Continuously.  I mean, I told him we need, you know, we

14    need to talk to Anessah and get her to testify, tell her,

15    you know, talk to her if she comes to visit you, you

16    know, explain to her that she needs to, you know, if it's

17    a courage issue she needs to, she needs to get some

18    because this is serious.  If she was with you during the

19    time this occurred or she dropped you and picked you up,

20    I need her to do that, to say this.

21              She was visiting him so I was hoping that

22    he would be able to get her to testify, and apparently

23    not, because she was even here during the trial.  Asked

24    again and same response.  And with her, I guess,

25    interaction with him and his family and me, if that

13

1    wasn't enough to encourage her to tell the, you know,

2    what she knew as far as the time issue, I don't know what

3    else there was for me to do.

4  Q.  Did there come a point where they wanted to release you

5      as the attorney?

6  A.  Absolutely.

7  Q.  Do you recall when in the proceedings that was?

8  A.  If I'm not mistaken, it might have been like the last

9      pretrial -- no, I actually think it was -- yeah, it was

10     the last pretrial hearing.  There was a mention of a Mr.

11     Terrell Thomas, and I put that, you know, motion before

12     the Court, because at that point if they were

13     dissatisfied with the decisions I was making then I had

14     no problem.

15             In either case, I had held the Wade

16     hearing and do what I could do for him.  I couldn't

17     control his alibi witness, and I understand the

18     constraints of his particular opinion and circumstance,

19     but there was nothing that I could do to make Ms.

20     Broadnax be a good witness for him, so I absolutely put

21     the motion before the Court that I had asked to be

22     withdrawn as his attorney and that was denied, so I

23     proceeded.

24             MS. McCANN:  May I have one minute, your

25     Honor?

14

1                  THE COURT:  Yes, you may.

2                  (Pause in the proceedings)

3   Q.  (By Ms. McCann)  Did you ever subpoena Ms. Broadnax?

4   A.  I handed her a subpoena on the morning we went to

5       breakfast, yes.

6   Q.  Okay, and the morning you went to breakfast was?

7   A.  I picked her up at her house, I think it was on Archdale

8       and Plymouth Street or something, took her to breakfast

9       with me.  I physically handed it to her.  I didn't even

10      bother to mail it.

11  Q.  Was that prior to trial?

12  A.  Absolutely, yeah.

13               MS. McCANN:  All right, I don't have any

14    other questions at this time, your Honor.

15              THE COURT:  Very well.

16              Do you, Mr. Bernacki?

17             MR. BERNACKI:  I don't have any questions,

18    your Honor.

19              THE COURT:  Thank you, Ms. Frederick,

20    thank you.

21            (At 11:57 a.m., witness excused)

22             MS. McCANN:  Could I have a brief

23    adjournment, your Honor, to discuss with Mr. Jones?

24             THE COURT:  Yeah, sure.  What do you mean,

25    a brief adjournment?  You mean like now?

```
 1                    MS. McCANN:  Yeah, like five minutes.
 2                    THE COURT:  Oh, oh, okay.  I thought you
 3       meant something beyond today.  Okay, you've got some time
 4       here.  We're not in a big hurry.
 5                    MR. BERNACKI:  Especially in relation to
 6       this case.
 7                    THE COURT:  I want to try to get it all
 8       done today if we can, so let me know when you're ready.
 9                    MS. McCANN:  Thank you, your Honor.
10                    THE COURT:  Okay.  All right.
11                    (At 11:57 a.m., recess held)
12                         --    --    --
13                    (At 12:16 p.m., proceedings continued)
14                    COURT CLERK: Back on record with James
15       Jones.
16                    MS. McCANN:  Thank you, your Honor.
17       Jacqueline McCann on behalf of James Jones again.
18                    THE COURT:  Proceed on, please.
19                    MS. McCANN:  Your Honor, we're going to
20       recall Ms. Fredrick for a few questions.
21                    THE COURT:  Why?
22                    MS. McCANN:  The areas that I didn't cover
23       that were raised in the motion about the failure to call
24       the lineup attorney at the trial and the failure to call
25       Mr. Jones at the Wade hearing.
```

16

1           THE COURT: Okay, I'm not going to like,
2    you know, keep bringing this up and over again. You put
3    the witness on the witness stand. You had a chance to
4    ask these questions. Okay, I'm not going to take the
5    time here, you know, to be going over and over this
6    again. I thought we were finished with her. She could
7    have been excused. She could have been gone.
8           MS. McCANN: And I literally have two
9    questions, your Honor.
10          THE COURT: Go ahead back to the witness
11   stand, please, Ms. Frederick, please, okay.
12          MS. McCANN: Thank you, your Honor.
13          DIRECT EXAMINATION CONTINUED
14   BY MS. McCANN:
15   Q.  Ms. Frederick, can you tell us your decision-making,
16       decision-making process in not calling Dennis Shrewsbury,
17       the lineup attorney at the trial that you had called at
18       the Wade hearing?
19   A.  Right. Mr. Shrewsbury was the assigned lineup attorney.
20       The reason, reasons that I thought it might be kind of
21       risky to call him is because through his
22       cross-examination and the rebuttal witnesses came the
23       information that the origin of the pictures was for the
24       previous conviction for carrying a concealed weapon, so I
25       didn't want to gamble with the fact that Mr. Jones was

17

1    presently on probation for carrying a concealed weapon

2    getting before the jury on a gun case, or murder case,

3    rather, so that was the reason that I decided to back off

4    of that one.

5  Q.  Okay.  And can you tell us your thinking in making your

6    decision not to call Mr. Jones at the Wade hearing to

7    testify as he did at the trial, that he did not have any

8    type of relationship with these individuals that would go

9    to an independent basis for the identification?

10  A.  I'm not sure which particular court appearance we had.  I

11    think it was one of the initial, maybe even the first,

12    and his Honor was kind of concerned about and made a

13    comment regarding having placed him on probation and now

14    you've gone out and killed somebody, so I kind of thought

15    that there was going to be some issue as to whether or

16    not his Honor would take Mr. Jones' testimony as being

17    truthful, whether there would be some contention between

18    the two, and obviously I needed the Judge to render a

19    decision.

20             MS. McCANN:  Thank you.

21             MR. BERNACKI:  I have no questions, your

22    Honor.

23             THE COURT:  Thank you.

24             Let's make sure.  Is there anything else

25    that you're going to need to ask?

1      MS. McCANN:  No, your Honor, thank you.

2      THE COURT:  All right, thank you.

3      I want to try to get all the testimony in

4  here if we can, okay, please.

5      MS. McCANN:  We have no more witnesses,

6  your Honor.

7      THE COURT:  Do you have anybody to call,

8  Mr. Bernacki?

9      MR. BERNACKI:  No, your Honor.

10      THE COURT:  Okay.  I recognize that with

11  the time span between the last time that we were here,

12  you know, in this there's a gap there, but I think there

13  was a transcript produced of the last proceedings so you

14  had that testimony, so if you can kind of put it

15  altogether in argument for me right now?

16      MS. McCANN:  Yes, your Honor.

17      THE COURT:  Okay, let's do that then.

18      MS. McCANN:  Well, your Honor heard Mr.

19  Jones, the defendant testify, Anessah Broadnax, the

20  girlfriend, ex-girlfriend testify, the mother Diane Jones

21  and the grandmother Juanita James at the last hearing.  I

22  think your Honor can take notice that their testimony was

23  credible.  Ms. Broadnax while nervous when subpoenaed by

24  court order did appear and did testify and did cover the

25  time period.

19

1    And Ms. Frederick testified that despite
2    all of Ms. Broadnax's nervousness and hesitation to
3    testify, that she herself found her to be credible but
4    she was concerned that the jury might not.
5         Your Honor, she was a credible witness and
6    that was a determination that should have been left for
7    the jury in a first degree murder case where miss-
8    identification was being run as the main defense. The
9    alibi can only help you, and, you know, if for some -- if
10   she absolutely couldn't put on Ms. Broadnax and take that
11   chance in her own mind, then certainly she could have put
12   on James and his mother and grandma to cover the time
13   frame. Wouldn't have taken him as far out into the
14   evening, but it would have taken him past, well past the
15   5 p.m. shooting time.
16        You heard Juanita James come in as the
17   grandma and admit straightforwardly that she didn't see
18   James that day. She came into the apartment, she heard
19   the water running. You know, her daughter had told her,
20   you know, it was a running family joke, as you heard,
21   that James was known to take these long showers. She
22   knocked on the door, yelled to him but never actually
23   laid her eyes on him. You had the testimony from James
24   Jones that, you know, he heard the knocking and basically
25   saw her but grandma didn't see him, and nobody tried to

20

1    beef that up in any way.

2                    I mean, their testimony now is almost two

3    years later, so if you go back, your Honor, and you read

4    the transcript you will be able to pick out minor

5    discrepancies between their testimony, but the core of it

6    covers the time frame.  And as I read prosecutors say all

7    the time that in closing statements, you know, if all of

8    our witnesses got up and said the exact same thing then

9    you would know it was scripted and then you would worry,

10   and the same thing is true here.  But the broad stroke in

11   the alibi was there, minor details on the fringes may

12   have been different.  And again, your Honor, this is a

13   first degree murder case where misidentification was

14   being run. The alibi can only help.

15                   Now, in regard to the failure to call the

16   lineup attorney at trial, your Honor, he testified before

17   you at the Wade hearing and I -- gave the most damaging

18   testimony to the prosecution in terms of he felt it was a

19   very suggestive lineup, different hair -- you know, Mr.

20   Jones was the only one with a different hairstyle, he was

21   the only one in a T-shirt while all the others had on, I

22   believe like jackets, and I think he said he was the only

23   clean shaven one.

24                   Now, he also testified at that Wade

25   hearing about a statement made by the second witness

                           21

1    that, that he didn't actually identify Mr. Jones as the

2    shooter, that when he came in and they asked him he

3    identified No. 3 and he said when they asked him what No.

4    3 did, who was Mr. Jones, he said nothing, the guy that

5    just left out of here said he was driving, and that he

6    then said that is the guy she showed us pictures of, that

7    being Joann Miller, the Officer-in-charge, that he never

8    actually said this is the man I'm identifying as the

9    driver.

10                Now, at trial when that gentleman

11   testifies, he testifies that he did identify Mr. Jones as

12   the driver on the first past when he was at that lineup.

13   And when Ms. Frederick (sic) goes to question Joann

14   Miller, the Officer-in-charge about that statement, Joann

15   Miller testifies that the witness made that statement at

16   the lineup, that he did say, he said those things about,

17   you know, the other witness had told him he was driving

18   and that he had been shown the picture, but that he also

19   said that is the guy I saw driving.

20                Now, Ms. Fredericks was left to say at

21   Page 13 of Volume 3, I believe, you know, well, I didn't

22   hear that, I was at the lineup, but of course she's not a

23   witness, so, and Ms. Miller goes on to say, well, I heard

24   it.  Now, Mr. Shrewsbury could have testified regarding

25   what he heard and that he did not hear that and could

22

1  have testified consistent with his testimony at the Wade
2  hearing.
3          As to Ms. Fredericks' concerns about your
4  Honor somehow letting in information that, that Mr. Jones
5  had this prior conviction for CCW and that's how they
6  obtained his picture for when Ms. Miller showed the
7  picture to the boys before they came to the lineup, I
8  don't see how that would have come in, and certainly it
9  would have been more prejudicial than probative and I
10  don't see how your Honor would have allowed that to come
11  out.
12          In regard to her decision not to put Mr.
13  Jones on the stand at the Wade hearing, you know, without
14  the jury, in front of you, that went very much, your
15  Honor, to the independent basis.  Martin and I believe
16  the other witness testified that they had contact the
17  year before with the defendant, throughout that year
18  before so that he was known to them, and I believe Mr.
19  Martin even said that, you know, they had smoked either
20  dope or cigars or something together.
21          Now, Mr. Jones testified at this Ginther
22  hearing that that was just blatantly untrue, that he had
23  no relationship with these people and certainly didn't
24  smoke anything with them or have that kind of contact
25  with them that they were claiming to you, and had that

23

1      testimony been presented at the Wade hearing your Honor

2      might have found very well that there was not an

3      independent basis.

4              If you recall the facts of this case, your

5      Honor, Mr. Jones was robbed a day or two before the fatal

6      shooting and the prosecutor's theory was that Mr. Jones

7      had a motive to go after this group of young men on that

8      corner because he felt that they had been involved in the

9      robbery. Well, that works both ways, your Honor.  Those

10     young men, whether or not they may have been involved in

11     the robbery or they may not have, but they knew that Mr.

12     Jones associated them with it.  So when somebody came

13     driving by and shooting at them, they had a motive to

14     misidentify and to say out of good conscious or out of

15     bad faith, to think that it was Mr. Jones in that car

16     because he was the one, you know, that just the day

17     before had been robbed and was trying to blame them for

18     it.

19             So whether they out of a bad faith, there

20     seemed to be some kind vendettas and rivalries going on

21     between these people, or whether out of just a

22     subconscious, you know, he's the go that's after us, they

23     had a motive or a reason to misidentify him, good faith

24     or bad faith, and so Mr. Jones' testimony that there was

25     no independent basis would have gone to that.

24

1        And that just ties back into the whole
2    alibi, your Honor.  There was, there was a valid mis-
3    identification defense and the alibi could only have
4    helped.  It was not a reasonable decision not to present
5    it at all, certainly.  We believe that Ms. Broadnax was a
6    credible witness, although she was nervous.

7        As the prosecutor often says, you know, we
8    don't get to choose our witnesses, your Honor, that to
9    the jury, we don't get to choose our witnesses, we have
10   to bring in criminals or whoever observed the events and
11   we have to put them on and then we let you the jury
12   decide who's credible.

13       In the same vein in this case the defense
14   had the choice of putting on a nervous witness, and Ms.,
15   Ms. Fredericks chose not to do that, and by doing that
16   she also then went on to choose to get rid of the alibi
17   entirely as opposed to just excising Ms. Broadnax.

18       THE COURT:  You cannot -- I believe I
19   heard more than just somebody being a nervous witness.
20   It was almost like she decided that she didn't want to
21   testify based on what defense counsel said.  There was
22   more stated than just somebody being nervous.

23       MS. McCANN:  Yes, that she didn't want to
24   come in, she don't want to testify, but I heard counsel
25   say that it was, she wasn't sure, you know, she could

25

1    never pin her down as to exactly why that was but it that

2    it seemed to her it was out of this nervous personality

3    and that she did find her credible. So at this point,

4    your Honor, we would be asking you to grant the new

5    trial.

6            And at this Ginther hearing Ms. Broadnax

7    testified consistent with her conduct here that had she

8    been actually called to the stand, though she was nervous

9    about that, she would have testified as she did here, so

10   we ask the Court for a reversal on those grounds.

11           THE COURT: Thank you, Ms. McCann.

12           Go ahead, Mr. Bernacki.

13           MR. BERNACKI: I think I've set forth in

14   my written pleadings what the standard is, and the

15   standard is they have to show that the defense counsel

16   through their inadequate representation deprived the

17   defendant of a substantial defense that would have

18   probably lead to a different conclusion, which in this

19   matter would have been an acquittal.

20           In relation to the issues raised, A, you

21   would first have to believe that Mr. -- I was going to

22   say Mr. Broadnax, but if the defendant had testified at

23   the Wade hearing that you would have suppressed the

24   identification based on that representation. That's how

25   that would have changed. I don't believe that's true.

26

1    It a credibility issue at that particular thing, at that

2    particular juncture and it's his choice.

3             Again as to Mr. Broad -- as to the

4    defendant testifying at trial, it was his choice.  The

5    record is clear.  You questioned him then and we've

6    questioned him here in court.  He again said it was his

7    choice.  He might have been advised not to do it but it's

8    his choice, it's not the attorney's choice, and it was

9    clearly made present there.  After the fact I'm sure he

10    would have liked to have testified, but we don't get two

11    shots at it.

12             THE COURT:  Did I ask the defendant at

13    trial about testifying?

14             MR. BERNACKI:  Yes.  There was a, you

15    know, there was a colloquy there.  I don't know if it was

16    through the attorney or --

17             THE COURT:  I know I have a habit of

18    making that kind of record when they do not testify.  I

19    just wanted to make sure.

20             Go ahead.

21             MR. BERNACKI:  The proposition that quote,

22    "an alibi couldn't have hurt" I think is absurd.  Alibis

23    often hurt defendants.  Alibis are some of the worst

24    things to put on the stand because you create the issue

25    not just to whether there's sufficient evidence, whether

1    those people are correct, whether the prosecution is

2    telling the truth, it becomes often a question of, oom,

3    who's lying here. I don't know necessarily where that's

4    a great defense to put on. I don't know whether, and I

5    think it should be cautiously put on.

6            I think it is absurd to say that if you

7    have a witness and the key witness saying "I can't say

8    that" and you think that person is going to say that on

9    the stand, that it would be ineffective to put that

10   person on the stand. Was he with you on that day; I

11   can't say that. And if you look through her testimony

12   you notice she is unclear about what day she is talking

13   about, because there's different days here. There's the

14   day that he was robbed and he was called off to have a,

15   to view a lineup, and at that time I think he was

16   arrested and placed in a lineup himself.

17           And the day upon which he was arrested,

18   there's a span of two or three days there. I think it's

19   from the 15th to the 18th, and she was always unclear

20   about what day she was talking about. She couldn't --

21   she says she remembers specifically the day in question,

22   which was the 15th. I asked her extensively what did you

23   do the day before, what did you do the day after; I don't

24   remember. I mean, we basically do the same thing

25   everyday.

28

1        How do you remember that day?

2        Because he was arrested.  He got taken

3   away from me that day.

4        He didn't get taken away from her on the

5   day that the murder occurred.  That's the day he got

6   arrested, right, I asked.  She said yes.

7        So you're telling me about the day he got

8   arrested.

9        You know what, that's not the day he got

10  arrested.  It was the day after that, and the lawyer

11  asked me what I did and I don't remember what I said the

12  day before he got arrested.  So I asked her, he got

13  arrested the day after?  "I'm not sure, I can't

14  remember".  That's the sort of testimony that she had

15  here that's going to change this case.  It isn't.  It

16  isn't so.

17       The grandmother can't provide anything.

18  She testified about some water running.  And even from

19  the attorney here said you want me to lie, suggesting,

20  you know, what else should I say.  I don't think that's

21  proper to put that sort of a witness on there either.

22       And the, and the attorney Ms. Fredericks

23  indicated the mother said she was asleep at the time,

24  therefore saying that, yes, he was over there visiting on

25  that day, which was an area close to where this robbery

29

1   occurred, within a mile or so, mile-and-a-half, not too

2   far away, and yet couldn't account for him after a period

3   of time, 3:00 in the afternoon.

4              An attorney in his representation which

5   makes decisions, make the decisions that it's a trial

6   strategy as to who to present.  Counsel says we, you

7   know, we don't get to choose.  Yes, they do get to

8   choose.  You can choose who you present, and to present

9   these witnesses would have not made a difference in this

10  case.  There was no prejudice as to that.  There is not

11  even a defense here, 'cause the key witness says "I can't

12  say that", that the very simple proposition right after

13  the incident happened, not two years later where I'm

14  asking her what did you do the day before, the day after,

15  she can't say at that time, and she says it continuously

16  to the attorney representing him.

17             Even with her, the attorney's coaxing of

18  her, trying to get her a job, taking her to lunch and

19  everything, trying to relax her, I can't say that I, you

20  know, I was with him at that time, therefore there was no

21  ineffective assistance there.

22             In relation to calling Mr. Shrewsbury, she

23  said talk about here, he could get up there and say, you

24  know, I thought it was suggestive, I thought it was this.

25  Those are legal conclusions.  If you're going to do that,

30

1    then it's my supposition and I think it would be

2    perfectly proper to say, well, isn't it true that the

3    Judge in fact ruled that this was proper to admit here.

4    That's a legal conclusion.  He can describe what went on.

5    He can't, he cannot render legal opinions.  It's not his

6    position to render legal opinions, and if he renders a

7    legal opinion then you have the identification fortified

8    by the fact to say, yes, the Judge admitted it, he heard

9    all this and the Judge admitted it, he ruled it and said

10   he admitted it.  Is that going to be helpful to your

11   case?  Well, that just bolsters it.  In fact, there's

12   already been a ruling on it.

13                 The representation here by counsel was

14   more than, was more than adequate.  She worked with what

15   she had.  She presented a logical, vigorous defense, but

16   the fact that it did not work is in fact, doesn't render

17   it ineffective, because in fact it was.  So based on the

18   evidence that was produced at the trial, the evidence

19   that was produced at this hearing as well as the legal

20   standard, we would ask you to deny this motion.

21                 THE COURT:  Thank you.

22                 Ms. McCann, go ahead, please.

23                 MS. McCANN:  Thank you, your Honor.

24                 With regard to Anessah Broadnax, your

25   Honor, counsel did testify that she made the statement "I

31

1 can't say that".  She didn't testify that she knew what

2 that meant.  She interpreted it as nervousness and that

3 she found the woman credible.  Counsel didn't ask any

4 questions beyond that of her on cross-examination. There

5 was none.

6       He did -- when Ms. Broadnax testified here

7 the prosecutor did try to shake her about the day, but if

8 you read her testimony in the transcript, I think on one

9 occasion she used the date the 16th but it was clear in

10 the rest of her testimony that she was talking about the

11 day of the shooting incident, and she was quite a strong

12 witness on that.

13       Regarding the grandma, Juanita James and

14 her comment to counsel, you know, what do you want me to

15 do, lie, or do you want me to lie, I think if you recall

16 Ms. James here, your Honor, and her personality, that

17 that was more in, in sort of a way of, you know, that's

18 what I saw, what do you want me to say, you know, that's

19 all I can testify to, and that's all she testified to

20 here.

21       THE COURT:  Her last name was James but

22 you said Jones, right?

23       MS. McCANN:  The mother's name is Diane

24 Jones and the grandma's name is Juanita James.

25       THE COURT:  Oh, I'm sorry, Juanita James,

1     okay.

2               MS. McCANN:  Regarding Shrewsbury, your

3     Honor, I'm not suggesting that he should have been asked

4     about his legal conclusion of whether the lineup was

5     suggestive.  I'm saying that he should have been,

6     testified to the factual things of what happened, why,

7     you know, how he was different; the hair was different,

8     the T-shirt was different and clean shaven, and most

9     importantly, the statements that the witnesses made at

10    that lineup, not about his legal conclusion that it was

11    suggestive.  That's a Wade hearing matter, but about the

12    factual matters that he testified to.

13              In regard to the burden, your Honor, the

14    burden is not that it probably would have made a

15    difference.  Strickland specifically says that our burden

16    is not that high.  It is reasonable probability.

17              This case boils down to an identification

18    case.  Two witnesses came in and said Mr. Jones was the

19    driver of the car.  Now, the way to attack that is

20    through that Wade hearing.  I'm not suggesting that

21    counsel didn't do anything in this case.  She had a Wade

22    hearing, lost that on independent basis because she

23    didn't call Mr. Jones because she feared your Honor,

24    because you had made some comment at an earlier hearing

25    that you had a predisposition to disbelieve him.  I think

1    she was underestimating you.

2            In regard to having Shrewsbury testify at

3    the trial, those were about factual matters, and counsel

4    had to rely on her own statement in front of the jury

5    during a question of, you know, well, I didn't hear that,

6    I was there, but she's not a witness and that's not

7    evidence.  Mr. Shrewsbury could have provided that

8    evidence.

9            I think it was a lack of experience in

10    that it was the first murder case, your Honor, but the

11    alibi has to come in.  If you want to excise Ms. Broadnax

12    then do that, but you got to put on mom, grandma and Mr.

13    Jones.  When there's just two people who have a potential

14    motive to misidentify or potential reason to misidentify

15    in good faith and you have Mr. Jones' testimony that he

16    was at a different location, that has to come in and go

17    to the jury.  Thank you.

18            THE COURT:  Thank you, Ms. McCann.

19            Obviously I will need to review the entire

20    transcript of the testimony that was taken back on June

21    27th and in combination with that that was done today,

22    and hopefully I'll be able to take a couple of days

23    during the break here to do that and render an opinion

24    and issue an order on this so it can move on or whatever

25    else needs to be done with that.  So I'll take it under

1   advisement and hopefully have some decision within a

2   couple weeks or less.

3                   Thank you all for your time and your

4   patience and we got this finally on a timeline.  Thank

5   you all.

6                   MS. McCANN:  Thank you, your Honor.

7                   Just a housekeeping matter, your Honor.

8   Could we get an order for this transcript?

9                   THE COURT:  Yeah, please, yeah.  Order the

10  transcript on this, please.  I don't know what needs to

11  be done, but I want the transcript for the hearing today

12  as soon as possible.

13                  (At 12:41 p.m., proceedings concluded)

14                      --   --   --

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF MICHIGAN   )
2                        )  ss.
3    COUNTY  OF  WAYNE   )
4
5            I, VERDA J. TURNER, RPR/CSR-0102, an Official
6    Court Reporter in and for the Third Judicial Circuit
7    Court, Criminal Division, State of Michigan, do hereby
8    certify that the foregoing pages 1 through 36, inclusive,
9    were prepared by me in the matter of **JAMES ALFRED JONES**,
10   Case Number 01-13853, on December 19, 2003, and was
11   reduced to typewritten form by means of Computer-assisted
12   Transcription, and comprise a full, true and accurate
13   transcript of the proceedings had in the above-entitled
14   cause.
15
16
17                                  Verda J. Turner, RPR/CSR-0102
                                    Official Court Reporter
18
19        Date
20
21
22
23
24
25

36